No. 26-30203

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF LOUISIANA, BY & THROUGH ITS ATTORNEY GENERAL, LIZ MURRILL; ROSALIE MARKEZICH,

*Plaintiffs-Appellants,*

v.

FOOD & DRUG ADMINISTRATION; MARTY MAKARY, COMMISSIONER, U.S. FOOD AND DRUG ADMINISTRATION; RICHARD PAZDUR, IN HIS OFFICIAL CAPACITY AS DIRECTOR, CENTER FOR DRUG EVALUATION & RESEARCH, U.S. FOOD & DRUG ADMINISTRATION; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendants-Appellees.*

v.

DANCO LABORATORIES, L.L.C.; GENBIOPRO, INCORPORATED,

*Intervenors-Appellees.*

On Appeal from the United States District Court
for the Western District of Louisiana (No. 6:25-cv-01491)
The Honorable David C. Joseph, U.S. District Judge

## BRIEF OF LEGAL VOICE AS *AMICUS CURIAE* IN OPPOSITION TO THE PLAINTIFFS-APPELLANTS' MOTION FOR § 705 STAY OR INJUNCTION PENDING APPEAL

Julia Marks
LEGAL VOICE
907 Pine Street Suite 500
Seattle, WA 98101
Tel (206) 682-9552
jmarks@legalvoice.org

Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel (202) 624-2500
dwolff@crowell.com

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/ Daniel W. Wolff
Daniel W. Wolff

Amicus:

Legal Voice

Counsel:

For Amicus:
 Daniel W. Wolff of Crowell & Moring LLP
 Sharmistha Das of Crowell & Moring LLP
 Rachel S. Lesser of Crowell & Moring LLP
 Karen Mawdsley of Crowell & Moring LLP
 Madeline P. Reyes of Crowell & Moring LLP
 Julia Marks of Legal Voice
 Robin Turner of Legal Voice

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ II

INTEREST OF AMICUS CURIAE ................................................ 1

INTRODUCTION ......................................................... 1

ARGUMENT ............................................................ 2

I.   SURVIVORS OF IPV NEED ACCESS TO REPRODUCTIVE
     HEALTH CARE. ................................................. 2

     A.   Abusers Exert "Coercive Control" in Many Forms, and
          Systemic Inequities and Barriers Exacerbate the
          Impacts of Coercive Control ............................... 2

     B.   Abusers Interfere with Survivors' Reproductive
          Choices, Including Coercing and Forcing Victims into
          Unwanted Pregnancies .................................... 5

     C.   After Experiencing Reproductive Coercion, Survivors
          May Seek Abortion Care .................................. 7

II.  REDUCING ACCESS TO MIFEPRISTONE WILL HAVE
     GRAVE CONSEQUENCES FOR IPV SURVIVORS ..................... 9

III. REINSTATING THE IN-PERSON DISPENSING
     REQUIREMENT WILL NOT PREVENT REPRODUCTIVE
     COERCION BUT WILL HARM IPV SURVIVORS ................... 11

CONCLUSION ......................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Dallas v. Delta Air Lines, Inc.*,
847 F. 3d 279 (5th Cir. 2017) ............................................................... 9

**Other Authorities**

Alexandra Thompson et al., *The Disproportionate Burdens of the Mifepristone REMS*, 104(1) Contraception 16 (2021) ................. 11

Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008, Annual Rates for 2009 and 2010* (2011), http://bjs.gov/content/pub/pdf/htus8008.pdf ........................... 8

Beth A. Bailey, *Partner Violence During Pregnancy: Prevalence, Effects, Screening, and Management*, 2 Int'l J. Women's Health 183 (2010) ................................................................ 8

Claudia Garcia-Moreno et al., *Understanding and Addressing Violence Against Women: Intimate Partner Violence* 1 (2012), World Health Organization, http://apps.who.int/iris/bitstream/10665/77432/1/WHO_RHR_12.36_eng.pdf. ................................................................ 3

Corinne Peek-Asa et al., *Rural Disparity in Domestic Violence Prevalence and Access to Resources*, 20 J. Women's Health 1743 (Nov. 2011) ..................................................................... 5

Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6167003/pdf/heq.2017.0045.pdf ................................................................ 8

Denise D'Angelo et al., *Rape and Sexual Coercion Related Pregnancy in the United States*, 66(3) Am. J. Prev. Med. 389-398 (2024) ............................................................................ 6

Dhaval Dave et al., *Abortion restrictions and intimate partner violence in the Dobbs Era*, 104 J. Health Econ. 103074 (2025) ......................................................................................... 10

Elizabeth Miller et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy*, 81(4) Contraception 316 (2010) .............................................................................. 5

Elizabeth Tobin-Tyler et al., *How State Antiabortion Lawsuits and Increased Surveillance Empower Domestic Abusers*, 334(4) JAMA 297 (2025) ................................................... 5

Ema Alsina et al., *Interventions to Prevent Intimate Partner Violence: A Systematic Review and Meta-Analysis*, 30(3-4) Violence Against Women 953-980 (2024), https://pubmed.ncbi.nlm.nih.gov/37475456/ ...................................... 11

Erika Sussman & Sara Wee, *Accounting for Survivors. Economic Security: An Atlas for Direct Service Providers, Map Book One*, Ctr. for Survivor Agency & Just. 1 (2016), https://csaj.org/wp-content/uploads/2021/10/Accounting-for-Survivors-Economic-Security-Atlas-Mapping-the-Terrain-.pdf .................................................................................. 4

Gunnar Karakurt et al., *Mining Electronic Health Records Data: Domestic Violence and Adverse Health Effects*, 3 J. of Fam. Violence 79 (2017) ................................................................. 7

Heike Thiel de Bocanegra et al., *Birth Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters*, 16 Violence Against Women 601 (2010).............. 6, 7

Jamila K. Stockman et al., *Intimate Partner Violence and Its Health Impact on Disproportionately Affected Populations, Including Minorities and Impoverished Groups*, 24 J. Womens Health (Larchmt) 62 (2015)..................................... 3

Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA 1915 (1996) .............................................. 8

Julie Goldscheid, *Gender Violence and Work: Reckoning with the Boundaries of Sex Discrimination Law*, 18 Colum. J. Gender & L. 61 (2008).............................................................. 4

Karla Fischer et al., *The Culture of Battering and the Role of Mediation in Domestic Violence Cases*, 46 SMU L. Rev. 2117 (1993) ............................................................................ 3

KT Grace and JC Anderson, *Reproductive Coercion: A Systematic Review*, 19 Trauma Violence Abuse 371-390 (2018) .................................................................................. 5

Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women.s Use of Contraception: A Systematic Review and Meta-Analysis*, PLoS One 10(2): e0118234 (2015), https://journals.plos.org/plosone/article?id=10.1371/journa l.pone.0118234 .............................................................. 5

Louisiana Dep't of Health, *Louisiana Pregnancy-Associated Mortality Review: Maternal Mortality in Louisiana 2020 Report* 13-14 (2024), https://ldh.la.gov/assets/oph/Center-PHCH/FamilyHealth/2020_PAMR_Report_April2024.pdf................. 8

Maeve Wallace et al., *States' Abortion Laws Associated With Intimate Partner Violence-Related Homicide Of Women And Girls In The US, 2014-20*, 43(5) Health Aff (Millwood) 682 (2024) ...................................................................... 9

Maeve Wallace, *Trends in Pregnancy Associated Homicide, United States 2020*, 112 Am. J. Public Health 1333-36 (2022) ................................................................................ 8

Megan Hall et al., *Associations between Intimate Partner Violence and Termination of Pregnancy: A Systemic Review and Meta-Analysis*, PLoS Med. 11(1): e1001581, 2 (2014)................... 7

Melisa M. Holmes et al., *Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women*, 175 Am. J. Obstetrics & Gynecology 320 (1996) ................... 7

Melissa E. Dichter et al., *Coercive Control in Intimate Partner Violence: Relationship with Women.s Experience of Violence, Use of Violence, and Danger*, Psych. of Violence 8(5), 596-604, Am. Psych. Ass'n (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6291212/ .......................... 4

Nat Stern et al., *Unheard Voices of Domestic Violence Victims: A Call to Remedy Physician Neglect*, 15 Geo. J. Gender & L. 613 (2014) ................................................................. 7

Natalie J. Sokoloff & Ida Dupont, *Domestic Violence at the Intersections of Race, Class, and Gender: Challenges and Contributions to Understanding Violence Against Marginalized Women in Diverse Communities*, 11 Violence Against Women 38 (2005) ............................................... 4

National Domestic Violence Hotline, *Reproductive Coercion and Abuse Report* 8, https://www.thehotline.org/wp-content/uploads/media/2025/04/ReproductiveCoercionAnd AbuseReport.pdf ............................................................... 6

Phyllis Holditch Niolon et al., *Preventing Intimate Partner Violence Across the Lifespan: A Technical Package of Programs, Policies, and Practices*, Nat'l Center for Injury Prevention & Control, Division of Violence Prevention (2017), https://stacks.cdc.gov/view/cdc/45820 .................................... 11

Ruth Leemis et al., *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 1 (2022), Ctrs. For Disease Control & Prevention, https://www.cdc.gov/nisvs/documentation/NISVSReporton IPV_2022.pdf .................................................................... 3

Sarah CM Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1 (2014), https://pubmed.ncbi.nlm.nih.gov/25262880 .......................................... 7

Shaina Goodman, *Intimate Partner Violence Endangers Pregnant People and Their Infants*, National Partnership for Women and Families (May 2021), https://nationalpartnership.org/report/intimate-partner-violence/#:~:text=Pregnancy%20can%20often%20be%20an ,both%20maternal%20and%20infant%20health ............................... 8

*Violence Against Women*, World Health Organization (Mar. 9, 2021), https://www.who.int/news-room/fact-sheets/detail/violence-against-women .................................................. 3

Yvonne Lindgren, *The Doctor Requirement: Griswold, Privacy, and at-Home Reproductive Care*, 32 Const. Comment. 341 (2017) ........................................................................ 11

## INTEREST OF AMICUS CURIAE[1]

*Amicus* Legal Voice is a non-profit, non-partisan public interest organization that serves survivors of intimate partner violence ("IPV") through community education, coalition-building, and legal and policy advocacy. *Amicus* has a strong interest in ensuring that survivors can exercise bodily autonomy, including accessing medication abortion.

## INTRODUCTION

IPV survivors are entitled to make their own reproductive choices, free from interference or coercion. Limiting access to mifepristone would reduce survivor safety and autonomy. Plaintiffs-Appellants ("Appellants") have asked this Court to stay or enjoin the Food and Drug Administration's ("FDA's") 2023 Risk Evaluation and Mitigation Strategy, which removed the in-person dispensing requirement for mifepristone and permitted telemedicine prescriptions and mail delivery of this medication. (Mot. for § 705 Stay or Injunction Pending Appeal, ECF No. 12.)

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus* or its counsel made a monetary contribution for preparation or submission of this brief.

Appellants argue that the district court identified no irreparable harm from a stay. To the contrary, granting Appellants' motion will upend the status quo that has existed for years and needlessly jeopardize the health and safety of IPV survivors by forcing them to travel in person to a health center to access medication, which will be dangerous or impossible for many survivors. *Amicus* urges the Court to consider the immediate and irreparable harm that IPV survivors will face if access to mifepristone is restricted and deny Appellants' motion.

## ARGUMENT

### I. Survivors of IPV need access to reproductive health care.

#### A. Abusers exert "coercive control" in many forms, and systemic inequities and barriers exacerbate the impacts of coercive control.

IPV is a pattern of "behaviour by an intimate partner or ex-partner that causes physical, sexual or psychological harm, including physical aggression, sexual coercion, psychological abuse and controlling

2

behaviours."[2] Almost *60 million* women in the United States[3] report sexual violence, physical violence, or stalking by an intimate partner during their lifetimes. [4] Women of color in particular report disproportionately high rates of IPV.[5]

Abusers exert control by isolating survivors from family and friends, monitoring whereabouts and relationships,[6] limiting financial resources, tracking travel, limiting access to birth control and reproductive healthcare, and threatening to harm or kidnap children, among other tactics.[7] These intentional behaviors are called "coercive control": A repetitive pattern of acts that lessens the victim's

---

[2] *Violence Against Women*, World Health Organization (Mar. 9, 2021), https://www.who.int/news-room/fact-sheets/detail/violence-against-women; *see also* Claudia Garcia-Moreno et al., *Understanding and Addressing Violence Against Women: Intimate Partner Violence* 1 (2012), World Health Organization, http://apps.who.int/iris/bitstream/10665/77432/1/WHO_RHR_12.36_eng.pdf.

[3] People of many gender identities can become pregnant and experience IPV. This brief specifically references "women" where the underlying research or quoted material focuses on women.

[4] Ruth Leemis et al., *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 1, 14 (2022), Ctrs. For Disease Control & Prevention, https://www.cdc.gov/nisvs/documentation/NISVSReportonIPV_2022.pdf.

[5] *Id.*; *see also* Jamila K. Stockman et al., *Intimate Partner Violence and Its Health Impact on Disproportionately Affected Populations, Including Minorities and Impoverished Groups*, 24 J. Womens Health (Larchmt) 62 (2015).

[6] Karla Fischer et al., *The Culture of Battering and the Role of Mediation in Domestic Violence Cases*, 46 SMU L. Rev. 2117, 2126–27 (1993).

[7] *Id.* at 2121-22.

independence because they "are often isolated from friends, family, or other support systems[.]"[8]

Access to telehealth and medication abortion services is even more important for survivors facing poverty or living in marginalized communities. Women living in poverty are nearly twice as likely to experience domestic violence[9] and struggle even more to escape IPV because the abuser may sabotage employment or restrict access to money.[10] Survivors from marginalized communities face systemic inequities that exacerbate the conditions for coercive control,[11] making them more likely to experience IPV.[12] Women living in rural areas, who

---

[8] Melissa E. Dichter et al., *Coercive Control in Intimate Partner Violence: Relationship with Women's Experience of Violence, Use of Violence, and Danger*, Psych. of Violence 8(5), 596-604, Am. Psych. Ass'n (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6291212/.

[9] Erika Sussman & Sara Wee, *Accounting for Survivors' Economic Security: An Atlas for Direct Service Providers, Map Book One*, Ctr. for Survivor Agency & Just. 1 (2016), https://csaj.org/wp-content/uploads/2021/10/Accounting-for-Survivors-Economic-Security-Atlas-Mapping-the-Terrain-.pdf.

[10] Julie Goldscheid, *Gender Violence and Work: Reckoning with the Boundaries of Sex Discrimination Law*, 18 Colum. J. Gender & L. 61, 75–77 (2008).

[11] *See generally* Natalie J. Sokoloff & Ida Dupont, *Domestic Violence at the Intersections of Race, Class, and Gender: Challenges and Contributions to Understanding Violence Against Marginalized Women in Diverse Communities*, 11 Violence Against Women 38 (2005).

[12] *See supra* § I.A.

face more frequent and severe rates of IPV, face additional challenges.[13]
They have to drive, on *average*, more than 25 miles to access domestic violence intervention programs.[14]

### B. Abusers interfere with survivors' reproductive choices, including coercing and forcing victims into unwanted pregnancies.

Abusers may control their partners by "reproductive coercion," which includes discarding or damaging contraceptives, removing prophylactics during sex without consent, forcibly removing internal-use contraceptives, or retaliating against their partners or threatening harm for contraceptive use.[15] Reproductive coercion can also include coercing a partner to have an abortion or not to have an abortion.[16]

The stories of the survivors who have faced reproductive coercion are harrowing:

---

[13] Corinne Peek-Asa et al., *Rural Disparity in Domestic Violence Prevalence and Access to Resources*, 20 J. Women's Health 1743, 1747 (Nov. 2011).

[14] *Id.* at 1747-48.

[15] Elizabeth Tobin-Tyler et al., *How State Antiabortion Lawsuits and Increased Surveillance Empower Domestic Abusers*, 334(4) JAMA 297 (2025); Elizabeth Miller et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy*, 81(4) Contraception 316, 316-317 (2010); Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women's Use of Contraception: A Systematic Review and Meta-Analysis*, PLoS One 10(2): e0118234 (2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0118234.

[16] KT Grace and JC Anderson, *Reproductive Coercion: A Systematic Review*, 19 Trauma Violence Abuse 371-390 (2018).

My partner knowingly and forcefully kept having sex after [my] consent was withdrawn. I became pregnant as a result of rape. I was raped again once I discovered I was pregnant while I was in an incredibly vulnerable state. After the first rape, I wanted to go to the pharmacy as soon as possible to get the morning-after pill. However, I had no way of getting there and feared trying to go on my own, of what he would have tried to do if I left. I had to wait until he took me, which was well over the amount of time I wanted to go, and obviously, the pill by this point was ineffective, as I became pregnant as a result.[17]

An estimated one in twenty women in the United States experienced a pregnancy from rape, sexual coercion, or both during their lifetimes.[18] When the National Domestic Violence Hotline surveyed over 3,000 women seeking help, 23 percent reported that their abusive partner pressured them into becoming pregnant when they did not want to and 20 percent reported that their partner prevented them from using birth control.[19]

---

[17] National Domestic Violence Hotline, *Reproductive Coercion and Abuse Report* 8, https://www.thehotline.org/wp-content/uploads/media/2025/04/ReproductiveCoercionAndAbuseReport.pdf.

[18] Denise D'Angelo et al., *Rape and Sexual Coercion Related Pregnancy in the United States*, 66(3) Am. J. Prev. Med. 389-398 (2024).

[19] National Domestic Violence Hotline, *supra* note 17; Heike Thiel de Bocanegra et al., *Birth Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters*, 16 Violence Against Women 601 (2010).

### C.    After experiencing reproductive coercion, survivors may seek abortion care.

Meaningful access to abortion care is critical for IPV survivors. Dozens of studies have found a strong association between IPV and the decision to terminate pregnancy.[20] A survivor may choose to terminate a pregnancy that results from reproductive coercion,[21] rape,[22] or out of fear of increased violence or being trapped in an abusive relationship.[23]

Abortion care can be lifesaving medical care for many survivors. Abusers commonly restrict access to transportation and medical care,[24] leaving IPV survivors less likely to receive prenatal care and more likely

---

[20] *See* Megan Hall et al., *Associations between Intimate Partner Violence and Termination of Pregnancy: A Systemic Review and Meta-Analysis*, PLoS Med. 11(1): e1001581, 2 (2014) (identifying 74 studies from the United States and around the world that demonstrated a correlation between IPV and abortion).

[21] *Id.* at 16–17.

[22] Melisa M. Holmes et al., *Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women*, 175 Am. J. Obstetrics & Gynecology 320, 322 (1996) (50 percent of women pregnant through rape had abortions).

[23] Sarah CM Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1, 5 (2014), https://pubmed.ncbi.nlm.nih.gov/25262880/.

[24] Nat Stern et al., *Unheard Voices of Domestic Violence Victims: A Call to Remedy Physician Neglect*, 15 Geo. J. Gender & L. 613, 633 (2014).

7

to miss medical appointments. [25] Survivors of color face additional barriers that make them vulnerable to pregnancy-related complications.[26]

Not only do pregnant people in abusive relationships face increased health risks associated with pregnancy; they are also likely to suffer more violence during pregnancy.[27] IPV affects as many as 324,000 pregnant women each year[28] and can escalate to homicide[29]—a leading cause of maternal death across the United States[30] and the second-leading cause

---

[25] Gunnar Karakurt et al., *Mining Electronic Health Records Data: Domestic Violence and Adverse Health Effects*, 3 J. of Fam. Violence 79, 79–87 (2017).

[26] Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249, 253 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6167003/pdf/heq.2017.0045.pdf.

[27] Beth A. Bailey, *Partner Violence During Pregnancy: Prevalence, Effects, Screening, and Management*, 2 Int'l J. Women's Health 183 (2010); *see also* Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA 1915, 1918 (1996).

[28] Shaina Goodman, *Intimate Partner Violence Endangers Pregnant People and Their Infants*, National Partnership for Women and Families (May 2021), https://nationalpartnership.org/report/intimate-partner-violence/#:~:text=Pregnancy%20can%20often%20be%20an,both%20maternal%20and%20infant%20health.

[29] Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008, Annual Rates for 2009 and 2010* at 10 (2011), U.S. Dep't Just., Bureau of Just. Stats., http://bjs.gov/content/pub/pdf/htus8008.pdf (between 1980 and 2008 40% of homicides of women were committed by intimate partners).

[30] Maeve Wallace, *Trends in Pregnancy Associated Homicide, United States 2020*, 112 Am. J. Public Health 1333-36 (2022).

8

of pregnancy-associated death in Louisiana.[31] Most cases of pregnancy-associated homicide involve domestic violence.[32] Access to abortion is a matter of life or death: Researchers have found an association between increased state-based limits on abortion access and increased rates of IPV-related homicide.[33]

Meaningful access to abortion care can improve survivors' circumstances. Research shows that "having a baby from an unwanted pregnancy appears to result in sustained physical violence over time."[34] In contrast, "having an abortion was associated in a reduction over time in physical violence" from the abuser.[35]

## II. Reducing access to mifepristone will have grave consequences for IPV survivors.

Preliminary relief is intended to preserve the status quo and prevent irreparable harm. *See City of Dallas v. Delta Air Lines, Inc.*, 847

---

[31] Louisiana Dep't of Health, *Louisiana Pregnancy-Associated Mortality Review: Maternal Mortality in Louisiana 2020 Report* 13-14 (2024) https://ldh.la.gov/assets/oph/Center-PHCH/FamilyHealth/2020_PAMR_Report_April2024.pdf.

[32] *See* Wallace, *supra* note 30.

[33] Maeve Wallace et al., *States' Abortion Laws Associated With Intimate Partner Violence-Related Homicide Of Women And Girls In The US, 2014-20*, 43(5) Health Aff (Millwood) 682 (2024).

[34] Roberts et al., *supra* note 23 at 5.

[35] *Id.*

F.3d 279, 285 (5th Cir. 2017). Granting the nationwide restrictions Plaintiffs-Appellants seek here would do the opposite for IPV survivors. As explained *supra,* being forced to carry a pregnancy to term exposes survivors of IPV to a higher likelihood of further violence and poses significant health risks. There is a significant increase in IPV rates in areas with limited access to abortion, including Louisiana.[36]

Granting Appellants' motion would increase barriers to medication abortion for IPV survivors, with grave consequences for their health and well-being, by interfering with telehealth abortion services and reducing access to medication abortion,[37] forcing IPV survivors to travel long distances and wait longer for appointments to get care.

Access to telehealth, the ability to fill prescriptions at local pharmacies, and the ability to receive medication by mail are essential to IPV survivors because these options reduce the cost of abortion care and barriers from access to transportation, childcare, and the surveillance of an abuser. See *supra* § I.B. Compared to people in non-violent

---

[36] Dhaval Dave et al., *Abortion restrictions and intimate partner violence in the Dobbs Era,* 104 J. Health Econ. 103074 (2025).

[37] U.S. Food and Drug Administration, Medical Review of Mifepristone (Application No. NDA 020687), Center for Drug Evaluation and Research, Dkt. 1, Exh. 51 (Oct. 6, 2025).

relationships, IPV survivors are three times as likely to conceal their abortion from their partner,[38] and in-home medication abortion is often a survivor's only option.[39] Travel is costly, both financially and in time spent away from work and care-giving responsibilities,[40] which are prohibitive for many survivors.[41]

Having a variety of options for accessing care maintains safety and privacy. Reinstating the In-Person Dispensing Requirement would jeopardize survivors' ability to access abortion care and their lives.

## III. Reinstating the in-person dispensing requirement will not prevent reproductive coercion but will harm IPV survivors.

Preventing reproductive coercion requires a range of interventions to reduce IPV and give survivors tools, resources, and support to escape abuse.[42]

---

[38] Hall et al., *supra* note 20, at 25.

[39] Yvonne Lindgren, *The Doctor Requirement: Griswold, Privacy, and at-Home Reproductive Care*, 32 Const. Comment. 341, 373 (2017).

[40] Alexandra Thompson et al., *The Disproportionate Burdens of the Mifepristone REMS*, 104(1) Contraception 16, 17 (2021).

[41] Sussman et al., *supra* note 9, at 1, 4.

[42] Ema Alsina et al., *Interventions to Prevent Intimate Partner Violence: A Systematic Review and Meta-Analysis*, 30(3-4) Violence Against Women 953-980 (2024), https://pubmed.ncbi.nlm.nih.gov/37475456/; Phyllis Holditch Niolon et al., *Preventing Intimate Partner Violence Across the Lifespan: A Technical Package of Programs, Policies, and Practices*, Nat'l Center for Injury Prevention & Control, Division of Violence Prevention (2017), https://stacks.cdc.gov/view/cdc/45820.

No one should ever be forced to have, continue, or end a pregnancy against their will. Just as stories of pregnant people having their birth control sabotaged, being raped, or being blocked from accessing health care are horrific, so too are stories of pregnant people being forced or tricked into taking mifepristone. We must take these incidents seriously *and* recognize that broadly ending patients' ability to obtain mifepristone through telemedicine is neither a proportionate nor effective response to IPV. Making health care harder to access in the name of protecting women is misguided and counterproductive: The restrictions Appellants' demand will harm survivors who need abortion care for their health and safety.

## CONCLUSION

*Amicus* respectfully urges the Court to deny Appellants' motion for a stay or injunction pending appeal.

/s/ Daniel W. Wolff
Daniel W. Wolff
Sharmistha Das
Rachel S. Lesser
Karen Mawdsley
Madeline P. Reyes
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2500

12

Fax: (202) 628-5116
dwolff@crowell.com

Julia Marks
Robin Turner
LEGAL VOICE
907 Pine Street Suite 500
Seattle, WA 98101
Tel. (206) 682-9552
jmarks@legalvoice.org

*Counsel for Amicus Curiae*

13

## CERTIFICATE OF SERVICE

I hereby certify that, on April 23, 2026, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Daniel W. Wolff
Daniel W. Wolff

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 2,430 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f);

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook;

(iii) all required privacy redactions have been made;

(iv) the hardcopies submitted to the Clerk are exact copies of the ECF submission; and

(v) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: April 23, 2026                 /s/ Daniel W. Wolff
                                      Daniel W. Wolff