No. 26-30203

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF LOUISIANA, BY AND THROUGH ITS
ATTORNEY GENERAL, LIZ MURRILL ; ROSALIE MARKEZICH,
*Plaintiffs-Appellants*

v.

FOOD & DRUG ADMINISTRATION; MARTY MAKARY,
COMMISSIONER, U.S. FOOD AND DRUG ADMINISTRATION; RICHARD
PAZDUR, IN HIS OFFICIAL CAPACITY AS DIRECTOR, CENTER FOR
DRUG EVALUATION & RESEARCH, U.S. FOOD & DRUG
ADMINISTRATION; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F. KENNEDY, JR., SECRETARY, U.S.
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Defendants-Appellees*

v.

DANCO LABORATORIES, L.L.C.; GENBIOPRO, INCORPORATED,
*Intervenors-Appellees*

On Appeal from the United States District Court
for the Western District of Louisiana
No. 6:25-cv-01491-DCJ-DJA, Hon. David C. Joseph

**[TENDERED] BRIEF OF AMICI CURIAE DISABILITY RIGHTS
EDUCATION AND DEFENSE FUND AND EIGHT OTHER
ORGANIZATIONS IN OPPOSITION TO PLAINTIFFS-APPELLANTS
MOTION FOR § 705 STAY OR INJUNCTION PENDING APPEAL**

*(Counsel listed on inside cover)*

Maria Michelle Uzeta
DISABILITY RIGHTS EDUCATION AND DEFENSE FUND
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Telephone: 510-644-2555
muzeta@dredf.org

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

FULL LIST OF AMICI CURIAE............................................................................8

CORPORATE DISCLOSURE STATEMENT........................................................9

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ......................10

STATEMENT OF INTERESTS .........................................................................12

RULE 29(a)(4)(E) STATEMENT .......................................................................13

SUMMARY OF THE ARGUMENT....................................................................13

ARGUMENT .....................................................................................................14

I.    Reinstating The In-Person Dispensing Requirement Would Violate Federal Law By Imposing A Discriminatory Barrier To Care.............................................14

A. Congress Prohibited REMS That Unduly Burden Access, Especially For Patients With Functional Limitations..................................................................14

B. Federal Disability Law Independently Requires Equal Access and Reasonable Modification. ...................................................................................15

II.    Reinstating The In-Person Dispensing Requirement Would Exclude Disabled People From Equal Access to Reproductive Health Care.......................17

A. Physical, Equipment, and Transportation Barriers Prevent Disabled People From Accessing In-Person Care................................................................18

B. Financial Barriers, Privacy Concerns, and Medical Mistreatment Further Compound the Harm. ......................................................................................20

III. Telemedicine Access To Mifepristone Is Essential, Life-Preserving Health Care For Disabled People Who Face Elevated Risks of Complications, Including Death. .............................................................................................................21

CONCLUSION ....................................................................................................23

CERTIFICATE OF COMPLIANCE ...................................................................25

## TABLE OF AUTHORITIES

*Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613 (5th Cir. 2020) ...........................16

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) ......................................16

*Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370 (5th Cir. 2021)............16

*In re Halo Wireless, Inc.*, 684 F.3d 581 (5th Cir. 2012).............................................v

*Lefebure v. D'Aquilla*, 15 F.4th 670 (5th Cir. 2021)..................................................v

*Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615 (7th Cir. 2000)...................v

*State of Louisiana et al v. Food and Drug Administration et al.,* No. 26-30203 ....10

*Tennessee v. Lane*, 541 U.S. 509 (2004) .................................................................16

*United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039 (5th Cir. 1984) ...............16

**Statutes**

5 U.S.C. § 705 ...............................................................................iii, viii, 14

21 U.S.C. § 355-1............................................................................13, 15

29 U.S.C. § 794 ......................................................................vi, 13, 15, 18

42 U.S.C. § 12101 et seq. ..........................................................................passim

**Other Authorities**

Am. Diabetes Ass'n, Standards of Care in Diabetes—2023 Abridged for Primary
    Care Providers, 41 Diabetes Care 4, 28 (2022)................................................23

Ctr. for Drug Evaluation & Research, Application Nos. 020687 & 91178,
    Rationale Review.......................................................................................15

Jamie Ducharme, For People With Disabilities, Losing Abortion Access Can Be a
    Matter of Life or Death, Time (Jan. 25, 2023) ................................................23

Jessica L. Gleason et al., Risk of Adverse Maternal Outcomes in Pregnant Women
    with Disabilities, 4 JAMA Network Open e2138414 (2021).............................22

Kavitha Surana, Afraid to Seek Care Amid Georgia's Abortion Ban, She Stayed at
    Home and Died, ProPublica (Sept. 18, 2024) ................................................23

5

Lisa I. Iezzoni et al., Prevalence of Current Pregnancy Among U.S. Women with and without Chronic Physical Disabilities, Med. Care 8 (June 1, 2014)..............22

M. Antonia Biggs et al., *Access to Reproductive Health Services Among People with Disabilities*, 6 *JAMA Network Open* e231313 (2023) ...........................17, 21

Nancy R. Mudrick et al., Change Is Slow: Acquisition of Disability Accessible Medical Diagnostic Equipment in Primary Care Offices Over Time, 8 Health Equity 157 (2024)...............................................................................................18

Nancy R. Mudrick et al., Physical Accessibility in Primary Health Care Settings: Results from California On-Site Reviews, 5 Disability & Health J. 159 (2012) ..... ....................................................................................................................18, 19

Nat'l Council on Disability, The Current State of Health Care for People with Disabilities 1, 49–50 (2009) ...........................................................................18

Rauf Melekoglu et al., Successful Obstetric and Anaesthetic Management of a Pregnant Woman With Achondroplasia, BMJ Case Rep. 1 (Oct. 25, 2017) .......23

Sima I. Patel & Page B. Pennell, Management of Epilepsy During Pregnancy: An Update, 9 Therapeutic Advances in Neurological Disorders 118, 124 (2016) ....22

Stephen Brumbaugh, Travel Patterns of American Adults with Disabilities 1 (U.S. Dep't of Transp., Bureau of Transp. Statistics, Sept. 2018)..........................19, 20

Tara Lagu et al., *"I Am Not the Doctor for You": Physicians' Attitudes About Caring for People with Disabilities*, 41 *Health Affairs* 1387 (2022) .......18, 19, 21

Tara Lagu et al., *Access to Subspecialty Care for Patients with Mobility Impairment: A Survey*, 158 *Annals of Internal Medicine* 441 (2013)............17, 18

The Disability Network Sw. Mich., A Lack of Accessible Public Transportation Creates Isolation (May 2, 2022)........................................................................20

U.S. Dep't of Justice, Civil Rights Div., Access to Medical Care for Individuals with Mobility Disabilities..............................................................................18

6

U.S. Gen. Acct. Off., Transportation—Disadvantaged Populations: Some
Coordination Efforts Among Programs Providing Transportation Services, But
Obstacles Persist 6 (2003) ...................................................................................19

UNH Inst. on Disability, Annual Disability Statistics Compendium 2025 1 (2025)
.............................................................................................................................20

Zachary A. Morris et al., *The Extra Costs Associated with Living with a Disability
in the United States*, 33 *J. Disability Pol'y Stud.* 158 (2021)...............................20

**Rules**

5th Cir. R. 27 ..............................................................................................................x

5th Cir. R. 28 .............................................................................................................10

5th Cir. R. 29 .............................................................................................................10

Fed. R. App. P. 26 .......................................................................................................9

Fed. R. App. P. 27 ..................................................................................................... iii

Fed. R. App. P. 29 ...............................................................................................passim

Fed. R. App. P. 32 .....................................................................................................25

**Regulations**

28 C.F.R. § 35.130 ....................................................................................................16

28 C.F.R. § 36.302 ....................................................................................................16

28 C.F.R. § 39.150 ....................................................................................................18

**Legislative Materials**

Pub. L. No. 115-271, tit. III, § 3032(b) ....................................................................15

Susan Thaul, FDA Amendments Act of 2007, Cong. Rsch. Serv. RL34465 (2010)
.............................................................................................................................15

**FULL LIST OF AMICI CURIAE**

1. Disability Rights Education and Defense Fund

2. Autistic Self Advocacy Network

3. Autistic Women and Nonbinary Network

4. New Disabled South

5. Women Enabled International

6. Robyn Powell, PhD, JD, Assistant Professor, Stetson University College of Law (in an individual capacity and not representative of the institution)

7. Ruth Colker, Distinguished University Professor and Heck Faust Memorial Chair in Constitutional Law at Moritz College of Law, Ohio State University (in an individual capacity and not representative of the institution)

8. Tony Coelho, former U.S. Congressman, Founder of The Coelho Center for Disability Law, Policy, and Innovation

9. Katherine Pérez, Director of the Coelho Center for Disability Law, Policy, and Innovation, and Visiting Professor of Law at Loyola Law School (in an individual capacity and not representative of the institution)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), amici through their counsel certify that they have no parent corporations nor any publicly held corporations owning 10% or more of their stock.

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

*State of Louisiana et al v. Food and Drug Administration et al.,* No. 26-30203

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to the persons and entities listed in Plaintiffs/Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici Curiae**

10. Disability Rights Education and Defense Fund

11. Autistic Self Advocacy Network

12. Autistic Women and Nonbinary Network

13. New Disabled South

14. Women Enabled International

15. Robyn Powell, PhD, JD, Assistant Professor, Stetson University College of Law (in an individual capacity and not representative of the institution)

16. Ruth Colker, Distinguished University Professor and Heck Faust Memorial Chair in Constitutional Law at Moritz College of Law, Ohio State University (in an individual capacity and not representative of the institution)

17. Tony Coelho, former U.S. Congressman, Founder of The Coelho Center for

Disability Law, Policy, and Innovation

18. Katherine Pérez, Director of the Coelho Center for Disability Law, Policy, and Innovation, and Visiting Professor of Law at Loyola Law School (in an individual capacity and not representative of the institution)

**Counsel for Amicus Curiae**

Maria Michelle Uzeta, Disability Rights Education and Defense Fund

Respectfully submitted,

DISABILITY RIGHTS EDUCATION
    AND DEFENSE FUND

By:    /s/ Maria Michelle Uzeta
    Maria Michelle Uzeta
    *Attorney for Amici Curiae*

Dated: April 23, 2026

**STATEMENT OF INTERESTS**

Amici curiae are disability rights organizations and academics dedicated to advancing the civil and human rights of people with disabilities and to ensuring their full and equal participation in society. Many Amici are led by and comprised of people with disabilities. Through legal advocacy, education and training, legislative advocacy, public policy development, and community engagement, Amici work to dismantle structural barriers that deny people with disabilities equitable access to health care and other essential services. A full list of Amici is included in the Certificate of Interested Parties.

Amici have a strong and direct interest in the issues presented in this case because the relief Plaintiffs seek—reinstatement of an in-person dispensing requirement for mifepristone—would foreseeably discriminate against and harm people with disabilities. People with disabilities face significant risks of severe pregnancy- and childbirth-related complications, including death, as well as persistent barriers to accessing health care. For many disabled people, access to telemedicine is a critical means of obtaining timely, safe, and accessible care.

The challenged Food and Drug Administration ("FDA") action permitting telemedicine dispensing of mifepristone directly affects Amici's constituents and the communities they serve. Reinstating an in-person requirement would re-erect physical, transportation, financial, and privacy barriers that federal law has long

sought to dismantle. Amici therefore have a substantial interest in ensuring that the Court considers the disability-specific consequences of the requested relief and the interaction between the FDA's regulatory authority and federal disability civil rights laws.

**RULE 29 (a)(4)(E) STATEMENT**

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than Amici, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

**SUMMARY OF THE ARGUMENT**

If this Court grants Plaintiffs' request and reinstates the in-person dispensing requirement for mifepristone, the consequences for the disability community will be devastating. Reinstatement would strip people with disabilities of accessible care options, in direct conflict with federal laws that require equal access and reasonable modifications and prohibit disability discrimination. An in-person requirement would impose undue burdens on disabled people in violation of 21 U.S.C. § 355-1(f)(2)(C) and would violate Section 504 of the Rehabilitation Act and the Americans with Disabilities Act by erecting unnecessary barriers to care.

Reinstating in-person requirements would deepen the already substantial barriers disabled people face in accessing health care, including inaccessible

facilities and medical equipment, transportation limitations, financial strain, and entrenched medical bias. Telemedicine access to mifepristone is therefore a critical safeguard. Disabled people also experience higher rates of reproductive coercion and intimate partner violence, making private, remote access to care an essential protection.

The stakes are grave. Disabled people face significantly elevated risks of severe pregnancy-related complications and death. For some, being forced to continue a pregnancy is life-threatening. Even a temporary reinstatement of the in-person requirement would cause profound and irreparable harm. Given these harms, the Court should deny Plaintiffs' Motion for § 705 Stay or Injunction.

## ARGUMENT

I. **Reinstating The In-Person Dispensing Requirement Would Violate Federal Law By Imposing A Discriminatory Barrier To Care.**

### A. Congress Prohibited REMS That Unduly Burden Access, Especially For Patients With Functional Limitations.

The REMS framework was Congress's mechanism for balancing drug safety against patient access. Recognizing that expanded regulatory authority could restrict access to necessary medications, Congress expressly prohibited REMS requirements that are "unduly burdensome on patient access to the drug," requiring the FDA to consider the impact on patients with serious or life-threatening

14

conditions and patients with difficulty accessing health care.[1] In 2018, Congress strengthened these protections by amending the statute to require explicit consideration of burdens on "patients with functional limitations,"[2] reflecting recognition that people with disabilities face compounding barriers to care that regulations can exacerbate.

In removing the in-person requirement in 2023, the FDA acted squarely within congressional intent—eliminating a structural barrier that perpetuated access inequities for disabled patients.[3] Reinstating that requirement would contradict both congressional and agency priorities by imposing medically unnecessary barriers on the very populations Congress directed the Agency to protect.

## B. Federal Disability Law Independently Requires Equal Access and Reasonable Modification.

Section 504 of the Rehabilitation Act and the ADA require covered entities to provide disabled individuals equal access and "equal opportunity to obtain the

---

[1] Susan Thaul, *FDA Amendments Act of 2007*, Cong. Rsch. Serv. RL34465 (2010).

[2] 21 U.S.C. § 355-1(f)(2)(C)(iii), as amended by Pub. L. No. 115-271, tit. III, § 3032(b).

[3] Ctr. for Drug Evaluation & Research, Application Nos. 020687 & 91178, Rationale Review 18–19 (ECF No. 1-50).

same result" as nondisabled individuals.[4] The Fifth Circuit and its district courts have consistently enforced these requirements, including in health care settings, holding that covered entities must modify policies, practices, or procedures when necessary to avoid discrimination—unless the modification would fundamentally alter the nature of the service.[5]

The Supreme Court has confirmed the ADA's affirmative obligations,[6] and Congress identified the specific types of barriers that impede access to health care for people with disabilities:  architectural, transportation, communication, and policy-based obstacles.[7] To carry out this intent, covered entities must make reasonable modifications to mitigate such barriers when necessary to ensure access to care.[8]

---

[4] See, e.g., *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1049 (5th Cir. 1984); *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011) (en banc); *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 377 (5th Cir. 2021).

[5] See *Frame,* 657 F.3d at 231–33; *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 618 (5th Cir. 2020).

[6] *Tennessee v. Lane*, 541 U.S. 509, 533 (2004) (holding that "Title II's affirmative obligation to accommodate persons with disabilities is a reasonable prophylactic measure, reasonably targeted to a legitimate end.").

[7] 42 U.S.C. § 12101(a)(5).

[8] See 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 36.302(a).

These frameworks compel the same conclusion: reinstating an in-person dispensing requirement—even temporarily—would erect precisely the type of exclusionary structural barrier to health care that Congress sought to eliminate and that courts have consistently held unlawful. Where, as here, a reasonable modification exists that preserves meaningful access to health care without fundamentally altering the services provided, the law demands accommodation. Telemedicine is that modification.

## II. Reinstating The In-Person Dispensing Requirement Would Exclude Disabled People From Equal Access to Reproductive Health Care.

Telemedicine has fundamentally expanded access to health care for people with disabilities, who face significant and well-documented barriers to in-person reproductive care.[9] Reinstating the in-person requirement would undo those gains, allowing entrenched barriers to persist and excluding many disabled people from care.

---

[9] See, e.g., M. Antonia Biggs et al., *Access to Reproductive Health Services Among People with Disabilities*, 6 *JAMA Network Open* e231313 (2023) (reporting that 69% of respondents with disabilities experienced barriers to accessing reproductive health care), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2812360; Tara Lagu et al., *Access to Subspecialty Care for Patients with Mobility Impairment: A Survey*, 158 *Annals of Internal Medicine* 441, 441–42 (2013) (finding that 44% of gynecology practices that were surveyed could not accommodate a patient with a mobility disability), https://pubmed.ncbi.nlm.nih.gov/23552258/.

17

### A. Physical, Equipment, and Transportation Barriers Prevent Disabled People From Accessing In-Person Care.

Physical barriers remain a central obstacle to health care access for people with disabilities,[10] despite long-standing legal obligations requiring providers to ensure accessibility.[11] Empirical evidence confirms the pervasiveness of these barriers. In one recent study surveying physicians about their treatment of patients with disabilities, every respondent acknowledged that their practice contained physical barriers to care, including inaccessible facilities or equipment.[12] One study inspecting 2,389 primary care offices found that only 53% met all exterior access criteria, 56% met entrance and interior public-area criteria, and just 34.3% met

---

[10] See Nat'l Council on Disability, *The Current State of Health Care for People with Disabilities* 1, 49–50 (2009); Tara Lagu et al., *"I Am Not the Doctor for You": Physicians' Attitudes About Caring for People with Disabilities*, 41 *Health Affairs* 1387, 1389–90 (2022), https://doi.org/10.1377/hlthaff.2022.00475; Nancy R. Mudrick et al., *Physical Accessibility in Primary Health Care Settings: Results from California On-Site Reviews*, 5 *Disability & Health J.* 159 (2012), https://dredf.org/wp-content/uploads/2015/02/Mudrick-Breslin-Liang-Yee-DHJO-article-V5-No3-2012.pdf; Nancy R. Mudrick et al., *Change Is Slow: Acquisition of Disability Accessible Medical Diagnostic Equipment in Primary Care Offices Over Time*, 8 *Health Equity* 157 (2024); Lagu, *Access to Subspecialty Care*, *supra* note 10, at 443.

[11] 42 U.S.C. § 12182(a), (b); 42 U.S.C. § 12132; 29 U.S.C. § 794(a); 28 C.F.R. § 39.150(b). See also U.S. Dep't of Justice, Civil Rights Div., *Access to Medical Care for Individuals with Mobility Disabilities* (last updated June 26, 2020), https://www.ada.gov/resources/medical-care-mobility/.

[12] See Lagu, *Not the Doctor for You*, *supra* note 11, at 1389.

interior office and restroom accessibility standards.[13] Inaccessible medical equipment compounds the problem—only 8.4% of primary care offices had an adjustable-height exam table, and 44% of gynecology offices reported inaccessibility primarily due to equipment.[14] Providers unprepared to serve disabled patients have directed wheelchair users to grocery stores and zoos to obtain a simple weight measurement[15]—experiences that are not only degrading but powerfully deterrent to seeking care.

Transportation barriers are equally determinative. Approximately 25.5 million people in the United States have disabilities that make travel difficult, and 3.6 million do not leave their homes at all.[16] Nearly 30% report difficulty accessing transportation.[17] Despite decades of ADA requirements, 20% of U.S. public transit

---

[13] See Mudrick, *Physical Accessibility in Primary Settings*, *supra* note 11, at 163–64.

[14] See Mudrick, *Physical Accessibility in Primary Settings*, *supra* note 11, at 164.

[15] See Lagu, *Not the Doctor for You*, *supra* note 11, at 1389.

[16] Stephen Brumbaugh, *Travel Patterns of American Adults with Disabilities* 1 (U.S. Dep't of Transp., Bureau of Transp. Statistics, Sept. 2018), https://www.bts.gov/sites/bts.dot.gov/files/docs/explore-topics-and-geography/topics/passenger-travel/222466/travel-patterns-american-adults-disabilities-9-6-2018.pdf.

[17] U.S. Gen. Acct. Off., *Transportation—Disadvantaged Populations: Some Coordination Efforts Among Programs Providing Transportation Services, But Obstacles Persist* 6 (2003), http://tinyurl.com/6zzvbtuh.

stops as recently as 2019 did not meet accessibility standards.[18] Telemedicine directly addresses these barriers. Reinstating the in-person requirement would reintroduce transportation and logistical burdens that federal disability law forbids.

### B. Financial Barriers, Privacy Concerns, and Medical Mistreatment Further Compound the Harm.

People with disabilities face profound and compounding financial barriers to health care. They are more than twice as likely to live in poverty, face substantially higher costs of living due to disability-related expenses and experience a 65% increase in out-of-pocket health care spending.[19] Telemedicine mitigates these burdens by reducing travel costs, time off work, and attendant care expenses. Reinstating the in-person requirement would revive these barriers—turning theoretical inconvenience into practical exclusion.

Many disabled people also rely on third parties for transportation to in-person appointments.[20] In the context of reproductive care, this reliance can force

---

[18] The Disability Network Sw. Mich., *A Lack of Accessible Public Transportation Creates Isolation* (May 2, 2022), https://www.dnswm.org/a-lack-of-accessible-public-transportationcreates-isolation/.

[19] UNH Inst. on Disability, *Annual Disability Statistics Compendium 2025* 1 (2025), https://www.researchondisability.org/sites/default/files/media/2025-03/pdf-online_fullcompendium-with-title-acknowledgement-pages.pdf.; Zachary A. Morris et al., *The Extra Costs Associated with Living with a Disability in the United States*, 33 *J. Disability Pol'y Stud.* 158, 162 (2021), https://doi.org/10.1177/10442073211043521.

[20] See Brumbaugh, *supra* note 17, at 9.

disclosure of deeply private medical decisions and expose disabled people to interference, coercion, or retaliation.[21] Telemedicine and mail dispensing allow disabled people to obtain care privately, without risking autonomy. Reinstating in-person requirements strips away this essential protection.

People with disabilities face widespread discrimination and mistreatment in reproductive health care settings. Nearly half report experiences including ridicule, humiliation by providers, dismissal of symptoms, or minimization of health concerns.[22] Some providers have attempted to discharge disabled patients from their practices altogether.[23] Telemedicine can reduce exposure to these discriminatory dynamics by allowing patients to access care more privately, without the bias that attaches to visible disability. Reinstating the in-person requirement would needlessly re-expose disabled people to medical environments where discrimination remains pervasive.

## III. Telemedicine Access To Mifepristone Is Essential, Life-Preserving Health Care For Disabled People Who Face Elevated Risks of Complications, Including Death.

Mifepristone can be essential—and in many cases life-saving—health care

---

[21] *Id.*

[22] See Biggs, *Access to Reproductive Health, supra* note 9, at 6.

[23] See Lagu, *Not the Doctor for You, supra* note 11, at 1392–93.

for people with disabilities. Disabled people are just as likely as nondisabled people to become pregnant, yet they face dramatically higher risks of severe complications and mortality.[24] Pregnant people with physical, intellectual, and sensory disabilities experience significantly higher rates of nearly all adverse maternal outcomes and are approximately eleven times more likely to die during childbirth.[25] They face elevated rates of sepsis, thromboembolism, severe cardiovascular events, hemorrhage, and other life-threatening conditions.[26] Specific disabilities—including epilepsy, diabetes, achondroplasia, multiple sclerosis, and bipolar disorder—are associated with particularly elevated pregnancy risks, and pregnancy may require discontinuation of medications essential to managing these conditions, resulting in serious and avoidable health consequences.[27]

---

[24] See Lisa I. Iezzoni et al., *Prevalence of Current Pregnancy Among U.S. Women with and without Chronic Physical Disabilities*, Med. Care 8 (June 1, 2014) (People with disabilities become pregnant at similar rates as people without disabilities); Jessica L. Gleason et al., *Risk of Adverse Maternal Outcomes in Pregnant Women with Disabilities*, 4 *JAMA Network Open* e2138414 (2021), https://doi.org/10.1001/jamanetworkopen.2021.38414.

[25] See Gleason et al., *supra* note 25, at 2, 4–7.

[26] *Id.*

[27] See Sima I. Patel & Page B. Pennell, *Management of Epilepsy During Pregnancy: An Update*, 9 *Therapeutic Advances in Neurological Disorders* 118, 124 (2016) (showing people with epilepsy may be at higher risk of death, preeclampsia, premature rupture of membranes (PPROM), and chorioamnionitis (an infection of the placenta and the amniotic fluid) during pregnancy); Am.

These risks are compounded by the systemic access barriers disabled people already face. Delays caused by transportation barriers, inaccessible facilities, or provider bias can turn manageable conditions into life-threatening emergencies. For some disabled people, timely access to mifepristone is the only means of preventing catastrophic harm or death.[28] Reinstating the in-person dispensing requirement would predictably prevent or delay care for those most at risk—with irreversible consequences. The Court should deny Plaintiffs' request.

**CONCLUSION**

The 2023 REMS appropriately eliminated a medically unnecessary in-person dispensing requirement that perpetuated longstanding barriers to care for people with disabilities. Reinstating that requirement—even temporarily—would

---

Diabetes Ass'n, *Standards of Care in Diabetes—2023 Abridged for Primary Care Providers*, 41 *Diabetes Care* 4, 28 (2022) (people with diabetes may be more likely to face complications including preeclampsia and miscarriage); Rauf Melekoglu et al., *Successful Obstetric and Anaesthetic Management of a Pregnant Woman With Achondroplasia*, *BMJ Case Rep.* 1 (Oct. 25, 2017) (People with achondroplasia, the most common type of dwarfism, may face a higher risk of cardiac abnormalities, recurrent respiratory infections, complications involving anesthetics, increased caesarean delivery rates, and preterm birth).

[28] Kavitha Surana, *Afraid to Seek Care Amid Georgia's Abortion Ban, She Stayed at Home and Died*, ProPublica (Sept. 18, 2024), https://www.propublica.org/article/; Jamie Ducharme, *For People With Disabilities, Losing Abortion Access Can Be a Matter of Life or Death*, Time (Jan. 25, 2023), https://time.com/.

force disabled people to navigate a demonstrably inaccessible system of care, increasing the risk of delayed or denied treatment and resulting health complications, including death. These harms are concrete, foreseeable, and irreparable. They would also violate federal statutory protections that Congress enacted expressly to prevent this kind of exclusion. Amici respectfully urge the Court to deny Plaintiffs' request for relief.

Respectfully submitted,

DISABILITY RIGHTS EDUCATION
     AND DEFENSE FUND

By:    /s/ Maria Michelle Uzeta
       Maria Michelle Uzeta
       *Attorney for Amici Curiae*

Dated: April 23, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitation of Fed. R. App. P. 29(a)(5) because this brief contains 2528 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14- point font size, Times New Roman.

DISABILITY RIGHTS EDUCATION
    AND DEFENSE FUND

By:    /s/ Maria Michelle Uzeta
        Maria Michelle Uzeta
        Attorney for Amici Curiae

Dated: April 23, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of April 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

DISABILITY RIGHTS EDUCATION
     AND DEFENSE FUND

By:    /s/ Maria Michelle Uzeta
       Maria Michelle Uzeta
       Attorney for Amici Curiae

Dated: April 23, 2026