STATE OF LOUISIANA
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE, LA
70804-9005

LIZ MURRILL
ATTORNEY GENERAL

September 30, 2026

**VIA ECF**
Lyle W. Cayce
Clerk of Court
United States Court of Appeals, Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, Louisiana 70130-3408

**Re: *Louisiana v. Food & Drug Administration*, No. 26-30203**

Dear Mr. Cayce:

I write to notify the panel of two legal developments material to the panel's resolution of this case.

*First*, today Louisiana—joined by Arkansas and Alabama—filed a lawsuit in the Western District of Louisiana against nearly three dozen individuals and entities responsible for remotely dispensing FDA-approved mifepristone in Louisiana, Arkansas, and Alabama. *See Louisiana v. Nouhavandi*, No. 2:26-cv-03836 (W.D. La.) (attached). As the complaint in that case illustrates, none of those individuals and entities could carry out their current operations without the 2023 REMS's removal of the in-person dispensing requirement.

*Second*, also today Louisiana—joined by Arkansas and Alabama—filed a motion for leave to file a bill of complaint (attached), *Louisiana v. New York*, in the United States Supreme Court against New York, Massachusetts, and California. The bill of complaint challenges the telehealth shield laws of those states on various legal grounds.

Both complaints explain how Louisiana's success in *Louisiana v. FDA* will eliminate the flood of FDA-approved mifepristone into the State. Louisiana's success in *Louisiana v. Nouhavandi* will eliminate the

STATE OF LOUISIANA
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE, LA
70804-9005

LIZ MURRILL
ATTORNEY GENERAL

ability of nearly three dozen of the most prominent actors to illegally send *any* abortion drugs into the State. And Louisiana's success in *Louisiana v. New York* will strip all shield-law state residents—regardless of any back-up drugs they may try to use—of the claimed authority to violate Louisiana's laws with impunity.

Respectfully,

*/s/J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga
Solicitor General

*Counsel for Louisiana*

cc: All Counsel (via ECF)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

THE STATE OF LOUISIANA, by and through its Attorney General, Liz Murrill;

THE STATE OF ARKANSAS, by and through its Attorney General, Tim Griffin; and

THE STATE OF ALABAMA, by and through its Attorney General, Steve Marshall;

PLAINTIFFS,

v.

BRANDON NOUHAVANDI;

JESSICA NOUHAVANDI;

JBN OPERATIONS LLC;

CAMBRIDGE REPRODUCTIVE HEALTH CONSULTANTS (D/B/A THE MASSACHUSETTS MEDICATION ABORTION ACCESS PROJECT);

ANGEL FOSTER;

SUSAN YANOW;

MAUREEN PAUL;

REMY COEYTAUX;

MARGARET SIMEONE;

A SAFE CHOICE INC.;

A SAFE CHOICE NETWORK INC.;

REMY COEYTAUX, MD, PC (D/B/A CHOIX REPRODUCTIVEHEALTH);

Civ. No.:

Judge:

Mag. Judge:

OPTIO WOMEN'S HEALTH, INC.;

ABUZZ, LLC;

MANISHA KUMAR;

ISHANI VILLAGE LLC;

CHRISTIE PITNEY;

CHRISTIE PITNEY NURSING AND REPRODUCTIVE HEALTH INC. (D/B/A FORWARD MIDWIFERY, NURSING, AND REPRODUCTIVE HEALTH);

FORWARD MIDWIFERY PLLC;

ROBIN TUCKER;

R. TUCKER LIMITED (A/K/A R. TUCKER CHARTERED, A/K/A METRO AREA ADVANCED PRACTICE HEALTHCARE);

METRO AREA MODERN REPRODUCTIVE CARE, LLC (D/B/A ROXY CLINIC);

CHARLENE EISENBERG REPRODUCTIVE HEALTH COLLABORATIVE, INC. (A/K/A CE REPRO, A/K/A CE REPRO FUND);

PEA CONN LLC (D/B/A SOUTHERN WOVEN);

SOUTHERN WOVEN HEALTH PLLC (A/K/A WOVEN HEALTH PARTNERS);

ONE PLUS FOUR LLC (D/B/A WE TAKE CARE OF US);

ROBIN HEWLETT;

CSA ASC LLC (D/B/A WE TAKE CARE OF US);

TIMOTHY PAIK-NICELY; AND

| |
|---|
| WITH OPEN ARMS CENTER FOR REPRODUCTIVE CHOICES, INC. (D/B/A CHOICES RISING),<br><br>DEFENDANTS. |

**COMPLAINT**

**(NOTICE: Graphic images appear on pages 81–83.)**

1. In our constitutional system, the sovereign, co-equal states are endowed with the power and responsibility to regulate within their borders for the health and safety of their citizens.

2. This case involves a sweeping, coordinated scheme to violate such laws through individuals and organizations who do not reside in the forum states and swear to never set foot in those states. They instead advertise illegal services online in the forum states, accept payments for certain products from individuals in those states, and then illegally ship those products to addresses in those states. This is not accidental or incidental: They acknowledge that their conduct is illegal—some even do business *only* in states where their conduct is illegal, and others send 95% of their monthly shipments to such states.

3. Our constitutional system does not tolerate such blatant disregard for a state's sovereign authority. That is true regardless of the nature of the products being unlawfully shipped into the forum state. It does not matter whether the package contains anthrax, mail bombs, or chemical weapons intended to harm individuals within that state, or (as is the case here) abortion drugs.

4. That is why Plaintiffs Louisiana, Arkansas, and Alabama bring this suit. As sovereign states, they wield traditional police powers within their borders, enforcing democratically enacted laws for the health and safety of their citizens. Among such laws are specific restrictions on abortion, including a general prohibition on abortion with narrow exceptions and a prohibition on the

dispensing of abortion drugs by mail. Those laws protect the lives and health of unborn babies and their mothers—and they reflect careful policy choices adopted through each State's democratic process. Some may disagree with these policy choices, but they are the law within Plaintiff States. Indeed, this was the Supreme Court's promise in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022): that each sovereign state may "regulate abortion as its citizens wish." *Id.* at 230.

5. Notwithstanding the promise of *Dobbs*—and notwithstanding Plaintiff States' laws—abortions have proliferated by the thousands within Plaintiff States' borders. Not because of local doctors and nurses, or even underground abortionists, risking arrest by violating those laws. Rather, it is because of an army of individuals and organizations in *other* states like California, New York, and Massachusetts fixed on perpetrating "a scheme to undermine [the Supreme Court's] decision in *Dobbs*." *Danco Lab'ys, LLC v. Louisiana*, 146 S. Ct. 1192, 1193 (2026) (Alito, J., dissenting). They are some of the defendants in this case—and their mission is "to operationalize [their] middle-finger rage," "thwart red-state attorneys general," and "thwart draconian anti-abortion laws."[1]

6. The scheme is simple. The organizations operate websites advertising abortion drugs in Plaintiff States. The organizations use a short questionnaire in which website users (anonymous men, women, and children) can represent (or misrepresent) their alleged pregnancy status. The website users then pay a fee for the abortion drugs or represent that they cannot afford the fee (in which case most organizations will assume the cost). Some organizations then use mail-order pharmacies to ship the drugs (predominantly from California) to addresses in Plaintiff States; others handle their own shipments after "pill-packing parties [] fueled by pizza and wine."[2] The drugs are then used to abort

[1] *See generally* Nina Martin, *She's Remaking the Abortion Landscape One Pill at a Time*, Mother Jones (July 31, 2026), perma.cc/E8AJ-N8P6 (attached as Ex. 1).

[2] *Id.* at 4.

babies in Plaintiff States and, in documented instances, send women to emergency rooms with severe bleeding and excruciating pain.




A typical daily run to the nearby post office includes hundreds of packages bound for all 50 states. Emily Schiffer

7. The organizations carry out this scheme by widely advertising that abortion drugs are "safer than Tylenol" or even "driving a car." They also severely downplay the rate and nature of adverse reactions to abortion drugs that frequently demand emergency care. And if emergency care is necessary, they actively encourage women to lie to healthcare providers in Plaintiff States by saying that they are simply suffering a miscarriage.

8. All this violates Plaintiff States' laws. The organizations openly acknowledge as much. But they think themselves invincible because their agents swear to never set foot in Plaintiff States (thereby avoiding arrest), and their home states have enacted so-called "shield laws" intended to thwart legal liability for individuals perpetrating this interstate abortion scheme.

9. By abridging Plaintiff States' traditional authority to regulate the practice of medicine, this interstate scheme places the lives and health of women, girls, and unborn babies in Plaintiff States at risk. Plaintiff States' laws exist for a reason: to protect life and to ensure that appropriate safeguards are in place in the narrow circumstances where an abortion might be permitted. Today, however, abortion drugs are flooding into Plaintiff States in open defiance of their laws—and Plaintiff States alone are bearing the human and economic costs of that scheme.

10. The organizations and individuals behind this scheme are free to disagree with Plaintiff States' policy decisions—but they are not free to disregard them, especially at the expense of women, girls, and babies in Plaintiff States. Accordingly, Plaintiff States have taken extraordinary measures to counter this attack on their sovereign authority. Those include cease-and-desist letters, subpoenas, criminal enforcement actions, and even a lawsuit against the U.S. Food and Drug Administration. So far, however, nothing has stopped the deliberate flood of abortion drugs into Plaintiff States.

11. Louisiana's own experience well illustrates the problem. Of Louisiana's request for assistance in holding a New York doctor accountable for the death of a teenager's baby, Governor Kathy Hochul said, "[T]here's no way in hell that I'll ever respond to a request to extradite [the doctor] and face criminal charges."[3] Responding to Louisiana's similar request concerning a California doctor responsible for the death of a domestic abuse victim's baby, Governor Gavin Newsom was more pointed: "@AGLizMurrill: Go fuck yourself."[4]

[3] Press Release, Office of N.Y. Governor Kathy Hochul, *Protecting Reproductive Freedom: Governor Hochul Signs Legislation Affirming New York's Status as a Safe Haven for Reproductive Health Care* (Feb. 3, 2025), perma.cc/G5PY-7VHD (attached as Ex. 2). The audio recording linked in the release is available at perma.cc/8L5R-VEBJ.

[4] Gavin Newsom (@GavinNewsom), X (Feb. 5, 2026), perma.cc/5532-P3BS (attached as Ex. 3).


Gavin Newsom
@GavinNewsom

Louisiana plans to sue me because I won't extradite a doctor for providing an abortion.

@AGLizMurrill: Go fuck yourself. California will never help you criminalize healthcare.

12. This cross-border assault on Plaintiff States is clear and undeniable—and it is a "classic" public nuisance under federal common law. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (citation omitted); *accord Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 691–92 (5th Cir. 2021).

13. At its core, the federal common law of public nuisance protects a sovereign state's "interest in the abatement of public nuisances, instances in which the injury to the public health and comfort [is] graphic and direct." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 604 (1982). A state thus may, for example, sue to enjoin an out-of-state entity's "noxious" discharge of items across state lines and into the suing state. *See id.* at 603–04 (citing *Missouri v. Illinois*, 180 U.S. 208 (1901); *Ga. v. Tenn. Copper Co.*, 206 U.S. 230 (1907)). Similarly, a state may sue over "the keeping of diseased animals," "the practice of medicine by one not qualified," or any number of other interferences with "the public health" that fall within the "broad category" of public nuisances. *Cranor*, 998 F.3d at 691 (citation omitted); *accord Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771–72 (7th Cir. 2011) (applying federal common law and emphasizing that "[p]ublic nuisance traditionally has been understood to cover a tremendous range of subjects" (citing examples)).

14. Relevant here, a state also may sue to enjoin conduct "not warranted by law, ... which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all." *Cranor*, 998 F.3d at 691 (quoting Restatement (Second) of Torts § 821B cmt. a (Am. L. Inst. 1979)). Put otherwise, "conduct … proscribed by a statute" presents a quintessential public nuisance, especially where it involves "a significant interference with the public health" and the perpetrator "knows" of that "continuing" harm. Restatement (Second) of Torts § 821B(2) & cmt. d; *accord City of*

*Huntington v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 566–69 (4th Cir. 2025) ("One means of demonstrating an unreasonable interference with a public right is to show that a defendant's act or causal contributions to that act were 'unlawful.'" (citing the Restatement)); *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 220 (3d Cir. 2020) (applying the Restatement to find a public nuisance based on the defendant's "alleged failure to operate its facility in accordance with [state law]").

15. The federal common law of public nuisance squarely forecloses the defendants' interstate scheme to circumvent Plaintiff States' laws. The very act of dispensing abortion drugs by mail throughout Plaintiff States is "proscribed by" Plaintiff States' laws. Restatement (Second) of Torts § 821B(2)(b). The drugs are "a significant interference with the public health," *id.* § 821B(2)(a)—by design, they are intended to terminate pregnancies, thereby ending the lives of thousands of unborn babies in Plaintiff States and sending mothers to emergency rooms because of drug complications. Worse, the organizations behind this scheme and their facilitators "know[]" about this "continuing" harm *because that is their mission*. *Id.* § 821B(2)(c). They advertise in, and send abortion drugs into, Plaintiff States for the avowed purpose of undermining our pro-life laws. Recently asked about this point, one defendant's employee giggled: "It made me so happy ... when [Justice Alito] wrote, 'They're undermining *Dobbs*.' I was like, *yeah*, *exactly*."[5]

16. The federal common law of public nuisance, moreover, is uniquely suited and necessary to resolve this cross-border conflict. Federal common law governs "areas of national concern," including "where the basic scheme of the Constitution so demands" and where a suing state's harm "emanat[es] from another State." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) (citation omitted). That is precisely the case here given the functional nullification of Plaintiff States' laws—and Plaintiff States' subordination to the policy preferences of pro-abortion states and

[5] Ex. 1 at 7.

their citizens. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607 (noting the propriety of a state suit where the "injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers"); *id.* at 607–08 (recognizing a state's "[d]istinct" "interest in securing observance of the terms under which it participates in the federal system"). Indeed, in circumstances like this, the application of federal common law in federal court is virtually a "duty" because Plaintiff States have "surrendered" "the right to make war," which otherwise would provide a defense against out-of-state aggressors. *Missouri*, 180 U.S. at 241.

17. In "our historic tradition," "the States enjoy 'equal sovereignty.'" *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) (citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)); *accord Shelby County v. Holder*, 570 U.S. 529, 544 (2013) ("[T]he constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." (quoting *Coyle v. Smith*, 221 U.S. 559, 580 (1911))). That was the tradition the *Dobbs* Court upheld by "return[ing]" to "the citizens of each State" the authority to regulate abortion as they see fit. 597 U.S. at 302. This is the tradition that the defendants avowedly seek to undermine by deliberately violating Plaintiff States' laws designed to protect human life. And that is the tradition this lawsuit will vindicate.

18. If state sovereignty means anything, it means that states like Louisiana, Arkansas, and Alabama cannot be forced to endure open violations of their laws, deaths of their babies, and harms to their women and girls simply because an out-of-state actor disagrees with their sovereign prerogative to choose life within their borders.

## PARTIES

19. Plaintiff Louisiana is a sovereign state of the United States. This action is brought on behalf of Louisiana by Attorney General Liz Murrill, who is legally authorized to sue on its behalf. Her offices are located at 1885 N. Third St., Baton Rouge, Louisiana 70802.

20. Plaintiff Arkansas is a sovereign state of the United States. This action is brought on behalf of Arkansas by Attorney General Tim Griffin, who is legally authorized to sue on its behalf. His offices are located at 101 W. Capitol Ave., Little Rock, Arkansas 72201.

21. Plaintiff Alabama is a sovereign state of the United States. This action is brought on behalf of Alabama by Attorney General Steve Marshall, who is legally authorized to sue on its behalf. His offices are located at 501 Washington Ave., Montgomery, Alabama 36104.

22. Defendant Cambridge Reproductive Health Consultants, Inc. (d/b/a The Massachusetts Medication Abortion Access Project (The MAP)) is a 501(c)(3) tax-exempt organization, with its principal place of business at 98 Electric Ave., Suite #1, Somerville, Massachusetts 02144. The MAP is "a non-profit, asynchronous telemedicine Shield Law practice in Massachusetts that provides medication abortion care to patients from all 50 states."[6] The MAP operates under the domains themap.wspr.health, cambridgereproductivehealthconsultants.org, and cambridgereproductivehealthconsultants.org/map.

23. Defendant Angel Foster is the president and a co-founder of Cambridge Reproductive Health Consultants, Inc. She also serves as its registered agent for service of process at 98 Electric Ave., Apt. #1, Somerville, Massachusetts 02144. In September 2023, Foster launched The MAP within Cambridge Reproductive Health Consultants, Inc., and runs its daily operations today.[7]

24. Defendant Susan Yanow is The MAP's director of community engagement. She is a resident of Massachusetts.

25. Defendant Maureen Paul is The MAP's medical director. She is a resident of Massachusetts.[8]

---

[6] The MAP, *Abortion Pills by Mail—Private & Affordable Abortion Care*, perma.cc/2MRU-YZ7J (last visited Sept. 24, 2026) (attached as Ex. 4).

[7] *See* Ex. 1 at 2–3, 21.

[8] *See id.* at 6.

26. Defendant Remy Coeytaux is a resident of California.

27. Defendant Margaret Simeone is a resident of California.

28. Defendant A Safe Choice Inc. is a California corporation formerly known as Abortion Care at Home Inc. It was incorporated by Defendant Coeytaux in June 2024. The corporation's address is 548 Market St. #752820, San Francisco, CA 94104. The registered agent for the corporation is United States Corporation Agents, Inc., 500 N. Brand Blvd. Glendale, CA 91203.

29. Defendant A Safe Choice Network Inc. is a California corporation initially registered by Defendant Coeytaux as incorporator in January 2026. Also in January 2026, Coeytaux signed a statement of information listing Defendant Simeone as chief executive officer, chief financial officer, and secretary of A Safe Choice Network Inc. A Safe Choice Network Inc. operates the domain asafechoicenetwork.com. The corporation's address is 455 Market St., Ste. 1940 #611906, San Francisco, CA 94105. The registered agent for the corporation is United States Corporation Agents, Inc., 500 N. Brand Blvd. Glendale, CA 91203.

30. Defendant Remy Coeytaux, MD, PC (d/b/a Choix ReproductiveHealth) is a California corporation located at 8911 Lakewood Dr., Ste. 25B, Windsor, CA 95492.[9] Defendant Coeytaux is its chief executive officer, chief financial officer, and secretary. Its mailing address is P.O. Box 215, Healdsburg, CA 95448. The registered agent for the corporation is United States Corporation Agents, Inc., 500 N. Brand Blvd. Glendale, CA 91203.

31. Defendant OPTIO Women's Health, Inc. is a California corporation located at 8911 Lakewood Dr., Ste. 25B, Windsor, CA 95492. OPTIO Women's Health, Inc. operates the domain optiowomenshealth.com. Its mailing address is P.O. Box 215, Healdsburg, CA 95448.

[9] Remy Coeytaux, MD, PC, Statement of Information Corporation (attached as Ex. 5).

32. Defendant Abuzz, LLC is a Massachusetts limited liability company located at 125 Westgate Center Drive #1036, Hadley, MA 01035. Abuzz, LLC operates the domain abuzzhealth.com. Its resident agent is Registered Agents Inc., 82 Wendell Ave., Ste. 100, Pittsfield, MA 01201.

33. Defendant Manisha Kumar is a Massachusetts resident.

34. Defendant Ishani Village LLC is a Massachusetts limited liability company. Ishani Village LLC operates the domain ishanivillage.com. Its resident agent is Registered Agents Inc., 82 Wendell Ave., Ste. 100, Pittsfield, MA 01201.

35. Defendant Christie Pitney is a Maryland resident.

36. Defendant Christie Pitney Nursing and Reproductive Health Inc. (d/b/a Forward Midwifery, Nursing, and Reproductive Health) is a California corporation with its principal office located at 17879 Harbaugh Valley Rd., Sabillasville, MD 21780 and a California address of 100 Willow Plaza 400, Visalia, CA 93291. Forward Midwifery operates the domain forwardmidwifery.org. Defendant Christie Pitney is its chief executive officer, chief financial officer, and secretary, located at the same address. Its agent for service of process is Darryl W. Hitchman, 100 Willow Plaza 400, Visalia, CA 93291.

37. Defendant Forward Midwifery PLLC is a Washington, D.C. professional limited liability company.

38. Defendant Robin Tucker is a Maryland resident.

39. Defendant R. Tucker Limited (a/k/a R. Tucker Chartered) is a Washington, D.C. corporation that is registered as a foreign corporation in Maryland.[10] Defendant Tucker signed the Maryland incorporation document as president. Signing as owner of R. Tucker Limited, Defendant

---

[10] R. Tucker Limited (F22036503), Foreign Corporation Qualification (attached as Ex. 6).

Tucker also has secured the trade name "Metro Area Advanced Practice Healthcare" for R. Tucker Limited in Maryland. R. Tucker Limited's early principal office address was 4848 Battery Lane, Ste. 100, Bethesda, MD 20814. In May 2026, R. Tucker Limited changed its principal office address to its current resident agent's address: Registered Agents Inc., 306 W. Redwood St., Ste. 200, Baltimore, MD 21201.

40. Defendant Metro Area Modern Reproductive Care, LLC (d/b/a Roxy Clinic) is a Maryland limited liability company. Defendant Tucker was its original resident agent at 4848 Battery Lane, Ste. 100, Bethesda, MD 20814. Defendant Tucker also is its president. Its principal office address is its current resident agent's address: Registered Agents Inc., 306 W. Redwood St., Ste. 200, Baltimore, MD 21201.

41. Defendant Charlene Eisenberg Reproductive Health Collaborative, Inc. (a/k/a CE Repro, a/k/a CE Repro Fund) is a Maryland corporation and a 501(c)(3) organization. Defendant Tucker was CE Repro's original resident agent in Maryland. CE Repro obtained its tax-exempt status in 2023 via an Internal Revenue Service letter mailed to CE Repro in care of Defendant Tucker.[11] For tax year 2025, the Internal Revenue Service lists Defendant Tucker as CE Repro's principal officer at CE Repro's address: 10770 Columbia Pike, Ste. 1005, Silver Spring, MD 20901.[12] CE Repro's current resident agent is Registered Agents Inc., 306 W. Redwood St., Ste. 200, Baltimore, MD 21201.

42. Defendant Pea Conn LLC (d/b/a Southern Woven) is a Delaware limited liability company (incorporated in August 2025) that is registered in New York as a foreign limited liability company. Southern Woven owns and operates the website www.southernwoven.com. Southern

---

[11] Letter from Stephen A. Martin, Dir., Exempt Orgs. Rulings & Agreements, Internal Revenue Serv., to Charlene Eisenberg, Reproductive Health Collaborative Inc. (Mar. 7, 2023), perma.cc/PK9Z-9GVE (attached as Ex. 7).

[12] Charlene Eisenberg Reproductive Health Collaborative Inc., IRS (last visited Sept. 28, 2026), perma.cc/7BKA-ULYN (attached as Ex. 8).

Woven's agent for service of process on the Secretary of State is Registered Agents Inc., 418 Broadway Ste. R, Albany, NY 12207.

43. Defendant Southern Woven Health PLLC (a/k/a Woven Health Partners) is a Maine limited liability company. Its agent for service of process is Registered Agents Inc., 439 U.S. Route 1 Ste. A, York, ME 03909.

44. Defendant One Plus Four LLC (d/b/a We Take Care Of Us) is a California limited liability company formed in December 2025 with one manager: WTCOU LLC, 1209 Mountain Road Pl. NE, Ste. R, Albuquerque, NM 87110. One Plus Four LLC "own[s] and operate[s]" the domain wetakecareof.us.[13]

45. Defendant Robin Hewlett is a New Jersey resident.

46. Defendant CSA ASC LLC (d/b/a We Take Care Of Us) is a New Jersey limited liability company. Defendant Robin Hewlett is the member-owner of CSA ASC LLC.

47. Defendant Timothy Paik-Nicely is a California resident.

48. Defendant With Open Arms Center for Reproductive Choices, Inc. (d/b/a Choices Rising) is a California corporation. Defendant Timothy Paik-Nicely is the chief executive officer of this entity.

49. Defendant Jessica Nouhavandi is a California resident.

50. Defendant Brandon Nouhavandi is a California resident.

51. Defendant JBN Operations LLC is a California limited liability company operating as a mail-order pharmacy. Defendant Brandon Nouhavandi is the managing member of JBN Operations LLC.

[13] One Plus Four LLC, *We Take Care of Us Terms of Use* (last updated Apr. 1, 2026), perma.cc/LUX6-ECUQ (attached as Ex. 9).

52. Each individual defendant is sued both in his or her personal capacity as well as in his or her capacity as agent, employee, or volunteer for the Defendant entities with which the individual is affiliated.

## JURISDICTION AND VENUE

53. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff States' public nuisance claim arises under federal common law. *See, e.g.*, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997) ("Federal jurisdiction exists if the claims in this case arise under federal common law." (citing *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972))); *accord Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 543 (5th Cir. 1997); *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 189 (5th Cir. 1984).

54. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff States' claims necessarily raise substantial and disputed questions of federal law and constitutional order, including state sovereignty and self-governance. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).

55. This Court has supplemental jurisdiction over Plaintiff States' state-law claims under 28 U.S.C. § 1367.

56. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to [Plaintiff States' claims] occurred," and are occurring, in this district. As detailed further below, each Defendant advertises the sale and shipment of abortion drugs in this district; engages in financial transactions regarding such drugs with individuals in this district; prescribes or prepares such drugs for delivery in this district; or dispenses, ships, or delivers such drugs in this district or to out-of-state individuals for delivery in this district. To take one example, Defendant Angel Foster of The MAP has posed in front of a map confirming that The MAP sends abortion drugs to Louisiana (including to Lake Charles specifically), as well as Arkansas and Alabama:

**Inside the legal fight over the telehealth clinics that help women defy abortion bans**

Massachusetts, Maine, Vermont, and Rhode Island are among some states that have shield laws with specific provisions protecting them from criminal prosecution or civil lawsuits even if the patient is in another state, according to nonprofit KFF.



Dr. Angel Foster, co-founder of Massachusetts Medication Abortion Access Project, points out on a map of the United States where her organization provides care, May 13, 2025, in Somerville, Mass. *AP Photo/Charles Krupa*

57. For the same reasons and those detailed below, the Court has personal jurisdiction over each Defendant.

**<u>FACTUAL ALLEGATIONS</u>**

**I. Plaintiff States Prohibit Abortion After *Dobbs*.**

58. In 2022, the Supreme Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." *Dobbs*, 597 U.S. at 232. In so doing, the Supreme Court recognized that the citizens of the several states would disagree over the proper approach to abortion. "In some States, voters may believe that the abortion right should be even more extensive than the right that [*Roe v. Wade*, 410 U.S. 113 (1973), and its progeny] recognized." *Id.* at 256. But "[v]oters in other States may wish to impose tight restrictions based on their belief that abortion destroys an 'unborn human being.'" *Id.* That inevitable disagreement is a feature, not a bug, of our

constitutional system—and nothing prevents "the people's elected representatives from deciding [each state for itself] how abortion should be regulated." *Id.*

59. In the wake of *Dobbs*, each Plaintiff State chose life, prohibiting abortion in all but the narrowest circumstances and specifically prohibiting the remote dispensing of abortion drugs in Plaintiff States.

60. Each Plaintiff State treats an unborn baby as fully human from the moment of conception. *See* La. R.S. § 14:2(A)(11) (defining "[u]nborn child" to mean "any individual of the human species from fertilization and implantation until birth"); La. R.S. § 22:1014(A)(4) ("It is the longstanding policy of this state that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and constitution of this state."); Ark. Const. amend. 68 § 2 ("The policy of Arkansas is to protect the life of every unborn child from conception until birth ...."); Ark. Code § 20-16-1503(6) (defining "[u]nborn child" as "the offspring of human beings from conception until birth"); Ala. Const. art. I, § 36.06(b) ("This state further acknowledges, declares, and affirms that it is the public policy of this state to ensure the protection of the rights of the unborn child in all manners and measures lawful and appropriate."); Ala. Code § 26-23H-3(7) ("A human being, specifically including an unborn child in utero at any stage of development, regardless of viability.").

61. Each Plaintiff State generally prohibits the abortion of an unborn baby except to save the life of the mother. *See* La. R.S. § 40:1061(C), (F) ("No person may knowingly" perform an abortion unless a licensed physician determines "in reasonable medical judgment" that abortion is necessary "to prevent the death or substantial risk of death due to a physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of a pregnant woman."); Ark. Code §§ 5-61-304(a), 5-61-404(a) ("A person shall not purposely perform or attempt to perform an abortion except to save

the life of a pregnant woman in a medical emergency."); Ala. Code § 26-23H-4(a), (b) ("It shall be unlawful for any person to intentionally perform or attempt to perform an abortion except" "if an attending physician licensed in Alabama determines that an abortion is necessary in order to prevent a serious health risk to the unborn child's mother.").

62. Each Plaintiff State likewise proscribes the sale and prescription of abortion drugs to terminate pregnancies. *See* La. R.S. § 40:1061(C) ("No person may knowingly administer to, prescribe for, or procure for, or sell to any pregnant woman any medicine, drug, or other substance with the specific intent of causing or abetting the termination of the life of an unborn human being."); La. R.S. § 14:87.9(A) ("Criminal abortion by means of an abortion-inducing drug is committed when a person knowingly causes an abortion to occur by means of delivering, dispensing, distributing, or providing a pregnant woman with an abortion drug."); Ark. Code §§ 5-61-303(1)(A), 5-61-403(1)(A) ("defining "[a]bortion" to include "the act of using, prescribing, administering, procuring, or selling of any ... medicine, drug, or any other substance, device, or means with the purpose to terminate the pregnancy of a woman, with knowledge that the termination by any of those means will with reasonable likelihood cause the death of the unborn child"); Ala. Code § 26-23H-3(1) (defining "abortion" to include the "prescription of any ... medicine, drug, or any other substance or device with the intent to terminate the pregnancy of a woman known to be pregnant with knowledge that the termination by those means will with reasonable likelihood cause the death of the unborn child"); Ala. Code § 13A-13-7 (punishing "[a]ny person who willfully administers to any pregnant woman any drug or substance ... to induce an abortion, miscarriage or premature delivery or aids, abets or prescribes for the same").

63. In the narrow circumstances where an abortion via abortion drugs is permitted, each Plaintiff State criminally prohibits the dispensing of abortion drugs without an in-person examination by a state-licensed physician. *See* Ark. Code § 20-16-1504(c) ("Before providing an abortion-inducing drug, the physician prescribing, administering, dispensing, or otherwise providing the abortion-

inducing drug shall ... [e]xamine the pregnant woman in person . . . ."); Ala. Code § 26-23E-7 ("[T]he physician giving, selling, dispensing, administering, or otherwise providing or prescribing the abortion-inducing drug must first examine the pregnant woman in person and document, in the woman's medical chart, the gestational age and intrauterine location of the pregnancy prior to giving, selling, dispensing, administering, or otherwise providing or prescribing the abortion-inducing drug."); *see also* La. R.S. §§ 1061.1.5(A), 1061.10 (requiring pre-abortion examination).

64. In those limited circumstances, the abortion drugs likewise must be administered in person with the prescribing physician. *See, e.g.*, La. R.S. § 40:1061.11(A) ("When any drug or chemical is used for the purpose of inducing an abortion, the physician who prescribed the drug or chemical shall be in the same room and in the physical presence of the pregnant woman when the drug or chemical is initially administered, dispensed, or otherwise provided to the pregnant woman."); Ark. Code § 20-16-603(b)(1) ("[T]he initial administration of the drug or chemical shall occur in the same room and in the physical presence of the physician who prescribed, dispensed, or otherwise provided the drug or chemical to the patient.").

65. On top of these broadly applicable laws, Louisiana and Arkansas have repeated in other statutes their prohibition of the sale, prescription, and delivery of abortion drugs within their borders. *See* La. R.S. § 962.2(A) ("Except as provided in R.S. 40:1061.11, no abortion-inducing drug may be sold, prescribed, dispensed, distributed, or delivered in this state in violation of this Section."); La. R.S. § 962.2(B) ("Notwithstanding any other provision of law to the contrary, delivery to a person in Louisiana by mail-order, courier, or as a result of a sale made via the internet in violation of this Section is strictly prohibited."); Ark. Code § 20-16-1504(b) ("It is unlawful for any manufacturer, supplier, physician, or any other person to provide any abortion-inducing drug via courier, delivery, or mail service."). Louisiana and Alabama also criminally prohibit abortion advertising, *i.e.*, "the placing

and carrying of any advertisement of abortion services by the publicizing of the availability of abortion services." La. R.S. § 14:87.4(A); *see* Ala. Code § 13A-4-1(a)(1).

## II. Defendants Effect a Cross-Border Scheme to Facilitate Abortion in Plaintiff States.

66. Notwithstanding the promise of *Dobbs*—and notwithstanding Plaintiff States' laws detailed above—abortions have proliferated by the thousands in Plaintiff States after *Dobbs*. According to one study considering data through December 2025, approximately 1,000 abortions occur in Louisiana every month; approximately 300 every month in Arkansas; and approximately 700 every month in Alabama.[14]

67. This is the direct and intended result of a nationwide scheme to force abortion into Plaintiff States.

68. This nationwide scheme has three essential components. *First*, the Biden Administration's 2023 decision to remove a longstanding in-person dispensing requirement for the abortion drug mifepristone, for the avowed purpose of allowing FDA-approved mifepristone to be illegally mailed from pro-abortion states into pro-life states. That unlawful decision is at issue in Louisiana's pending lawsuit against the U.S. Food and Drug Administration. *See Louisiana v. FDA*, No. 25-cv-1491 (W.D. La.). *Second*, the decisions of states like New York, California, and Massachusetts to enact so-called "shield laws," which purport to immunize residents of those states from liability for illegally sending abortion drugs into Plaintiff States. Those illegal shield laws are at issue in *Louisiana v. New York*, filed today as an original action in the United States Supreme Court. *Third*, the unilateral decisions of pharmacies, non-profit organizations, prescribers, and others to facilitate the flood of

[14] Society of Family Planning, #WeCount Report April 2022 to December 2025 (June 10, 2026), perma.cc/B4LV-KJXJ (attached as Ex. 10). Data for each state can be found by searching the individual state via the search bar, or by downloading the comprehensive report. Plaintiff States' graphs can be found in Exhibit 10.

abortion drugs into Plaintiff States and thereby "thwart draconian anti-abortion laws."[15] This lawsuit addresses those actors.

69. No single lawsuit can deliver complete relief to Plaintiff States—but each lawsuit can provide meaningful relief. And relief in each of these pending lawsuits will bring Plaintiff States extraordinarily close to complete relief. To realizing the promise of *Dobbs*: that each sovereign state may decide for itself "how abortion should be regulated." *Dobbs*, 597 U.S. at 256.

**A. Abortion Drug Manufacturers Encourage Abortions in Plaintiff States.**

70. This story begins with abortion drugs themselves. The abortion drug mifepristone causes an embryo or fetus to detach from the uterine lining, killing the embryo or fetus.[16] Mifepristone commonly is dispensed in conjunction with the drug misoprostol, which initiates contractions to expel the dead embryo or fetus. Misoprostol also can be used standing alone to effectuate an abortion—and some defendants in this case have threatened to switch to a misoprostol-only regimen if they lose the ability to mail mifepristone.[17] Accordingly, the terms "abortion drugs" and "abortion-inducing drugs" in this complaint refer to both drugs individually and together, as well as any other drug intended to cause an abortion.

71. Mifepristone can be foreign-made, but, as relevant here, FDA also has approved mifepristone manufactured by two American companies, Danco Laboratories, LLC and GenBioPro Inc.

72. Danco manufactures Mifeprex, which is the branded drug and appears in an orange box. Danco uses a company called Cencora, Inc. to distribute Mifeprex.

---

[15] Ex. 1 at 20.

[16] The term embryo and fetus refer to different stages of a human's development in the womb, similar to how the terms infant and toddler are used to refer to different stages of a human's development outside of the womb.

[17] Ex. 1 at 6–7, 10–11.




73. GenBioPro manufactures generic mifepristone, which appears in a blue-and-white box. GenBioPro uses a company called R&S Northeast, LLC to distribute generic mifepristone.




74. Both Danco[18] and GenBioPro[19] direct "patients" on their websites to INeedAnA.com—a website that promises to "help you learn about all your abortion options and find the most up to date information about abortion clinics, pills by mail, state abortion laws, and support."[20]

---

[18] Mifeprex, *How Do I Get Mifeprex?*, perma.cc/GVM8-PBSS (last visited Sept. 24, 2026) (attached as Ex. 11).

[19] GenBioPro, *About Medical Abortion*, perma.cc/PP3Y-GLXA (last visited Sept. 24, 2026) (attached as Ex. 12).

[20] I Need an A, *Find Verified Clinics, Pills by Mail, and Support*, perma.cc/RE5K-4FCU (last visited Sept. 24, 2026) (attached as Ex. 13).

75. I Need An A acknowledges that abortions in Plaintiff States are illegal. For example, as to Louisiana, I Need An A states that "[a]bortion is mostly banned in Louisiana" save for "very limited situations, such as to prevent a serious health risk to the [woman]."[21] I Need An A even emphasizes that "telehealth abortion is not permitted in Louisiana."[22] But I Need An A assures a reader that only a "provider[]" is subject to the ban, "not the [woman] having an abortion."[23]

> **Current Louisiana Abortion Laws**
>
> **Abortion is mostly banned in Louisiana, but you still have options** 💜
>
> Under Louisiana Revised Statutes § 40:1061.1.3, providers can only provide abortion care in very limited situations, such as to prevent a serious health risk to the pregnant person.
>
> These laws apply to providers — not the person having an abortion. In fact, the law specifically says it cannot be used to punish the person who has an abortion. In simple terms, self-managed abortion is not a crime in Louisiana.
>
> Here are other key pieces of legal context to consider when exploring your options in Louisiana:
>
> - Abortion pills by mail are available in every state including Louisiana. Self-managed abortion is not a crime.
> - Although telehealth abortion is not permitted in Louisiana, people can still order abortion pills online. Louisiana law does not criminalize taking abortion pills, but what the law says can be different than what happens in reality.

76. Having assured the website user they can lawfully obtain abortion drugs from providers who themselves are violating state law, I Need An A then offers abortion options at the zip code entered by the user.

77. So, for example, with a Lake Charles zip code, I Need An A tells a user: "Doctors have been banned from performing abortions in Louisiana in most cases, but you've still got options." Besides driving or flying to an out-of-state clinic, I Need An A proposes that the user "[o]rder abortion

---

[21] I Need an A, *Abortion Access Guide in Louisiana*, perma.cc/8SU5-T66M (last visited Sept. 24, 2026) (attached as Ex. 14).

[22] *Id.* at 2 (expand to see all state legal info).

[23] *Id.*

pills online"—although it "may come with legal risk." If a user clicks that option, I Need An A displays various websites hosted by organizations that advertise the prescription, sale, and shipment of abortion drugs in Plaintiff States (and every other state). Those are defendants in this case.



**B. Defendants Prescribe, Sell, and Dispense Abortion Drugs Within Plaintiff States.**

78. Although each organization's website is structured differently, each runs materially the same operation. Each operates a website specifically advertising abortion drugs for sale and shipment in Plaintiff States; each accepts payments from individuals in Plaintiff States for those drugs; and each ships the drugs to addresses in Plaintiff States.

**1. The Massachusetts Medication Abortion Project (The MAP)**

79. Start with The MAP. Run by Cambridge Reproductive Health Consultants, The MAP "believe[s] abortion care should be available and accessible to everyone."[24] The MAP acknowledges "abortion is illegal or restricted in some states," but promises "[d]octors and medical professionals in certain states where abortion is protected may prescribe abortion pills by mail, even if you live in a state where it is banned or restricted."[25]

80. To carry out that promise, The MAP "work[s] with doctors in Massachusetts to prescribe FDA-approved abortion medication to patients anywhere in the US who meet eligibility for the medications and apply through our website."[26] As of July 31, 2026, The MAP claimed to operate through "five prescribers."[27]

81. The process to obtain abortion drugs from The MAP is extraordinarily simple. The MAP asks for a zip code, birth date, and date of a last known period—and then confirms that "[y]ou are eligible for abortion pills from The MAP." So that a user may understand The MAP's promise to "discreetly" send abortion pills, The MAP offers more information explaining the process: (1) "You can order abortion pills online right now, shipped directly to all 50 states"; (2) it takes only "2-5

[24] Ex. 4.

[25] The MAP, *Frequently Asked Questions*, perma.cc/G8EU-9WL3 (last visited Sept. 24, 2026) ("Is abortion legal in the US?") (attached as Ex. 15).

[26] *Id.* ("How does The MAP work?") (attached as Ex. 16).

[27] Ex. 1 at 22.

minutes" "to give some basic information about you, your pregnancy, and your medical history," and "the price you pay is up to you"; (3) a doctor will "prescribe you pills" within "1-12 hours"; and (4) "[p]ills should arrive 1-5 days from the approval at the address you provide."





Pills by Mail

You can order abortion pills online right now, shipped directly to all 50 states.

What you get

We will connect you with a doctor who can figure out if abortion pills are right for you.

The pills you get in the mail are the same you would get in a clinic, are prescribed by a doctor, and packaged in a plain envelope.

How does it work?

1 Complete the form
You will need to give some basic information about you, your pregnancy, and your medical history. Then, you'll add shipping and payment details. We use a pay-what-you-can model, meaning the price you pay is up to you.
2-5 minutes

2 Medical review
A doctor will look at the information you provided. If your pregnancy is under 80 days and abortion pills are safe for you to take, they will prescribe you pills.
Within 1-12 hours

3 Pills are shipped
Pills should arrive 1-5 days from the approval at the address you provide
Delivery in 1-5 days

Your data is encrypted before it leaves your device and we use secure systems to help protect your personal health information. For more information, please read our Privacy Policy.

Order Pills by Mail

82. The user completes the order using a payment platform called Stripe that The MAP uses to bring in its profits.

83. Once the order is complete, it slots into an ongoing production process at The MAP. To carry out its mission, The MAP has "thousands and thousands"[28] of Mifeprex (manufactured by Danco and distributed by Cencora) and misoprostol (packaged by a California company called

[28] Ex. 1 at 2.

PharmPak, Inc.) pills. To fill orders, The MAP hosts "pill-packing parties [] fueled by pizza and wine," during which volunteers and others stuff packages (typically 500 per party) with Mifeprex and misoprostol. Those parties "are a little competitive," and The MAP has "a long waiting list of volunteers eager for a chance to help thwart draconian anti-abortion laws."[29]



84. Defendant Angel Foster created The MAP and even today runs "the famous MAP assembly line" at pill-packing parties, while also "be[ing] front and center" when "constantly fundraising."[30]

85. Defendant Susan Yanow is The MAP's director of community engagement who—as part of her role—"deploy[s] volunteers" to package abortion drugs.[31] Similarly, Defendant Maureen Paul—The MAP's medical director—oversees the medical side of the operation.

86. The MAP then ships those packages from Massachusetts to their destinations, including thousands shipped to addresses in each of Plaintiff States. The MAP claims to send "more

[29] *See* Ex. 1 at 2–3, 5, 6.

[30] *See id.*

[31] *Id.* at 7.

than 6,000" shipments every month, 95% of which go to states "where abortion is subject to harsh restrictions and near-total bans."[32]

87. Plaintiff States have confirmed through public-protection investigations that The MAP will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. The MAP never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did The MAP meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had The MAP spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, The MAP approved the requests and shipped the drugs. This includes specific shipments to Louisiana in June 2026 and Arkansas in April 2026.

[32] *Id.* at 2–3.




**2. A Safe Choice Network/OPTIO**

88. Where The MAP tries to mask its operations behind anonymous individuals all under the same MAP umbrella, other organizations use a complex web of corporate entities, prescribers, and pharmacies to carry out an identical scheme. That is well illustrated by Defendant Remy Coeytaux's California-based operation, which involves A Safe Choice Network and OPTIO.

89. A Safe Choice Network (asafechoicenetwork.com)[33] is another of the organizations identified by I Need An A (and thus by mifepristone-manufacturers Danco and GenBioPro).[34] A Safe Choice Network claims to be "a referral network of caring and experienced medical doctors who

[33] Defendant A Safe Choice Inc. plainly is related to Defendant A Safe Choice Network Inc.—and to the extent that any allegations here regarding A Safe Choice Network Inc. also (or only) apply to A Safe Choice Inc., Plaintiffs make the same allegations as to A Safe Choice Inc.

[34] A Safe Choice, *Medication Abortion. Discreetly Delivered.*, perma.cc/FRE3-CB7Y (last visited Sept. 24, 2026) (attached as Ex. 17).

provide safe, private, and effective medication abortions to women nationwide." A Safe Choice Network emphasizes that it ships abortion drugs "discreetly to all 50 states."




90. A Safe Choice Network tells website users that, to obtain abortion drugs, they need only "complete our quick, confidential, secure, HIPPA compliant online consultation form (no phone call required)" and pay $140. "After reviewing your information, a doctor in A Safe Choice network will send abortion pills (mifepristone and misoprostol) to you discreetly via Priority Mail. The package will not identify the contents."

91. A Safe Choice Network recognizes that "[t]he legal risk for having an abortion depend[s] on the state in which you live." Accordingly, for information on legal risks, A Safe Choice

Network directs[35] website users to a website called Plan C, which, in turn, links back to I Need An A's "expla[nation] [of] current Louisiana abortion laws" (and the laws of the other Plaintiff States).[36]

92. The connection between A Safe Choice Network and Plan C (and thus I Need An A) is no accident. Defendant Remy Coeytaux is the president and CEO of A Safe Choice Inc., as well as the incorporator of A Safe Choice Network Inc.[37] A family member, Francine Coeytaux, is a co-founder of Plan C.[38]

93. An "Order Now" button on A Safe Choice Network's website takes the user to another website associated with OPTIO Women's Health, which announces "Medication Abortion via Telehealth." In a blog post, A Safe Choice Network claims to "partner with Optio Women's Health, an online clinic operating under California's shield law."[39]

94. The OPTIO website copies much of the language verbatim from A Safe Choice Network's website, including, for example, the $140 price and the promise to send "a discreet envelope" with abortion drugs "everywhere in the United States."[40] The OPTIO website claims that "OPTIO is proud to be A Safe Choice network member," although it is obvious the two websites and corporations are one and the same. The OPTIO website also links articles, including one entitled "U.S. Clinicians Can Now Mail Abortion Pills to States Banning Abortion, Thanks to Shield Laws in Five

[35] A Safe Choice, *FAQs*, perma.cc/HKN6-G48A (last visited Sept. 24, 2026) ("Possible legal risks to you") (attached as Ex. 18).

[36] Plan C, *Comprehensive clinic and support finder*, perma.cc/4VXT-YYX3 (last visited Sept. 24, 2026) (attached as Ex. 19).

[37] A Safe Choice Network Inc., Statement of Information Corporation (attached as Ex. 20).

[38] Plan C Movie, *About*, perma.cc/5AV8-PBWJ (last visited Sept. 24, 2026) (attached as Ex. 21).

[39] A Safe Choice, *How Mississippi Residents Can Get Abortion Pills in 2026: 3 Private Paths* (June 26, 2026), perma.cc/AAJ8-Q54N (attached as Ex. 22).

[40] Optio Women's Health, *Medication Abortion via Telehealth*, perma.cc/KVL2-XBWQ (last visited Sept. 24, 2026) (attached as Ex. 23).

States."[41] It likewise directs users to the I Need An A website for "trusted information, support services, and guidance."[42]

95. An "Order Now" button on the OPTIO website promises a "simpl[e]" process involving brief information, a $140 payment ("billed as OPTIO WOMEN'S HEALTH"), and "[d]iscreet shipping via US Postal Service Priority Mail."[43] Payment is submitted via the payment platform Clover.




96. As promised, completion of the process results in the delivery of a GenBioPro mifepristone pack and a bottle of misoprostol pills. They arrive in a package with a return address for "OWH" (*i.e.*, OPTIO Women's Health) and P.O. Box 1259, Windsor, CA 95492. The labels are generated by a shipping-label company called Shippo.

[41] Optio Women's Health, *Support and Resources*, perma.cc/AC3Q-VLZR (last visited Sept. 24, 2026) (attached as Ex. 24).

[42] *Id.* at 1.

[43] Optio Women's Health, *Request Medication*, perma.cc/8BN5-QKH6 (last visited Sept. 24, 2026) (attached as Ex. 25).




97. The phone number that the A Safe Choice Network website lists for assistance is the same number the OPTIO website lists: (707) 710-8866. That phone number is tied to an account with RingCentral, a cloud-based communications system. Defendant Remy Coeytaux is responsible for that account. Both Coeytaux (through the address remyco@gmail.com) and the current chief executive officer of A Safe Choice Network Inc., Defendant Margaret Simeone (through the address megsimeone@proton.me), use that account.

98. Defendant Coeytaux also is behind the shipment of packages bearing the "OWH" return address. He has an account with Shippo—the shipping-label company that processes the OWH shipping labels—and he set that account up through another email address (coeytaux@proton.me). Using that account, he prepares and ships packages linked with the same return address that appears on those packages (OWH, P.O. Box 1259, Windsor, CA 95492), and the same email address that the OPTIO website lists for assistance (doctor@optiowomenshealth.com). Defendant Coeytaux pays approximately $11-12 in shipping costs for each such shipment.

99. The Coeytaux-run operation through A Safe Choice Network, OPTIO Women's Health, and Remy Coeytaux, MD, PC (d/b/a Choix ReproductiveHealth) unsurprisingly makes extraordinary sums of money from the enterprise. Coeytaux used a usual email address (remyco@gmail.com), his corporation Remy Coeytaux, MD, PC (d/b/a Choix ReproductiveHealth), and his signature as president of his corporation to open an account with the payment platform Clover, which facilitates his profits. Predictably, his average sale price is around $140 or $150—and his total sales are astonishing. By processing dozens to hundreds of abortion-drug packages per day, it was not uncommon for Coeytaux to clear tens of thousands of dollars a month in 2024. And that was just the start: In 2026, he has been responsible for hundreds of abortion-drug packages every month, resulting in over $100,000 in profits every month.

100. Coeytaux's operation and profits, moreover, are not limited to orders processed through A Safe Choice Network and OPTIO Women's Health. He also partners with another organization, Aid Access,[44] which likewise advertises abortions drugs in "all 50 U.S. states including Louisiana," Arkansas, and Alabama.[45] For orders that he fills through Aid Access—including transactions with individuals in Louisiana, as reflected in the picture below—he has been paid through a Venmo handle (@RemyCoeytaux) bearing the name of his corporation, Remy Coeytaux, MD, PC.

[44] Due to unique issues surrounding foreign service of process, Plaintiff States will soon file a separate lawsuit against Aid Access.

[45] Aid Access, *Get Abortion Pill Online in Louisiana · Order Here*, perma.cc/A2ZR-3XAB (last visited Sept. 24, 2026) (attached as Ex. 26).




101. A Safe Choice Network and OPTIO are responsible for quite literally hundreds of such packages mailed to addresses within each Plaintiff State. Although Plaintiffs do not yet know the full extent of these operations, A Safe Choice Network/OPTIO/Coeytaux at least mailed nearly 500 abortion-drug packages to Louisiana addresses between 2025 and mid-2026; over 200 abortion-drug packages to Arkansas addresses between 2025 and mid-2026; and over 500 abortion-drug packages to Alabama addresses between 2025 and mid-2026.

102. Plaintiff States have confirmed through public-protection investigations that A Safe Choice Network/OPTIO will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. A Safe Choice Network/OPTIO never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did A Safe Choice Network/OPTIO meaningfully verify that the person submitting the request was

the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had A Safe Choice Network/OPTIO spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, A Safe Choice Network/OPTIO approved the requests and shipped the drugs. This includes specific shipments to Louisiana in August 2026 and Arkansas in March 2026.

**3. Abuzz**

103. Abuzz, LLC—based in Massachusetts—takes a similar tack involving prescribers and entities in the Northeast.

104. Abuzz engages in a widespread marketing campaign on social media that tries to glamorize abortion drugs, making them appear safe, easy, and normal. For example, Abuzz posts memes lauding access to abortion drugs to everyone "regardless of a zip code." It also posts images placing abortion drugs alongside everyday items like sunglasses and wallets.



105. Through its website abuzzhealth.com, Abuzz advertises abortion drugs via "fast, discreet shipping."[46]




106. Abuzz characterizes the process for obtaining drugs as "simple, confidential, and designed to meet your needs."[47] A website user need only answer "a few basic questions," "mak[e] a payment," and then receive the drugs within "1-5 business days."[48] No phone or video call is required—"[e]verything is done through the intake form."[49]

107. Abuzz does not provide any in-person screening for known contraindications of abortion drugs, such as bleeding disorders, certain medications, IUDs, gestation age, and ectopic

---

[46] Abuzz, *Need abortion care at home?*, perma.cc/K2QF-GRAW (last visited Sept. 24, 2026) (attached as Ex. 27).

[47] Abuzz, *How it Works*, perma.cc/QYZ6-TUZ8 (last visited Sept. 24, 2026) (attached as Ex. 28).

[48] *Id.* at 1, 3.

[49] Abuzz, *FAQs*, perma.cc/JU3K-6VXR (last visited Sept. 24, 2026) (attached as Ex. 29).

pregnancy. To the contrary, Abuzz discourages women from receiving this type of care, stating that the need for an ultrasound is a "myth," that patients with IUDs do not need to take them out, and that blood tests (or knowledge of blood type) is not needed because patients with Rh-negative blood type do not need to worry about negative effects until after twelve weeks of pregnancy.[50]




**Can I use abortion pills if I have an IUD in place?** –

It is very rare to become pregnant with an IUD in place. If you are pregnant with an IUD, there is a higher risk of it being an ectopic pregnancy. Ectopic pregnancies are dangerous because they can burst suddenly and cause severe internal bleeding. While an ultrasound is not required, it would show the location of the pregnancy and the IUD. You don't need to have the IUD taken out before taking abortion pills. They will still work (unless it is an ectopic pregnancy) and a risk is that the IUD may come out with the pregnancy. Since you have become pregnant, it also means you will need to have the IUD replaced after the abortion since it is no longer working correctly.

108. A "Get access today" button redirects the website user to an intake process. One of the first questions asks for a website user's state. If the user selects a state like New York, the website takes the user to questions about pregnancy status. But if the user selects a state like Louisiana, the website warns the user of "potential legal risks of getting abortion pills by mail in the state you selected."

[50] *See id.*

109. At the same step, the website links to third-party websites such as Plan C and Repro Legal Helpline for further information. Repro Legal Helpline carefully states that "using abortion pills to end your own pregnancy is not a crime in Louisiana" and also that "[h]ealthcare professionals in the state of Louisiana cannot provide abortions except to save the life or health of the pregnant [woman]"—by omission, Repro Legal Helpline concedes that the mailing of drugs itself is illegal.[51] The same is true of Plan C, which obliquely states that "[p]eople in Louisiana access abortion pills by mail from online clinics and providers outside of the state, despite laws that restrict in-state services."[52] Plan C also links to I Need An A, which, as explained above, expressly states that "telehealth abortion is not permitted in Louisiana."[53]

110. So long as the website user clicks through Abuzz's warning, a few questions and a few dollars (on the payment platform Square) later, abortion drugs—including GenBioPro mifepristone—are delivered to addresses in Plaintiff States.

111. Plaintiff States do not know every prescriber behind Abuzz, but they know of at least two: Defendant Christie Pitney and Defendant Manisha Kumar.

112. Pitney runs her own companies, Defendants Christie Pitney Nursing and Reproductive Health Inc. (d/b/a Forward Midwifery, Nursing, and Reproductive Health) and Forward Midwifery PLLC. Pitney also operates forwardmidwifery.org. Pitney and Forward Midwifery claim to offer mail-order abortion only "in California, Colorado, Maryland, Massachusetts, New Mexico, Oregon, & Washington."[54] That is not true. Pitney has an account with a shipping-label company called Pirate Ship—an account in her name and Forward Midwifery's name, using her

---

[51] Repro Legal Helpline, *Is abortion legal in Louisiana?*, perma.cc/EC2Z-AWJ2 (last visited Sept. 24, 2026) (attached as Ex. 30).

[52] Plan C, *Abortion pill access: Louisiana*, perma.cc/U2XR-GQG5 (last visited Sept. 24, 2026) (attached as Ex. 31).

[53] Ex. 14 at 2 (expand to see all state legal info).

[54] Forward Midwifery, *Promoting patient autonomy through empowering healthcare for all*, perma.cc/2E9Y-4MXF (last visited Sept. 24, 2026) (attached as Ex. 32).

Forward Midwifery address (christie@forwardmidwifery.com). Through that account, Pitney/Forward Midwifery prescribe and mail abortion drugs to addresses in Plaintiff States—on behalf of Abuzz and also as "an Aid Access provider" (the same organization with which Defendant Coeytaux is affiliated).[55] Pitney has confirmed that she has an "account[] with GenBioPro," which explains the GenBioPro drugs she is prescribing and mailing.[56]

113. On behalf of Abuzz, Pitney/Forward Midwifery are responsible for dozens of packages of abortion drugs mailed to addresses in each of Plaintiff States between 2024 and 2026.

114. Underscoring their work for Abuzz, Pitney/Forward Midwifery routinely use social media to amplify Abuzz content—such as this post proclaiming that "[a]bortion pills are SAFE, EFFECTIVE, and AVAILABLE in all 50 states!"

[55] Carrie N. Baker, *Online Abortion Provider Christie Pitney of Forward Midwifery: "Fast, Convenient Care"*, Ms. Magazine (Jan. 28, 2022) perma.cc/P7DM-EXCG (attached as Ex. 33).

[56] *Id.* at 13.




115. Defendant Kumar and her company Defendant Ishani Village carry out the same mission under Abuzz, using the same shipping-label company, Pirate Ship, that Pitney uses to mass mail abortion drugs. Both based in Massachusetts, Kumar/Ishani Village use Massachusetts' Address Confidentiality Program (ACP), which allows users to hide their addresses behind P.O. Box 9120, Chelsea, MA 02150.[57] In some instances (or at least some instances in the past), Kumar/Ishani Village disclose their identity despite using the ACP address.

[57] Address Confidentiality Program Fact Sheet (attached as Ex. 34).




116. Kumar/Ishani Village also, however, use the more-cryptic initials "IV" (*i.e.*, Ishani Village) when hiding behind the ACP while sending drugs for Abuzz.




117. Here, too, although Plaintiff States do not yet know the full extent of these operations, on behalf of Abuzz, Manisha Kumar and Ishani Village sent at least more than 1,300 abortion-drug packages to Louisiana addresses between 2024 and mid-2026; over 2,700 abortion-drug packages to Arkansas addresses between 2024 and mid-2026; and over 900 abortion-drug packages to Alabama addresses in fewer than 12 months spanning 2025 and mid-2026.

118. Plaintiff States have confirmed through public-protection investigations that Abuzz and its agents will send, and have sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. Abuzz never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did Abuzz meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had Abuzz spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, Abuzz approved the requests and shipped the drugs. This includes a specific shipment to Arkansas in February 2026 from Kumar/Ishani Village (and their hidden address).



**4. Southern Woven**

119. A web of Southern Woven entities and actors follows a similar pattern. The central piece is Defendant Robin Tucker. Tucker is a nurse practitioner and certified nurse midwife who lives and works in Maryland and Washington, D.C. She worked and, on information and belief, continues to work as a prescriber for the same organization associated with Defendants Remy Coeytaux and Christie Pitney (Aid Access), as well as the same organization associated with Defendants Manisha Kumar and Christie Pitney (Abuzz).[58] But more recently, she has created Southern Woven, which claims to be "southern" and which exclusively sells abortion drugs to individuals in pro-life states where abortion is prohibited.

120. Southern Woven's story rests on Tucker's entities—Defendants R. Tucker Limited, Metro Area Modern Reproductive Care, LLC (d/b/a Roxy Clinic),[59] and CE Repro (the 501(c)(3) organization). Through these entities, Tucker publicly purports to provide abortion drugs by mail only in states where abortion is lawful.[60] She does so through the same shipping-label company used by Pitney and Kumar—Pirate Ship—with an account registered in her name and Metro Area's name. Tucker typically generates labels with the same return address: MA (*i.e.*, Metro Area), P.O. Box 29, Cabin John, MD 20818.

121. The filing party that created Tucker's Metro Area entity (in May 2022) was the same Plano, Texas attorney (Heidi Kocher of a law firm called Liles Parker[61]) who created Christie Pitney's Forward Midwifery PLLC entity (in April 2022).[62] In addition, Pitney/Forward Midwifery use the

---

[58] Carrie N. Baker, *Online Abortion Provider Robin Tucker: 'I'm Trying To Remove Barriers…. It Feels Great To Be Able To Help People This Way"*, Ms. Magazine (Jan. 4, 2022), perma.cc/WBE7-7RXS (attached as Ex. 35).

[59] Roxy Clinic, *About*, perma.cc/TFS6-ZC36 (last visited Sept. 25, 2026) (attached as Ex. 36).

[60] Mara Gordon, *With Telehealth Abortion, Doctors Have to Learn to Trust and Empower Patients*, NPR (Jan. 17, 2023), perma.cc/P6DP-ZN6F (attached as Ex. 37).

[61] Liles Parker, *Heidi Kocher*, perma.cc/RE47-6TV2 (last visited Sept. 25, 2026) (attached as Ex. 38).

[62] Forward Midwifery PLLC, Articles of Organization for Domestic Limited Liability Company (attached as Ex. 39).

address 1331 H St. NW, Washington, D.C. 20005—the same address Tucker has used as an origin address and a return address for her shipments. These shared operational details reinforce that Tucker is not an isolated actor but part of a broader, coordinated network facilitating the sale and shipment of abortion drugs.

122. Despite her public representations, Tucker has repeatedly sent abortion drugs to addresses in states where such mailing is unlawful (including Louisiana and Arkansas) via the same shipping account—*i.e.*, in her name, in Metro Area's name, with a Pirate Ship label, and with the MA, P.O. Box 29, Cabin John, MD 20818 return address. She did so in 2023, 2024, and 2025. Tucker claims that Metro Area's providers "are licensed in each state we serve."[63] On information and belief, neither Tucker nor any agent of Metro Area is licensed in Louisiana and Arkansas.

123. In an apparent effort to cover up mailing abortion drugs to states where abortion is unlawful, Tucker tried to set up a shadow system in 2025: Southern Woven—a Delaware company registered to do business in New York, but really operating out of Maryland and Washington, D.C.

124. Tucker runs social media accounts for both Southern Woven and Metro Area (d/b/a Roxy Clinic) that publish the same content on the same days, which often appears to be AI-generated (as Southern Woven's website acknowledges):[64]

[63] Ex. 36.

[64] Southern Woven, *Medical Review and Clinical Standards*, perma.cc/B2X6-CWRS (last visited Sept. 25, 2026) (attached as Ex. 40).


We're still here.
roxyclinic.com
ROXY
roxy.clinic • Follow
roxy.clinic Quick update on care at Roxy.
We're staying open. We're continuing to serve patients. We're evaluating possible small adjustments to the regimen — more as we know more.
What hasn't changed:
- Online consult. from your couch
- Discreet delivery in plain packaging
- Sliding scale starts at $0
- Medical support throughout the process
- Care through 13 weeks
If you've got a consult started or were planning to, your care continues.
More on the blog as the situation evolves — link in bio.
#medicationabortion #telehealth #reproductivehealth #abortionpills #abortionaccess #abortioncare #telemedicine #reproductivejustice
19w
3 likes
May 1
Add a comment...
Post




125. Southern Woven's website claims to provide "Safe Abortion pill access For Southerners By Southerners."[65] According to the website, Southern Woven "was built" for "[t]he states with the most restrictive abortion laws."[66] "Telehealth is the way we do that. Mail is the way we do that." "Serving the South," Southern Woven promises, with "[s]afe and discreet delivery to your door."[67] "Our Mission," Southern Woven emphasizes, is "expand[ed] access to medication abortion in the South by connecting people with licensed telehealth clinicians."[68]

---

[65] Southern Woven, *Get the Abortion Pill Online*, perma.cc/X8GJ-XFKP (last visited Sept. 25, 2026) (attached as Ex. 41).

[66] Southern Woven, *For Southerners, By Southerners*, perma.cc/3HHL-ZUH4 (last visited Sept. 25, 2026) (attached as Ex. 42, at 3).

[67] Southern Woven, *Get the Abortion Pill Online*, *supra* n.65 (attached as Ex. 43).

[68] Southern Woven, *Support Abortion Access*, perma.cc/8S8S-6VGE (last visited Sept. 25, 2026) (attached as Ex. 44).

126. "Clinical care at Southern Woven is overseen by a Certified Nurse Midwife with more than a dozen state licenses and clinical experience going back to 2010 across labor and delivery, women's health, and complex gynecology"—*i.e.*, Robin Tucker.[69] And the process is much the same as with other schemes detailed above. According to Southern Woven, "[t]he model is simple on purpose: someone fills out a confidential intake," then "a licensed clinician reviews it," and then "FDA-approved medications are mailed in discreet packaging."[70] All for a sliding-scale fee between "$0 to $145" depending on a user's ability to pay.[71]

127. Southern Woven touts its status as "a referral partner of some of the most trusted organizations in the reproductive health space," including I Need An A.[72] Southern Woven also is open and "honest" about the illegality of its conduct: "We do **not** claim that accessing care through telemedicine is 'legal' in every state. What we say is that people across all 50 states are safely accessing care, and that shield laws protect the providers who prescribe."[73]

128. Payments for abortion drugs processed by Southern Woven's website—including payments for drugs mailed into Plaintiff States—are routed through a separate entity, Defendant Southern Woven Health PLLC (a/k/a Woven Health Partners), which is a Maine limited liability company.

129. Southern Woven is inextricably intertwined with Tucker's Metro Area entity—as well as Defendant CE Repro, Tucker's 501(c)(3) funding Southern Woven.

130. Southern Woven solicits donations on its website through CE Repro: "We partner with CE Repro Fund, our fiscal sponsor, to process donations securely and transparently. CE Repro

---

[69] Ex. 42 at 6.

[70] *Id.* at 4.

[71] *Id.* at 5.

[72] Southern Woven Medical Team, *Is Southern Woven Legit? Here's What You Should Know*, Southern Woven (Apr. 10, 2026), perma.cc/M4E7-K4BH (attached as Ex. 45, at 2).

[73] *Id.* at 4.

Fund is a 501(c)(3) nonprofit organization."[74] The website confirms that "100% of your donation goes directly to supporting abortion access through Southern Woven."[75] And it directs users to "[c]lick the button below to make a secure donation through our fiscal sponsor, CE Repro Fund."[76] When clicked, that button takes the user to a third-party donation website that states (a) it is "[o]rganized by CE Repro Fund" (identifying CE Repro's EIN number), (b) it is "[p]owered by the CE Repro Fund (a licensed 501(c)(3) nonprofit)," and (c) "CE Repro is a funding partner who ensures that your donation goes to Southern Woven, while still allowing you to make a tax deductible donation."[77]




131. Southern Woven also is using the same shipping scheme that Tucker built under Metro Area. It has mailed and is mailing abortion drugs—including GenBioPro mifepristone—to addresses in Plaintiff States via the same Pirate Ship shipping-label account and bearing the same familiar return address: MA, P.O. Box 29, Cabin John, MD 20818.

[74] Ex. 44.

[75] *Id.*

[76] *Id.*

[77] CE Repro Fund, *Southern Woven Healthcare*, Givebutter, perma.cc/244M-CVPB (last visited Sept. 25, 2026) (attached as Ex. 46).




132. Plaintiff States have confirmed through public-protection investigations that Southern Woven will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. Southern Woven never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did Southern Woven meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had Southern Woven spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, Southern Woven approved the requests and shipped the drugs. This includes specific shipments to Louisiana and Arkansas in August 2026.

**5. We Take Care Of Us**

133. Defendants One Plus Four LLC, CSA ASC LLC, and Robin Hewlett similarly operate under the name We Take Care Of Us (at the domain wetakecareof.us). We Take Care Of Us's website

originally listed CSA ASC LLC as its owner—and Hewlett, a midwife in New Jersey, owns and operates CSA ASC LLC. More recently, however, We Take Care Of Us's website lists One Plus Four LLC as its owner. Because the unlawful conduct by We Take Care Of Us alleged in this complaint spans both periods of alleged ownership, Hewlett is a named Defendant alongside both CSA ASC LLC and One Plus Four LLC.

134. We Take Care Of Us advertises abortion drugs "in all 50 states" and emphasizes that "[w]e provide care in all U.S. states."[78]




135. We Take Care Of Us warns that "[t]he legal context of abortion care is different in every state," and so directs website users to the Repro Legal Helpline website. As discussed above, Repro Legal Helpline states that, in Louisiana (and the other Plaintiff States), "[h]ealthcare professionals in the state of Louisiana cannot provide abortions except to save the life or health of

[78] We Take Care of Us, *Abortion Care*, perma.cc/7RCH-2ZVX (last visited Sept. 25, 2026) (attached as Ex. 47).

the pregnant [woman]."[79] The website also links to I Need An A's website, which states that "telehealth abortion is not permitted in Louisiana."[80]

136. We Take Care Of Us claims that "Certified Nurse Midwives" facilitate the organization's abortion drug scheme.[81]

137. The "Start Here" button on We Take Care Of Us's website takes the website user to a brief questionnaire that "should take about 5-7 minutes to complete."[82] The user must first answer the questions to determine "if you are eligible for care with one of our affiliated U.S. licensed providers."[83] "If you are eligible and you wish to continue," We Take Care Of Us will then collect the user's name, shipping address, and payment.[84] No video or telephone call is required—website users need only complete the online intake form.

138. Unlike with the MAP, A Safe Choice Network/OPTIO, Abuzz, and Southern Woven operations, We Take Care Of Us works through a mail-order pharmacy—the same pharmacy used by Aid Access, the organization affiliated with Coeytaux, Pitney, and Tucker. *See supra* ¶¶ 100, 112, 119. Once an unknown prescriber behind We Take Care Of Us receives payment, therefore, the prescriber sends the prescription to the mail-order pharmacy, which then directly mails the abortion drugs (GenBioPro mifepristone) into Plaintiff States. Those packages nearly always come through FedEx.

139. Plaintiff States have confirmed through public-protection investigations that We Take Care Of Us will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. We Take Care Of Us never conducted a telehealth

---

[79] Ex. 30.

[80] Ex. 14 at 2 (expand to see all state legal info).

[81] We Take Care of Us, *Frequently Asked Questions*, perma.cc/67C5-4KV9 (last visited Sept. 25, 2026) ("Who are the providers?") (attached as Ex. 48).

[82] We Take Care of Us, *Medical Request Form*, perma.cc/XQZ9-PDR4 (last visited Sept. 25, 2026) (attached as Ex. 49).

[83] *Id.*

[84] *Id.*

consultation or otherwise spoke with the person identified as the patient. Nor did We Take Care Of Us meaningfully verify that the person submitting the request was the person identified as the patient. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had We Take Care of Us spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, We Take Care Of Us approved the requests and shipped the drugs. This includes specific shipments to Louisiana in June 2026 and Arkansas in August 2025.




**6. Choices Rising**

140. For all practical purposes, With Open Arms Center for Reproductive Choices, Inc. (d/b/a Choices Rising)—created by Defendant Anthony Paik-Nicely—operates materially identically to how We Take Care Of Us operates.

141. Choices Rising's website (choicesrising.com) advertises "abortion pills by mail to 50 US states."




142. Choices Rising states that only "4 Easy Steps" are necessary to secure "convenient and discreet abortion pills delivered by mail": (1) complete a request form and provide requested information (including payment via Stripe); (2) sign consent forms; (3) receive Choices Rising's approval that "you have been medically cleared to receive the service"; and (4) receive abortion drugs by mail "within 3-5 days" "in an unmarked box."[85] No video or telephone call is necessary.

[85] Choices Rising, *Choices Rising Abortion Pill Virtual Clinic*, perma.cc/W3BN-HJ7Y (last visited Sept. 25, 2026) (attached as Ex. 50).

143. Choices Rising claims to have a "small team" of "board-certified physicians and [a] registered nurse"—presumably including Defendant Paik-Nicely—that "provid[es] access to the FDA-approved medications for safe in-home abortion treatment."[86]

144. Choices Rising also tells website users to visit I Need An A's website "[t]o find out more about what is legal in your state."[87] Choices Rising likewise directs website users to The Guttmacher Institute, whose website states that "[a]bortion is completely banned with very limited exceptions" in Louisiana—and "[m]edication abortion can only be provided after in-person visit because state requires pills to be dispensed in person."[88]

145. Through its website and people like Paik-Nicely, Choices Rising sends prescriptions for mail abortion drugs (including GenBioPro mifepristone) to the same mail-order pharmacy used by We Take Care Of Us and Aid Access. The mail-order pharmacy has then sent abortion drugs to addresses in each Plaintiff State, including (in Louisiana) addresses in Abbeville, Baton Rouge, Breaux Bridge, and Cheneyville.

146. Plaintiff States have confirmed through public-protection investigations that Choices Rising will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. Choices Rising never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did Choices Rising meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the

---

[86] Choices Rising, *About Us*, perma.cc/N77J-SSKE (last visited Sept. 25, 2026) (attached as Ex. 51).

[87] Choices Rising, *FAQs*, perma.cc/6RR4-UJXX (last visited Sept. 25, 2026) ("How will state specific laws affect my pregnancy options?") (attached as Ex. 52).

[88] Guttmacher, *Interactive Map: US Abortion Policies – Louisiana*, perma.cc/UA35-RWZR (last visited Sept. 25, 2026) (attached as Ex. 53).

billing address did not match the shipping address. Had Choices Rising spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, Choices Rising approved the requests and shipped the drugs. This includes a specific shipment to Arkansas in March 2026.




## C. Mail-Order Pharmacies and Common Carriers Facilitate This Scheme.

147. For Defendants We Take Care of Us and Choices Rising (and for the related organization, Aid Access), their operations would not work if they did not have a mail-order pharmacy to which their prescribers could send prescriptions for priority mailing to addresses in Plaintiff States. Those pharmacies thus are indispensable to the interstate mail-order abortion scheme. Relevant here

are Honeybee Health Inc., a Delaware corporation based in California, and its shadow corporation, Defendant JBN Operations—which is behind We Take Care of Us, Choices Rising, and Aid Access.

148. Honeybee Health Inc. is an online pharmacy founded by Defendant Jessica Nouhavandi. During the COVID-19 pandemic, Nouhavandi and Honeybee seized the opportunity to use Honeybee as a vehicle for mail-order abortion drugs. According to Francine Coeytaux, it was Honeybee and Nouhavandi who were "the first to actually look at the restrictions and say, 'Hey wait a minute, they don't mention anything about mailing.'"[89] "She (Nouhavandi) stepped up and starting doing this," says Coeytaux.[90] "By mid-2021," Honeybee was making millions of dollars off of mail-order abortion drugs.[91] As Nouhavandi has put it, "[w]e're really the main hub for mailing abortion pills.... Almost everything comes out of California, and mainly from Honeybee."[92] In fact, Choices Rising has gone so far as to list Honeybee Health as one of its partners.

149. Honeybee recently has filed a court brief claiming that "Honeybee dispenses the highest volume of mifepristone by mail of any U.S. mail-order pharmacy."[93] Honeybee qualified that statement by also saying that "Honeybee only dispenses mifepristone by mail in jurisdictions whose laws permit it to do so (currently thirty-one states and the District of Columbia) and does not ship mifepristone to Louisiana."[94]

150. Honeybee and Nouhavandi's word choice is significant because, although they have attempted to protect Honeybee itself from the consequences of mailing abortion drugs to pro-life

---

[89] James Brock, *Abortion Activists*, Los Angeles Business Journal (July 10, 2023), perma.cc/H88X-QGZT (attached as Ex. 54, at 2).

[90] *Id.*

[91] *Id.*

[92] Patrick Adams, *Abortion drugs: Bill would allow doctors to prescribe anonymously*, LAist (Sept. 10, 2025), perma.cc/S9PH-ARAC (attached as Ex. 55, at 4).

[93] Br. of Amicus Curiae Honeybee Health, Inc. In Support Of Applications By Danco And GenBioPro To Stay Or Vacate The Fifth Circuit's Stay Pending Appeal, Danco Lab'ys, L.L.C. v. Louisiana, No. 25A1207, at 1 (May 7, 2026), perma.cc/R6FG-NABP (attached as Ex. 56, at 1).

[94] *Id.*

states in violation of state laws ("we don't want to jeopardize our licenses to sell [ordinary medications that have nothing to do with abortions] in those states," says Nouhavandi[95]), Nouhavandi formed a shadow company with her brother Defendant Brandon Nouhavandi to carry out that illegal activity.

151. That company is Defendant JBN Operations LLC—*i.e.*, **J**essica and **B**randon **N**ouhavandi Operations LLC. JBN is a pharmacy business located at 3751 S. Hill St., Los Angeles, CA 90007. Brandon Nouhavandi—who was and, on information and belief, continues to be a Honeybee employee—is a manager or member of JBN. JBN's California pharmacy license expired in 2026—yet JBN has continued to ship abortion drugs to each of Plaintiff States after that expiration.

152. The idea behind JBN—"a U.S. pharmacy in a state with a shield law [that] would fill the orders, cutting delivery times"—came from Aid Access prescribers looking for a way to facilitate mailing abortion drugs into "red states."[96] It also came from Jessica Nouhavandi who told The New York Times Magazine that "she was exploring setting up a legally separate pharmacy in Massachusetts so that her company [Honeybee] could also take advantage of the state's shield law."[97] She ultimately did not have to move across the country because, after California passed its own shield law, she and her brother, Brandon, created JBN in California.

153. JBN is the lifeline for We Take Care of Us, Choices Rising, and Aid Access. When individuals in Plaintiff States accept their offer to sell abortion drugs, the corporations and prescribers behind those websites transmit the prescriptions to JBN. JBN then fills those prescriptions and ships the abortion drugs from California to the addresses in the Plaintiff State.

154. Although Plaintiff States do not yet know how many abortion-drug packages JBN has sent into each Plaintiff State, public reports suggest that Honeybee and JBN are responsible—through

[95] Ex. 54 at 3.

[96] Emily Bazelon, *The Doctors Risking Everything to Offer Abortions Across State Lines*, The New York Times Magazine (Oct. 4, 2022) (attached as Ex. 57).

[97] *Id.*

Aid Access alone—for "12,000 pills a month to people all over the country."[98] And on information and belief, JBN has shipped thousands of abortion-drug packages to each of Plaintiff States over the past three years.

155. JBN continues to ship abortion drugs to each of Plaintiff States today. That includes a specific shipment to Louisiana in June 2026. JBN's packages uniformly bear JBN's return address: 3751 S. Hill St., Los Angeles, CA 90007.




156. JBN's role in this scheme leads to the related role of common carriers themselves.

157. FedEx Corporation is responsible for approximately half of the scheme. Jessica and Brandon Nouhavandi—through JBN Operations LLC—have been FedEx customers since March 2024. FedEx has assigned a customer number to JBN Operations LLC (#200669519). It has logged

[98] Ex. 55 at 6.

JBN's return address as 3751 S. Hill St., Los Angeles, CA 90007. And it lists Brandon Nouhavandi as JBN's primary shipper contact. FedEx also tracks each of JBN's shipments into each of Plaintiff States.

158. FedEx has its own label-generating service, which appears to be what JBN uses in shipping thousands of abortion drugs into each of Plaintiff States on behalf of We Take Care of Us, Choices Rising, and Aid Access (and perhaps other unknown entities and individuals).




159. For its part, USPS is responsible for the remainder of the interstate mail-order abortion scheme. It has delivered, and continues to deliver, thousands of abortion drugs to addresses in Plaintiff States on behalf of The MAP, A Safe Choice Network/OPTIO, Abuzz, and Southern Woven.

160. USPS's responsibility for The MAP, in particular, is most egregious. Not only does USPS handle 100% of the shipments from The MAP into Plaintiff States, but USPS also creates—through an account(s) held by an agent(s) of The MAP—the shipping labels enabling the mass

shipment of the abortion drugs. USPS knows that The MAP is responsible for the shipments both because The MAP has a registered account and because the labels themselves expressly identify The MAP by name and by its return address:




161. The MAP is extraordinarily open about this scheme, centering USPS in almost every picture showcasing its operation to the media.


e about The MAP









MAP volunteers haul bins of packaged abortion pills to a nearby post office. Emily Schiffer




A typical daily run to the nearby post office includes hundreds of packages bound for all 50 states. Emily Schiffer

**III. Defendants Actively Misrepresent Key Facts Surrounding Abortion Drugs.**

162. One key theme across Defendants' websites is a blatant disregard for the truth and women and girls' safety. That includes frivolous claims such as A Safe Choice Network's claim to be "[a] woman-owned business" (when the whole operation is run by Remy Coeytaux).[99] It includes the frivolous claim by Robin Tucker (a Maryland resident) that Southern Woven is "For Southerners By Southerners."[100] And it includes the frivolous claims by Tucker and Christie Pitney that their businesses (Metro Area and Forward Midwifery) mail abortion drugs only to states where abortion is legal.

163. Beyond those frivolous claims, there are six general buckets of misleading claims appearing across all websites.

164. *First*, Defendants mislead consumers by suggesting medication abortion in Plaintiff States is lawful. They do so by emphasizing that self-administered abortion by a pregnant woman in a Plaintiff State is *not* a crime—but they omit that the act of dispensing abortion drugs by mail in each Plaintiff State *is* a crime. For example:

- The MAP claims that "[d]octors and medical professionals in certain states where abortion is protected may prescribe abortion pills by mail, even if you live in a state where it is banned or restricted."[101]
- A Safe Choice Network/OPTIO claims[102] Plaintiff States' laws "expressly exempt[] the pregnant [woman] from prosecution" and individuals in such states may lawfully obtain abortion drugs: "Because in-state access is nonexistent, many Mississippians [and those in Plaintiff States] now rely on telehealth providers based

[99] A Safe Choice, *About Us*, perma.cc/JV9T-3G69 (last visited Sept. 26, 2026) (attached as Ex. 58).
[100] *See* Ex. 42.
[101] Ex. 15.
[102] Ex. 22.

in states with shield laws. These laws protect doctors who prescribe and mail abortion pills to people in Mississippi and other restricted states. It is a proven, legal pathway that thousands of people use every year to get abortion pills in Mississippi and other banned states."

- We Take Care Of Us claims: "There are no laws directly criminalizing the ingestion of abortion pills in any state . . . ."[103]

165. Defendants Tucker/Southern Woven concede the misleading nature of the statements above: "We do **not** claim that accessing care through telemedicine is 'legal' in every state. What we say is that people across all 50 states are safely accessing care, and that shield laws protect the providers who prescribe."[104] But even that concession elides the fact that their conduct *is illegal* in Plaintiff States.

166. *Second*, Defendants mislead consumers by overstating the safety, and understating the risks and effects, of abortion drugs. For example:

- A Safe Choice Network/OPTIO claims that "[s]erious complications (such as infection requiring hospitalization or blood transfusion) occur in about 0.2% of cases."[105]

- Abuzz claims that abortion drugs "are very safe—safer than Tylenol and safer than driving in a car! The risk of severe, life-threatening complications requiring hospitalization is less than 1%."[106]

---

[103] We Take Care of Us, *Frequently Asked Questions*, perma.cc/67C5-4KV9 *supra* n.81 ("Is it legal to take abortion pills where I live?") (attached as Ex. 59).

[104] Ex. 45 at 4.

[105] A Safe Choice, *Living in Alabama and Safely Ordering Abortion Pills Online* (Nov. 13, 2025), perma.cc/ZDL3-8C6X (attached as Ex. 60).

[106] Ex. 29 at 2.

- Southern Woven claims abortions are "[e]xtremely safe" ("[s]afer than Tylenol, wisdom teeth removal, and childbirth"), that "[s]erious complications occur in less than 0.4% of cases," and that "[l]ess than 1% need to visit an ER."[107]
- We Take Care Of Us claims "[m]edication abortion is extremely safe. For every 100 people, about 99 will have a completely uncomplicated experience. Abortion medications have a better safety record than many common over-the-counter medications, including Tylenol."[108]
- Choices Rising claims abortion via medication "is one of the SAFEST medical procedures," that "[c]omplications occur in less than 0.4% of patients," and "[c]omplications are rare and most are not serious."[109]



[110]

167. Those representations squarely contradict FDA's own representations. The FDA-approved label states that up to 4.6% of women who take mifepristone for pregnancies under ten

[107] Southern Woven, *Frequently Asked Questions About Abortion Pills & Our Services*, perma.cc/UPF4-2RMF (last visited Sept. 26, 2026) ("Are abortion pills safe?") (attached as Ex. 61).

[108] We Take Care of Us, *Frequently Asked Questions*, *supra* n.81 ("Is Medication abortion safe?") (attached as Ex. 62).

[109] Choices Rising, *Abortion Pill (Medicated Abortion)*, perma.cc/R758-JTH2 (last visited Sept. 26, 2026) (attached as Ex. 63).

[110] We Take Care of Us, Post on Instagram (Sept. 20, 2024), perma.cc/ZF63-8BYH (attached as Ex. 64).

weeks experience serious adverse events requiring emergency room care.[111] The label states that "[a]bout 2 to 7 out of 100 women taking [mifepristone] will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding."[112] In fact, 8% of women may bleed for more than 30 days.[113] So severe are these risks that FDA has imposed a Black Box warning on mifepristone, stating: "WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING."[114]

> **WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
>
> ***See full prescribing information for complete boxed warning.***
>
> **Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.**
>
> - **Atypical Presentation of Infection. Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)**
> - **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)**
>
> **MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).**
>
> **Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.**

168. A recent analysis in the peer-reviewed journal *BioTech* also explains claims like these are "unfounded, misleading, and entirely dangerous," indicative of "a complete disregard for the need to communicate comprehensive and truthful safety information to patients."[115] More: "It is essential to state unequivocally that there has never been a single study appropriately comparing the safety of mifepristone and acetaminophen [Tylenol] or any of the common drugs presented in these claims."[116]

---

[111] Mifeprex FDA Label (approved by FDA Jan. 2023), available at perma.cc/YJF2-MSY5 (attached as Ex. 65, at 8).

[112] *Id.* at 17.

[113] *Id.* at 4.

[114] *Id.* at 1.

[115] Cameron Louttit, *The Origins and Proliferation of Unfounded Comparisons Regarding the Safety of Mifepristone*, 14 BioTech, no. 2, art. 39 (May 24, 2025), https://www.mdpi.com/3326836 (attached as Ex. 66, at 12–13).

[116] *Id.* at 3.

169. *Third*, Defendants mislead consumers by claiming the abortion drug regimen they are selling is "FDA-approved." For example:

- The MAP claims: "We work with doctors in Massachusetts to prescribe FDA-approved abortion medication to patients anywhere in the US who meet eligibility for the medications and apply through our website."[117]
- A Safe Choice Network/OPTIO claims: "A medication abortion, also known as a medical abortion, refers to an abortion that results from taking a combination of two FDA-approved medications, mifepristone and misoprostol."[118]
- We Take Care Of Us claims: "Yes, the US Food and Drug Administration (FDA) approved mifepristone (the first of two medicines used in a medication abortion) in 2000."[119]
- Choices Rising claims: "Get the FDA-approved abortion pill prescribed by licensed abortion providers and delivered discreetly to your door a few days after your initial request."[120]

170. FDA, however, has approved mifepristone only "in a regimen with misoprostol, to end an intrauterine pregnancy through ten weeks gestation (70 days or less since the first day of a patient's last menstrual period.)"[121] Indeed, FDA's mifepristone label is unambiguous: "Do not take [mifepristone] if you ... [h]ave a pregnancy that is more than 70 days (10 weeks)."[122]

---

[117] Ex. 16.

[118] Safe Choice, *Medication Abortion via Telehealth*, perma.cc/P8PU-DBN8 (last visited Sept. 25, 2026) (attached as Ex. 67).

[119] We Take Care of Us, *Frequently Asked Questions*, *supra* n.81 ("Are abortion pills FDA approved?") (attached as Ex. 68).

[120] Ex. 63.

[121] FDA, *Information about Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation* (current as of Jan. 17, 2025), perma.cc/Z75Z-ZJ5Z (attached as Ex. 69, at 1).

[122] Ex. 65 at 17.

171. Defendants by contrast actively advertise abortion drugs for delivery where the gestational period *exceeds* FDA's ten-week limit: The MAP (through 11.5 weeks[123]), A Safe Choice Network/OPTIO (through 13 weeks[124]), Abuzz (through 13 weeks[125]), Southern Woven (through 12 weeks, 6 days[126]), We Take Care Of Us (through 12 weeks[127]), Choices Rising (through 12 weeks[128]). In fact, Choices Rising separately claims that "[a]bortion pills are safe for pregnancies up to 13 weeks and 6 days in gestation."[129] Similarly, Abuzz has combined the "safer than Tylenol" misrepresentation above with a claim that "it's also medically *safe* to take the pills after 12 weeks."[130]




172. In addition, FDA expressly recommends *against* "buying mifepristone online" where the purchase would fall outside FDA's current approved program for mifepristone—which includes

[123] The MAP, *Frequently Asked Questions*, *supra* n.25 ("Do my abortion options depend on how many weeks pregnant I am?") (attached as Ex. 70).

[124] Ex. 23 at 2.

[125] Ex. 27 at 5.

[126] Southern Woven, *Frequently Asked Questions About Abortion Pills & Our Services*, *supra* n.107 ("How far in pregnancy can I use abortion pills?") (attached as Ex. 71).

[127] We Take Care of Us, *Medication Request Form* (last visited Sept. 28, 2026), perma.cc/3CFH-7S5Q (attached as Ex. 90) (click through until date of last menstrual period).

[128] Ex. 63.

[129] Choices Rising, *FAQs*, *supra* n.87 ("Who is eligible for medication abortion services from Choices Rising?") (attached as Ex. 72).

[130] AbuzzHealth, Post on Instagram (Oct. 22, 2024), perma.cc/N4ND-MV66 (attached as Ex. 73).

the ten-week limit.[131] By advertising the prescription, sale, and use of abortion drugs for pregnancies well beyond ten weeks, therefore, Defendants are advocating a use of abortion drugs that emphatically is *not* "FDA-approved."

173. *Fourth*, and relatedly, Defendants (*e.g.*, The MAP,[132] Abuzz,[133] Choices Rising,[134] and We Take Care of Us[135]) mislead consumers by claiming a 98% rate of efficacy. That is deeply misleading because, as A Safe Choice Network/OPTIO recognize, that number (if it were valid at all) is (a) more like "96%-98%" and (b) only as to abortion drugs "[t]aken within the first 10 weeks (70 days) of pregnancy"[136]—not through 12 and 13 weeks as Defendants advertise.

174. *Fifth*, Defendants mislead consumers by claiming that pre-abortion care is unnecessary. For example:

- A Safe Choice Network/OPTIO claims: "It is important to know that an ultrasound and in-person visits with a local healthcare provider are not necessary for the vast majority of people, either before or after a medication abortion."[137]
- Choices Rising claims: "There is no need to have a Telehealth consultation."[138]
- Abuzz claims an ultrasound is unnecessary.[139]
- We Take Care Of Us claims "an ultrasound is not required."[140]

---

[131] Ex. 69 at 1.

[132] The MAP, *Frequently Asked Questions*, *supra* n.25 ("How do I know if the abortion pills worked?") (attached as Ex. 74).

[133] Ex. 29 at 2.

[134] Ex. 63.

[135] We Take Care of Us, *Frequently Asked Questions*, *supra* n.81 (attached as Ex. 75).

[136] Ex. 60 at 5.

[137] A Safe Choice, *How to Safely Buy Abortion Pills Online in 2026: Your Comprehensive Guide from A Safe Choice* (July 20, 2025), perma.cc/88QZ-CHBU (attached as Ex. 75, at 7).

[138] Choices Rising, *Abortion Pill (Medicated Abortion)*, *supra* n.109 (attached as Ex. 76).

[139] Ex. 29 at 4.

[140] We Take Care of Us, *Medical Request Form*, *supra* n.82 (attached as Ex. 78) (click through to ultrasound question).

175. The lack of an accurate assessment of gestational age can be fatal. Similarly, the lack of an in-person assessment for contraindications, such as the presence of an ectopic pregnancy or an Rh blood type, can be seriously detrimental—and can be fatal—to a woman's health. The lack of in-person care also prevents a healthcare provider from ensuring a woman's consent and that she is free from coercion in seeking an abortion. Indeed, all this is why Plaintiff States' laws specifically require an in-person examination before an abortion (if otherwise lawful) may be effectuated.

176. *Sixth*, Defendants facilitate confusion and mistreatment by healthcare providers in Plaintiff States by urging individuals to lie about the reasons for their symptoms.

- The MAP claims: "[I]f you are worried, you can get an ultrasound at an emergency department or through a primary care doctor or gynecologist. If you get an ultrasound, you do not need to tell them you used abortion pills. You can tell them you are pregnant and had some bleeding, and want to know if everything is OK."[141]
- A Safe Choice Network/OPTIO claims: "If you need emergency medical care at any point, you do not have to tell anyone you took abortion pills. Simply tell the provider you are pregnant and bleeding. They are trained to treat complications from pregnancy loss and will take care of you."[142]
- Abuzz claims: "The only way for the providers to know [you took abortion drugs] is if you tell or you took the pills vaginally and they see them on an internal exam. You do not need to say that you took abortion pills."[143] In response to the question "If I have to go to the hospital, what should I say?" Abuzz answers: "The

[141] The MAP, *Frequently Asked Questions*, *supra* n.25 ("I am worried that something went wrong with the abortion. What do I do?") (attached as Ex. 79).

[142] Ex. 22 at 6.

[143] Ex. 29 at 8 ("Will anyone be able to tell that I took abortion pills?").

treatment for a miscarriage and abortion are the same, so you can just say something like 'I'm bleeding but it doesn't feel like my usual period. I'm afraid something is wrong' or 'I'm pregnant and bleeding. I'm scared there's something wrong' and you should get the care you need."[144]

- Southern Woven says: "If you need ER care for any reason, 'I'm having a miscarriage' is medically accurate, and the care protocols are identical either way."[145]
- Choices Rising says: "In the unlikely event that follow-up care is necessary ... you can simply describe your symptoms as they are identical to those of a miscarriage. Any requisite follow-up treatment would also be consistent for both an abortion and a miscarriage."[146]

177. Defendants' deception is not limited to what they say—it also includes what they leave out. In particular, Defendants fail to adequately disclose material information about what women may experience after taking abortion drugs. That includes the nature and severity of potential complications, the possibility of emergency or surgical intervention, the limitations of a remote screening process, the lack of integrated local follow-up care, and the physical realities of the abortion itself.

178. Start with the nature and severity of the physical and psychological pain. Participants in a Norwegian study on abortion drugs, for example, described pain that was "out of this world," "much worse than giving birth," and "a day in hell."[147] One participant "cried and screamed for eight

---

[144] *Id.*

[145] Southern Woven, *How to Get the Abortion Pill Online: Step-by-Step Guide*, perma.cc/E578-AVTF (last visited Sept. 27, 2026) (attached as Ex. 80).

[146] Choices Rising, *Secure Message* (attached as Ex. 81).

[147] Idun Røseth et al., *"Out of This World": Norwegian Women's Experiences of Medical Abortion Pain*, 16 J. Multidisciplinary Healthcare 889, 892–93 (2023), https://pubmed.ncbi.nlm.nih.gov/37038454/ (attached as Ex. 82).

hours" but was turned away from the emergency hospital and told her experience was "quite normal."[148] Another study surveying 1,596 abortion-drug patients found that 41.5% of respondents rated their pain as at least an eight on a ten-point scale.[149]

179. Beyond failing to account for the physical and psychological pain, Defendants fail to adequately disclose the heightened risk of complications as a pregnancy progresses. One study, for example, found that women who took abortion drugs between 9-12 weeks gestation (as compared to women who took the drugs before 9 weeks gestation) were significantly more likely to experience hemorrhage and infection—and that they were four times more likely to have an incomplete abortion and over six times more likely to require a surgical procedure.[150] Defendants do not disclose this.

180. Defendants also do not disclose the consequences of their remotely dispensing abortion drugs. Plaintiff States' investigations confirmed that Defendants would ship abortion drugs based on fictitious pregnancy information submitted through their online intake processes. And that points up the inherent limitations of the process: Without an examination or diagnostic testing, Defendants may not reliably identify an ectopic pregnancy, confirm gestational age, determine whether an IUD remains in place, or identify other conditions bearing on whether the drugs can be safely used. This matters because even FDA identifies ectopic pregnancy, pregnancies beyond 70 days, certain bleeding conditions, and an IUD as circumstances relevant to whether mifepristone should be used.

181. Moreover, that Plaintiff States have confirmed shipments from Defendants based on fictitious individuals and men requesting and paying for abortion drugs illustrates there are no

---

[148] *Id.* at 892.

[149] Hannah McCulloch et al., *Expectations and Experiences of Pain During Medical Abortion at Home: A Secondary, Mixed-Methods Analysis of a Patient Survey in England and Wales*, 51 BMJ Sexual & Reproductive Health 137, 140 (2025), https://pubmed.ncbi.nlm.nih.gov/39694584/ (attached as Ex. 83).

[150] Maarit Niinimäki et al., *Comparison of Rates of Adverse Events in Adolescent and Adult Women Undergoing Medical Abortion: Population Register Based Study*, 342 BMJ d2111, 5 (2011), https://pubmed.ncbi.nlm.nih.gov/21508042/ (attached as Ex. 84).

safeguards in place: Defendants will give the domestic abuser, the husband, and the violent boyfriend abortion drugs with impunity even where a pregnant woman does not want an abortion.

182. Finally, Defendants fail to adequately disclose the limitations of the care they can provide if complications arise. Their services are intentionally remote, but Defendants do not adequately explain the consequences of that limitation. If a woman experiences severe bleeding, an incomplete abortion, infection, or another complication requiring examination or treatment, Defendants cannot provide that care remotely. The woman must instead seek care from an unrelated Plaintiff State provider who did not prescribe the drugs and did not conduct the initial evaluation (if there was one).

183. These are not collateral details. These material misrepresentations and omissions go to the very essence of the service Defendants are selling, which both violates Plaintiff States' laws and occurs without the medical oversight required by Plaintiff States' laws that are designed to protect women and girls.

**IV. Defendants' Violation of Plaintiff States' Laws Is Knowing and Intentional.**

184. Defendants cannot claim ignorance of Plaintiff States' laws. Before filing this action, Plaintiff States expressly notified certain Defendants or their website hosts that their conduct violated Arkansas's and Alabama's laws and demanded that they cease their unlawful activity. The activity has not stopped.

185. Not only that, but Defendants themselves also acknowledge their conduct knowingly and intentionally violates Plaintiff States' laws—and are specifically designed to undermine Plaintiff States' laws.

186. Take The MAP. As Defendant Foster has described The MAP, "[t]he whole project is set up around distributed risk. Different people order our pills, package our pills, process the money, write the prescriptions and take the pills to the post office, which makes it harder to identify individuals

as opposed to the practice."[151] The idea, she said more recently, is to make it "really hard to identify an individual person who provided pills to an individual patient," thereby "making it much harder for someone in a red state to target them for legal action."[152]

187. And that attack on pro-life states is The MAP's entire mission. *Dobbs* was "The MAP's origin story."[153] After *Dobbs*, Defendant Foster "saw a perfect opportunity to operationalize her middle-finger rage."[154] "[S]he settled on creating an organization—that would become The MAP—offering telemedicine nationally . . . ." Foster is thus intimately involved in leading every aspect of The MAP, including by structuring and maintaining The MAP's "distributed risk" model. Because of her conduct, Foster "drastically limits how she moves within the US" by not entering pro-life states.[155]

188. Similarly after *Dobbs*, The MAP's now-medical director, Defendant Maureen Paul, joined the project "to channel her fury."[156] And when Justice Alito recently wrote that schemes like The MAP's "circumvent the [pro-life laws] that *Dobbs* made possible," The MAP's director of community engagement, Defendant Susan Yanow, giggled, "It made me so happy ... when he wrote, 'They're undermining *Dobbs*.' I was like, *yeah*, *exactly*.'"[157] Foster, for example, uses Mississippi as her "favorite example"—because Mississippi won *Dobbs*, and yet since *Dobbs*, abortions in Mississippi "have risen a mind-boggling 85 percent" due to mail-order abortion.[158]

189. As one article glowingly concluded, "Four years after the Supreme Court's *Dobbs* ... decision ended the national right to abortion, Foster and her allies have managed to create an

[151] Carrie N. Baker, *Massachusetts Abortion Provider Serves Patients Living in States Banning Abortion*, Ms. Magazine (July 29, 2024), perma.cc/7U25-C7QE (July 29, 2024) (attached as Ex. 85, at 10–11).

[152] Ex. 1 at 22.

[153] *Id.* at 3.

[154] *Id.* at 21.

[155] *Id.* at 23.

[156] *Id.* at 22.

[157] *Id.* at 7.

[158] *Id.* at 13.

entire healthcare, legal, and financing infrastructure—what [Paul] ... calls a 'shadow' system—that has kept abortion pills flowing, with stunning efficiency, into some of the most abortion-hostile parts of the country."[159]

190. The other Defendants share the same view. They each invariably link to the Repro Legal Helpline website, which states that, in Louisiana (and the other Plaintiff States), "[h]ealthcare professionals in the state of Louisiana cannot provide abortions except to save the life or health of the pregnant [woman]."[160] They also link to I Need An A's website, which states that "telehealth abortion is not permitted in Louisiana."[161] They thus unquestionably are aware of the illegality of their conduct—and still they persist, convinced that shield laws in their home states can protect them. And all that says nothing of their independent posts flaunting their illegal conduct.

191. Abuzz, for example, proclaims that it will mail abortion drugs to "any zip code" and "all 50 states"—"[e]ven states with bans and restrictions":



[162]



[163]

[159] *Id.* at 5.
[160] Ex. 30.
[161] Ex. 14 at 2 (expand to see all state legal info).
[162] Abuzzhealth, Post on Instagram (Feb. 27, 2026), perma.cc/B5NY-YYKP (attached as Ex. 86).
[163] Abuzzhealth, Post on Instagram (April 7, 2026), perma.cc/9BKH-DYGY (attached as Ex. 87).

192. Similarly, We Take Care Of Us proclaims:







[164][165]

193. Defendants also go to extraordinary lengths to coax individuals into concealing this unlawful activity. In its online process, Choices Rising includes a message stating: "During and after an abortion in a state where it is banned, prioritizing your personal safety and well-being is paramount, which includes protecting your privacy, seeking support from trusted sources, and understanding your legal rights. To minimize the risk of exposure, please use a secure browser, delete your search history, and follow all digital security guidelines for abortion care."[166] Similarly, A Safe Choice Network/OPTIO urge their users to: "Use a private email address unconnected to your regular accounts. Delete confirmation emails after saving your tracking information. If you share a device, clear your browsing history after visiting the site."[167]

**V. Defendants' Interstate Mail-Order Abortion Scheme Harms Plaintiff States.**

194. Defendants' conduct has had its predictable and intended effect within Plaintiff States. Abortions have proliferated by the thousands in Plaintiff States after *Dobbs*. According to one study considering data through December 2025, approximately 1,000 abortions occur in Louisiana every

---

[164] We Take Care of Us, Post on Instagram (Feb. 24, 2025), perma.cc/B6K4-P2NC (attached as Ex. 88).
[165] We Take Care of Us, Post on Instagram (Nov. 10, 2025), perma.cc/3E5R-BAR4 (attached as Ex. 89).
[166] Ex. 81.
[167] Ex. 22 at 5–6.

month; approximately 300 every month in Arkansas; and approximately 700 every month in Alabama.[168] To be clear, moreover, these numbers are not hypothetical: Defendants hold records detailing the thousands of abortion drugs that have been mailed into Plaintiff States for the avowed purpose of causing abortions in Plaintiff States.

195. Embedded within these numbers are quintessential sovereign, quasi-sovereign, and economic harms suffered by Plaintiff States.

196. *First*, the very mailing of abortion drugs in Plaintiff States violates each Plaintiff State's laws—either because such mailing itself is prohibited, or because abortion drugs must be dispensed in-person after an in-person examination, or because the narrow abortion exceptions are not satisfied. *See supra* Section I. In Louisiana and Alabama, moreover, Defendants' very act of advertising abortion drugs violates state law. La. R.S. § 14:87.4(A); *see* Ala. Code § 13A-4-1(a)(1), (d)(1).

197. *Second*, given the serious health risks surrounding abortion drugs, Plaintiff States are incurring classic quasi-sovereign harms within their borders. Their laws are intended to protect the lives of unborn babies in Plaintiff States from the moment of conception—and yet Defendants' conduct terminates those lives in violation of Plaintiff States' laws. At least some Defendants know this because they routinely receive communications through their online platforms confirming that they have succeeded in terminating unborn babies' lives. Abuzz, for example, has received pictures like (and including) the following from all over the country:

[168] Ex. 10.





198. Similarly, Plaintiff States' laws are intended to protect the health and safety of women and girls in Plaintiff States—and yet Defendants' conduct actively jeopardizes that health and safety

through misrepresentations, omissions, and the dispensing of drugs that have serious adverse consequences in Plaintiff States.

199. Healthcare providers have reported that their networks are having to treat women suffering complications from the abortion drugs on a daily basis. Plaintiff States have received sworn reports that such complications include hemorrhaging requiring blood transfusions, as well as incomplete abortions requiring suction dilation and curettage to complete the abortions. That includes, for example, a woman who took drugs from Abuzz and required a suction dilation and curettage as well as a blood transfusion after she began hemorrhaging in the operating room.

200. Plaintiff States also have received sworn reports about the traumatic physical and psychological effects on their women. To take one example, Defendant Remy Coeytaux sent abortion drugs to a Louisiana woman who did not want an abortion but was coerced by her ex-boyfriend to take the drugs—and she ended up on a garage floor bleeding and in excruciating pain. To take another: Aid Access (on information and belief through Defendant JBN Operations LLC) sent abortion drugs to a Louisiana woman who coerced her teenage daughter to take them—and EMTs found her daughter bleeding on a bathroom floor holding a dead fetus.

201. Here, too, Defendants well know the severe consequences of their conduct because they routinely receive communications through their online platforms confirming the symptoms women are experiencing. Abuzz, for example, has received pictures like (and including) the following from all over the country:





202. *Third*, Plaintiff States are suffering classic pocketbook injuries from Defendants' conduct. One form of such injuries is tens of thousands of dollars that Plaintiff States have been required to devote solely to investigations into Defendants' illegal conduct and concomitant enforcement actions. Another form of such injuries is Medicaid costs. The treatment detailed above

must be covered by Plaintiff States' Medicaid programs where individuals are on Medicaid. And a substantial portion, if not a majority, of women suffering complications from abortion drugs are on Medicaid. At least one healthcare provider in Louisiana has reported that approximately half of their team's patients treated for mifepristone complications are on Medicaid. That includes the individual highlighted above who took Abuzz drugs. The State of Louisiana, moreover, is aware of multiple instances of complications due to Aid Access drugs (on information and belief shipped by JBN Operations LLC) that Louisiana Medicaid was required to cover.

203. If and when Plaintiff States receive Defendants' complete identification of the individuals in Plaintiff States to whom they prescribed and dispensed abortion drugs, Plaintiff States will be able to cross check their Medicaid databases to determine the full extent of Medicaid costs that they have incurred and continue to incur.

## CAUSES OF ACTION

### COUNT I
### Violation of Federal Common Law of Public Nuisance
### All Plaintiff States Against All Defendants

204. Plaintiff States reallege and incorporate by reference all preceding paragraphs.

205. Defendants' facilitation of the advertising, selling, prescribing, and mailing of abortion drugs in Plaintiff States presents a "classic" public nuisance under federal common law. *Arizona*, 40 F.4th at 386 (citation omitted); *accord Cranor*, 998 F.3d at 691–92; *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604 (emphasizing a sovereign state's "interest in the abatement of public nuisances, instances in which the injury to the public health and comfort [is] graphic and direct").

206. "A public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1). Such unreasonable interferences may arise where "the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience"; where "the conduct is proscribed by a statute,

ordinance or administrative regulation"; or where "the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." *Id.* § 821B(2).

207. Defendants' conduct in this case satisfies each independent basis for identifying a public nuisance. *First*, Defendants' conduct significantly interferes with the public health, safety, and comfort within each Plaintiff State. *See supra* Sections II, III, IV, V. *Second*, Defendants' conduct facilitates conduct—the advertising, sale, and mailing of abortion drugs in Plaintiff States—that is plainly proscribed by Plaintiff States' laws. *See supra* Sections I, II, III, IV; *see also City of Huntington*, 157 F.4th at 567 ("One means of demonstrating an unreasonable interference with a public right is to show that a defendant's act or causal contributions to that act were 'unlawful.'" (citing the Restatement)); *Baptiste*, 965 F.3d at 220 (applying the Restatement to find a public nuisance based on the defendant's "alleged failure to operate its facility in accordance with [state law]"). And *third*, Defendants' conduct is continuing and they know or have reason to know of its ongoing consequences in Plaintiff States. *See supra* Sections II, III, IV, V.

208. Accordingly, Plaintiff States request injunctive relief, damages, and all other appropriate equitable and monetary relief necessary to abate this nuisance.[169]

**COUNT II**
**Violation of the Louisiana Unfair Trade Practices Act**
**(Conduct in Violation of La. R.S. § 40:962.2)**
**Plaintiff Louisiana Against All Defendants**

209. Louisiana realleges and incorporates by reference all preceding paragraphs.

[169] Given the allegations in this complaint, Plaintiff States believe that Defendants—or at least a subset of Defendants—are violating the federal Racketeer Influenced and Corruption Organizations Act (RICO) and its state law counterparts. At this time, however, Plaintiff States lack a complete picture of the full extent of Defendants' conduct. Accordingly, Plaintiff States reserve their rights to amend their complaint to add federal and state RICO claims if discovery confirms Plaintiff States' belief that Defendants are violating RICO. In addition, Plaintiff States reserve their rights to amend their complaint to add further corporate entities and individuals that discovery reveals to be implicated by the schemes detailed above.

210. The Louisiana Unfair Trade Practices Act ("LUTPA") sets forth Louisiana's statutory program prohibiting deceptive and unfair trade practices. La. R.S. § 51:1401, *et seq.* (The full title of this Chapter of the Louisiana Code is the "Unfair Trade Practices and Consumer Protection Law." *See id.*). LUTPA protects "consumers," La. R.S. § 51:1402(1), and the public by declaring that "unfair or deceptive acts or practices in the conduct of any trade or commerce are ... unlawful," La. R.S. § 51:1405(A). The Louisiana Attorney General has the power to, among other things, "investigate" and "institute legal proceedings and take such other actions" to address unfair trade practices under LUTPA. La. R.S. § 51:1404(A)(1)(a), (B).

174. Defendants' business conduct, described above, constitutes "trade" or "commerce" under LUTPA. La. R.S. § 51:1402(10). In particular, La. R.S. § 51:1402(10)(b) defines "trade" or "commerce" to "include the advertising, offering for sale, sale, or distribution of an abortion-inducing drug in violation of R.S. 40:962.2." La. R.S. § 40:962.2(A), in turn, generally prohibits any abortion drug from "be[ing] sold, prescribed, dispensed, distributed, or delivered in this state." La. R.S. § 40:962.2(B) also bars "delivery [of such a drug] to a person in Louisiana by mail-order, courier, or as a result of a sale made via the internet."

175. As detailed above, each Defendant publicly advertises, offers for sale, sells, or distributes abortion drugs in Louisiana—to be delivered by mail. That conduct plainly violates Louisiana law. And it violates the established public policy of Louisiana as expressed through its Constitution and its duly enacted statutes.

176. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Louisiana, as well as the health, safety, and well-being of Louisiana consumers who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants. It also has resulted in the deaths of unborn Louisiana babies.

211. Accordingly, Louisiana seeks a declaratory judgment that Defendants violated LUTPA, an injunction enjoining the Defendants' deceptive and unfair conduct, appropriate civil penalties per violation, damages, costs, attorneys' fees, and all other relief available under LUTPA.

**COUNT III**
**Violation of the Louisiana Unfair Trade Practices Act**
**(Unfair or Deceptive Conduct)**
**Plaintiff Louisiana Against All Defendants**

212. Louisiana realleges and incorporates by reference all preceding paragraphs.

213. Defendants also have engaged in unfair practices that offend Louisiana public policy that are substantially injurious and deceptive practices marred by deceit and misrepresentation.

214. Such practices include:

- Misrepresenting the lawfulness of medication abortion in Louisiana;
- Misrepresenting the safety, effects, and risks of abortion drugs;
- Misrepresenting FDA's approval of medication abortion;
- Misrepresenting the efficacy of medication abortion;
- Misrepresenting the need for in-person, pre-abortion care;
- Advising individuals who take their drugs to lie to healthcare providers.

198. Defendants' conduct is intentional, knowing, and reckless. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Louisiana, as well as the health, safety, and well-being of Louisiana consumers who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants. It also has resulted in the deaths of unborn Louisiana babies.

215. Accordingly, Louisiana seeks a declaratory judgment that Defendants violated LUTPA, an injunction enjoining the Defendants' deceptive and unfair conduct, appropriate civil penalties per violation, damages, costs, attorneys' fees, and all other relief available under LUTPA.

**COUNT IV**
**Violation of the Arkansas Deceptive Trade Practices Act**
**(Unconscionable Trade Practices)**
**Plaintiff Arkansas Against All Defendants**

216. Arkansas realleges and incorporates by reference all preceding paragraphs. Fed. R. Civ. P. 10(c).

217. The Arkansas Deceptive Trade Practices Act ("ADTPA") sets forth Arkansas's statutory program prohibiting deceptive and unconscionable trade practices. Ark. Code Ann. §§ 4-88-101, *et seq*.

218. The business practices of Defendants constitute the sale of "goods" or "services." Ark. Code Ann. § 4-88-102(4) and (7). The same business practices constitute business, commerce, or trade. Ark. Code Ann. § 4-88-107.

219. The ADTPA protects Arkansas consumers and the public interest in a legitimate business community by prohibiting certain business practices, including unconscionable behavior, during consumer transactions.

220. The Arkansas Supreme Court has defined unconscionable conduct as conduct that affronts one's sense of justice, decency, or reasonableness, and has explicitly held that conduct violating public policy or law is an unconscionable practice under the ADTPA. *Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006).

221. Arkansas law prohibits "any manufacturer, supplier, physician, or any other person to provide any abortion-inducing drug via courier, delivery, or mail service." Ark. Code Ann. § 20-16-1504(b). It also enumerates requirements for providing "an abortion-inducing drug" Ark. Code Ann. § 20-16-1504(c), and the procedures that must be followed by physicians. *See generally* Ark. Code Ann. § 20-16-1504 *et seq*.

222. Defendants, in the course of business, commerce, or trade, have engaged in unconscionable acts and practices by knowingly and systematically:

a. Circumventing and evading Arkansas statutes governing the provision of abortion-related services and the practice of medicine;

b. Marketing, prescribing, selling, and distributing abortion drugs into Arkansas in open defiance of Arkansas law;

c. Structuring their telehealth operations specifically to avoid compliance with or detection by Arkansas's regulatory and licensing regulatory structures; and

d. Encouraging, facilitating, and normalizing widespread noncompliance with Arkansas law among Arkansas residents.

223. Defendants' conduct is not only unconscionable because it violates state law, but also because it endangers the health and safety of Arkansas women and girls. In the course of business, commerce, or trade, Defendants have engaged in unconscionable acts and practices by prescribing and distributing abortion drugs to Arkansas women and girls in violation of Arkansas law designed to protect their safety.

224. Defendants' practices exposed and continue to expose Arkansas women and girls to a substantial risk of harm, including but not limited to:

a. Dispensing abortion drugs without the in-person examination required by Arkansas law and without screening for circumstances material to their use, including ectopic pregnancy, gestational age limits, IUD placement, and blood type;

b. Advising women and girls not to tell Arkansas medical providers they took abortion drugs, even in cases of emergency; and

c. Advising Arkansas women and girls not to follow standard medical procedures recommended by the FDA and required by Arkansas law.

225. These practices unconscionably disregard patient safety in favor of expanding access to illegal transactions, shift the burden of risks to patients and Arkansas's healthcare system, and exploit Arkansas women and girls' vulnerabilities in making time-sensitive and high-risk medical decisions.

226. Defendants' conduct offends established public policy of Arkansas as expressed through its Constitution and its duly enacted statutes.

227. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Arkansas, as well as the health, safety, and well-being of Arkansas women and girls who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants.

228. The deceptive practices alleged above were carried out through the coordinated conduct of Defendants. Each Defendant either directly engaged in a prohibited practice and is therefore liable, or knowingly facilitated, assisted, intermediated, or otherwise aided its operation or continuance, in violation of Ark. Code Ann. § 4-88-107(a)(12). To the extent a Defendant facilitated or aided another Defendant's violation, that Defendant knew or reasonably should have known of the facts giving rise to the violation and is jointly and severally liable under Ark. Code Ann. § 4-88-113(d).

229. Accordingly, Arkansas seeks a declaratory judgment that Defendants violated ADTPA, an injunction enjoining the Defendants' unconscionable conduct, civil penalties of $10,000 per violation, damages, costs, attorneys' fees, and all other relief available under ADTPA.

**COUNT V**
**Violation of the Arkansas Deceptive Trade Practices Act**
**(Knowing Misrepresentations)**
**Plaintiff Arkansas Against All Defendants**

230. Arkansas realleges and incorporates by reference all preceding paragraphs. Fed. R. Civ. P. 10(c).

231. Under ADTPA, it is unlawful to "knowingly make a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, approval, or certification of goods or services." Ark. Code Ann. § 4-88-107(a)(1). It is similarly unlawful to make a false representation as to whether the goods are of a particular standard, quality, grade, or model. *Id.*

232. Defendants, in the course of marketing and providing abortion drugs, have made false and misleading representations regarding the safety, efficacy, legality, and risks associated with such drugs. These misrepresentations include, but are not limited to:

a. Statements that minimize the frequency or severity of potential complications;

b. Statements that downplay the failure rate of abortion drugs, and the associated complications;

c. Statements that downplay the seriousness of ingesting abortion drugs;

d. Statements that minimize the need for in-person care before receiving abortion drugs, including standard screening measures and follow-up care;

e. Representations that state or imply that Defendants' products and services are FDA approved or in compliance with FDA guidelines and requirements; and

f. Representations that state or imply that Defendants' sale and delivery of abortion drugs to Arkansas women and girls is lawful.

233. The deceptive practices alleged above were carried out through the coordinated conduct of Defendants. Each Defendant either directly engaged in a prohibited practice and is therefore liable, or knowingly facilitated, assisted, intermediated, or otherwise aided its operation or continuance, in violation of Ark. Code Ann. § 4-88-107(a)(12). To the extent a Defendant facilitated or aided another Defendant's violation, that Defendant knew or reasonably should have known of the facts giving rise to the violation and is jointly and severally liable under Ark. Code Ann. § 4-88-113(d).

234. Accordingly, Arkansas seeks a declaratory judgment that Defendants violated ADTPA, an injunction enjoining the Defendants' unconscionable conduct, civil penalties of $10,000 per violation, damages, costs, attorneys' fees, and all other relief available under ADTPA.

**COUNT VI**
**Violation of the Arkansas Deceptive Trade Practices Act**
**(Deceptive Trade Practices—Material Omissions)**
**Plaintiff Arkansas Against All Defendants**

235. Arkansas realleges and incorporates by reference all preceding paragraphs. Fed. R. Civ. P. 10(c).

236. The ADTPA also prohibits the use of deception, fraud, or false pretenses in connection with advertising or a sale, as well as the "concealment, suppression, or omission of any material fact with the intent that others rely upon the concealment, suppression, or omission" while selling any goods or services. Ark. Code Ann. § 4-88-108(a)(1)–(2).

237. A material fact is one that could affect the consumer's conduct or decision when deciding to purchase the product. Materiality is presumed if the practice involves the health, safety, or other significant area where a reasonable consumer would be concerned. Federal Trade Commission, FTC Policy Statement on Deception, appended to Cliffdale Assocs., Inc., 103 F.T.C. 110, 174 (1984) at pp.1–6.

238. Defendants have also engaged in material omissions, including failure to adequately disclose:

a. The full range and likelihood of serious adverse events;

b. The importance of in-person medical evaluation in certain circumstances;

c. The limitations of remote screening and associated risk; and

d. The potential need for emergency medical care and the lack of integrated follow-up services.

239. These misrepresentations and omissions are material and likely to influence a reasonable consumer's decision to obtain abortion drugs from Defendants.

240. Defendants' conduct has caused significant harm, not only to individual patients, but also to healthcare providers and emergency services within Arkansas, as well as the integrity of the medical marketplace.

241. Accordingly, Arkansas seeks a declaratory judgment that Defendants violated ADTPA, an injunction enjoining the Defendants' false representations, omissions, concealments, and suppressions described throughout this Complaint, civil penalties of $10,000 per violation, damages, costs, attorneys' fees, and all other relief available under ADTPA.

**COUNT VII**
**Violation of the Alabama Deceptive Trade Practices Act**
**(Unconscionable Trade Practices)**
**Plaintiff Alabama Against All Defendants**

242. Alabama realleges and incorporates by reference all preceding paragraphs.

243. Alabama's Deceptive Trade Practices Act exists to protect "[t]he public health, welfare and interest" of "both the consuming public and the legitimate businessperson." Ala. Code § 8-19-2. The Act is enforceable by the Alabama Attorney General. *See* Ala. Code § 8-18-4.

244. Defendants' business conduct constitutes "trade or commerce" within the scope of the Act. Ala. Code § 8-19-3(14).

245. The Act prohibits any "unconscionable ... act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(27).

246. Defendants' conduct is "unconscionable" under the Act in at least two ways: it violates the public policy of Alabama and endangers the health and safety of Alabama women and girls.

247. Alabama law strictly prohibits "giving, selling, dispensing, administering, or otherwise providing or prescribing" "abortion-inducing drug[s]" except in very limited circumstances, which

(among other things) require an in-person examination and a determination that the abortion is necessary to prevent a serious health risk to the mother. Ala. Code § 26-23E-7; *see* Ala. Code § 26-23H-4; Ala. Code § 13A-3-7. Abortion is against the public policy of the state. Ala. Const. Art I., § 36.06.

248. Defendants have and are engaged in unconscionable acts and practices in the conduct of trade or commerce by, among other things:

a. Circumventing and evading Alabama law governing the provision of abortion-related services and the practice of medicine;

b. Marketing, selling, dispensing, administering, prescribing, or otherwise distributing abortion drugs into Alabama in open defiance of Alabama law;

c. Structuring their telehealth operations specifically to avoid compliance with or detection by Alabama's regulatory and licensing regulatory structures; and

d. Encouraging, facilitating, and normalizing widespread noncompliance with Alabama law among Alabama residents.

249. Defendants' conduct is not only unconscionable because it violates state law but also because it endangers the health and safety of Alabama women and girls. In the conduct of trade or commerce, Defendants have engaged in unconscionable acts and practices by prescribing and distributing abortion drugs to Alabama women and girls in violation of Alabama law designed to protect their safety.

250. Defendants' practices exposed and continue to expose Alabama women and girls to a substantial risk of harm, including but not limited to:

a. Dispensing abortion drugs without the in-person examination required by Alabama law and without screening for circumstances material to their use such as ectopic pregnancy, gestational age limits, IUD placement, and blood type;

b. Advising women and girls not to tell Alabama medical providers they took abortion drugs, even in cases of emergency; and

c. Advising Alabama women and girls not to follow standard medical procedures recommended by the FDA and required by Alabama law.

251. These practices unconscionably disregard patient safety in favor of expanding access to illegal transactions, shift the burden of risks to patients and Alabama's healthcare system, and exploit Alabama women and girls' vulnerabilities in making time-sensitive and high-risk medical decisions.

252. Defendants' conduct offends the established public policy of Alabama as expressed through its Constitution and its duly enacted statutes.

253. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Alabama, as well as the health, safety, and well-being of Alabama women and girls who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants.

254. Accordingly, Alabama seeks a declaratory judgment that Defendants violated Alabama's Act, an injunction enjoining the Defendants' unconscionable conduct, civil penalties, damages, costs, attorneys' fees, and all other relief available under Alabama's Act.

## COUNT VIII
**Violation of the Alabama Deceptive Trade Practices Act**
**(Misleading or Deceptive Trade Practices)**
**Plaintiff Alabama Against All Defendants**

255. Alabama realleges and incorporates by reference all preceding paragraphs.

256. Under Alabama's Deceptive Trade Practices Act, it is unlawful to, "[c]aus[e] confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," "[r]epresent[] that goods or services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have," or "[e]ngag[e] in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(2), (5), (27).

257. In the course of marketing and providing abortion drugs, Defendants have represented that the drugs have certain qualities or approval that they do not have and have caused confusion or misunderstanding about the approval of the drugs. Such representations include but are not limited to:

a. Representations that state or imply that Defendants' products and services are FDA approved or in compliance with FDA guidelines and requirements; and

b. Representations that state or imply that Defendants' sale and delivery of abortion drugs to Alabama women and girls is lawful.

258. Defendants have also made false, misleading, or deceptive representations regarding the safety, efficacy, legality, and risks associated with the abortion drugs. These include but are not limited to:

a. Statements that minimize the frequency or severity of potential complications;

b. Statements that downplay the failure rate of abortion drugs, and the associated complications;

c. Statements that downplay the seriousness of ingesting abortion drugs;

d. Statements that minimize or misrepresent the need for in-person care before receiving abortion drugs, including standard screening measures and follow-up care;

e. Statements that misrepresent the safety, effects, and risks of abortion drugs;

f. Statements that advise individuals who take their drugs to lie to healthcare providers.

259. Accordingly, Alabama seeks a declaratory judgment that Defendants violated Alabama's Deceptive Trade Practices Act, an injunction enjoining the Defendants' misleading or deceptive conduct, civil penalties, damages, costs, attorneys' fees, and all other relief available under Alabama's Act.

## PRAYER FOR RELIEF

Plaintiff States therefore request that the Court enter an order and judgment that grants the following relief, which it is authorized to do under 28 U.S.C. § 2201, Federal Rules of Civil Procedure 57 and 65, its equitable powers, and La. R.S. § 51:1401, *et seq.*, Ark. Code Ann. §§ 4-88-101, *et seq.*, and Ala. Code § 8-19-1, *et seq*:

A. Declaring that the conduct alleged herein constitutes a public nuisance under federal common law;

B. Requiring Defendants to abate the public nuisance described herein and to deter or prevent the resumption of such nuisance;

C. Ordering an injunction against Defendants' prohibited conduct in Plaintiff States;

D. Declaring that Defendants' conduct is in violation of LUTPA, ADTPA, and Alabama's Deceptive Trade Practices Act;

E. Enjoining Defendants from continuing the deceptive, unfair, and unconscionable business practices as described throughout this Complaint;

F. Disgorging all revenue derived from Defendants' unlawful, unconscionable, and deceptive acts and practices as alleged herein;

G. Awarding actual and compensatory damages;

H. Awarding civil penalties per each violation of Defendants' deceptive and unconscionable business practices in each Plaintiff State;

I. Awarding statutory damages in the maximum amount permitted by law;

J. Awarding reasonable attorneys' fees and costs of suit;

K. Awarding pre-judgment and post-judgment interest; and

L. Awarding any such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LIZ MURRILL**
**ATTORNEY GENERAL OF LOUISIANA**

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General
*/s/ Caitlin Huettemann*
CAITLIN HUETTEMANN
Assistant Solicitor General
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 N. Third Street
Baton Rouge, La 70802
Telephone: (225) 506-3746
AguinagaB@ag.louisiana.gov
HuettemannC@ag.louisiana.gov

*Counsel for Louisiana*

**TIM GRIFFIN**
**ATTORNEY GENERAL OF ARKANSAS**

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON*
Solicitor General
BRITTANY EDWARDS*
Senior Assistant Attorney General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-2007
autumn.patterson@arkansasag.gov
brittany.edwards@arkansasag.gov

*Counsel for Arkansas*

**STEVE MARSHALL**
**ATTORNEY GENERAL OF ALABAMA**

*/s/ A. Barrett Bowdre*
A. BARRETT BOWDRE*
Solicitor General
STATE OF ALABAMA

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 242-7300
barrett.bowdre@alabamaag.gov

**Application for admission pro hac vice forthcoming*

**No. ____, Original**

IN THE

# Supreme Court of the United States

STATE OF LOUISIANA; STATE OF ARKANSAS; AND STATE OF ALABAMA,
*Plaintiffs*,

v.

STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSETTS; AND STATE OF CALIFORNIA,
*Defendants.*

## MOTION FOR LEAVE TO FILE BILL OF COMPLAINT, BILL OF COMPLAINT, BRIEF IN SUPPORT


LIZ MURRILL
Attorney General
J. BENJAMIN AGUIÑAGA
Solicitor General
*Counsel of Record*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

TIM GRIFFIN
Attorney General
AUTUMN HAMIT PATTERSON
Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
101 W. Capitol Ave.
Little Rock, AR 72201

STEVE MARSHALL
Attorney General
A. BARRETT BOWDRE
Solicitor General
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130

**TABLE OF CONTENTS**

1. Motion for Leave to File Bill of Complaint
2. Bill of Complaint
3. Brief in Support of Motion for Leave to File Bill of Complaint

**No. ___, Original**

IN THE

# Supreme Court of the United States

STATE OF LOUISIANA; STATE OF ARKANSAS;
AND STATE OF ALABAMA,
*Plaintiffs*,

v.

STATE OF NEW YORK; COMMONWEALTH OF
MASSACHUSETTS; AND STATE OF CALIFORNIA,
*Defendants*.

## MOTION FOR LEAVE TO FILE BILL OF COMPLAINT

Plaintiffs State of Louisiana, State of Arkansas, and State of Alabama respectfully move this Court for leave to file the accompanying Bill of Complaint. For the reasons more fully stated in the accompanying Brief in Support, the Motion for Leave to File a Bill of Complaint should be granted.

Respectfully submitted,


LIZ MURRILL
Attorney General
J. BENJAMIN AGUIÑAGA
Solicitor General
*Counsel of Record*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

TIM GRIFFIN
Attorney General
AUTUMN HAMIT PATTERSON
Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
101 W. Capitol Ave.
Little Rock, AR 72201

STEVE MARSHALL
Attorney General
A. BARRETT BOWDRE
Solicitor General
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130

No. ____, Original

IN THE

# Supreme Court of the United States

STATE OF LOUISIANA; STATE OF ARKANSAS; AND STATE OF ALABAMA,
*Plaintiffs*,

v.

STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSETTS; AND STATE OF CALIFORNIA,
*Defendants*.

## BILL OF COMPLAINT

Plaintiffs State of Louisiana, State of Arkansas, and State of Alabama bring this action against Defendants State of New York, Commonwealth of Massachusetts, and State of California, and for their causes of action assert the following:

## NATURE OF THE ACTION

1. This case arises from one of the most serious interstate aggressions in our Nation's history, violating, among other things, the "fundamental principle of equal sovereignty" among the states, *Shelby County v. Holder*, 570 U.S. 529, 544 (2013), and "the Constitution's horizontal separation of powers," *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023).

2. In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), this Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." *Id.* at 232. States

that favor abortion are thus free to deregulate as they see fit, and pro-life states are just as free to regulate as they see fit.

3. After *Dobbs*, however, pro-abortion states immediately began to enact so-called telehealth "shield laws" aimed at facilitating abortion in pro-life states that have restricted or banned abortion.

4. Telehealth shield laws attempt to immunize health care providers, pharmacies, and other actors that illegally dispense abortion drugs into pro-life states from both liability in those states and professional repercussions in shield-law states.

5. Among other provisions, telehealth shield laws commonly allow anonymous or nearly anonymous mailing of abortion drugs; bar extradition; forbid public officials and private entities from cooperating with out-of-state law enforcement; refuse to recognize out-of-state judgments; bar disclosure of abortion data from prescription-drug monitoring programs; forbid professional discipline based on the prescription and mailing of abortion drugs out-of-state; and bar the termination or denial of insurance coverage for the same conduct. Some even create private rights of action for ruinous liability against anyone who files a lawsuit challenging this illegal conduct.

6. The power of a state's shield law rests not in any one provision within that law but in the combined effect of all its provisions, which attempt to predict—and eliminate—all legal or professional problems a shield-law state resident might otherwise face for violating pro-life states' laws. By embedding such provisions throughout their legal codes, shield-law states seek to assure their residents that they may, in fact, violate pro-life states' laws without any fear of repercussions.

7. And that is the avowed purpose of the shield laws: to facilitate abortions not in *shield-law states* but in *pro-life states*. For that reason, "shield laws" are not shields at all—they are swords disguised as shields and driven into pro-life states.

8. As New York Governor Kathy Hochul has explained them, shield laws "protect [those] who prescribe and send abortion pills to patients in states where abortion is outlawed."[1] "[T]hey can't stop us, they can't stop our providers, they can't stop New York, and that's how we're fighting back."[2] The New York shield law's sponsors agreed: "It feels great to do something positive in the wake of *Dobbs*. Today, we are rejecting the decision, and the thinking behind that decision." And New York's shield law "will provide more relief to hundreds of thousands of vulnerable women in ... hostile states throughout the country."[3]

9. Predictably, organizations, prescribers, and pharmacies in shield-law states—emboldened by the promise of protection—have seized the opportunity to illegally mail abortion drugs into pro-life states with impunity. They do so openly through websites advertising the sale and shipment of abortion drugs in pro-life states.

10. They are just as open about their "scheme to undermine [this Court's] decision in *Dobbs*." *Danco*

---

[1] New York State, *On Eve of Dobbs Decision Anniversary, Governor Hochul Signs Legislation Strengthening Access to Reproductive Health Care*, at 14:00-20 (June 23, 2023), perma.cc/H426-VEX7 ("*2023 Signing Ceremony*") (video embedded).

[2] *Id.* at 13:46-58.

[3] *Id.* at 23:15-25, 24:30-38.

*Lab'ys, LLC v. Louisiana*, 146 S. Ct. 1192, 1193 (2026) (Alito, J., dissenting). Said one member of The Massachusetts Medication Abortion Access Project, which operates under Massachusetts' shield law and mails abortion drugs into Plaintiff States: "It made me so happy ... when [Justice Alito] wrote, 'They're undermining *Dobbs*.' I was like, *yeah*, *exactly*."[4]

11. The results are striking. According to one report, Louisiana is experiencing approximately 1,000 abortions a month despite Louisiana's abortion ban; Arkansas is experiencing approximately 300 every month; and Alabama is experiencing approximately 700 every month.[5] According to the same report, each abortion results from out-of-state drugs.

12. Today, Plaintiff States filed a lawsuit against as many organizations and individuals as they have been able to identify notwithstanding the shield laws intended to thwart such litigation. *See Louisiana v. Nouhavandi*, No. 2:26-cv-3836 (W.D. La.). To fully obtain relief, however, they must also eliminate other contributing causes for the harm that they are suffering, including, as relevant here, the shield laws.

13. Accordingly, this lawsuit seeks a judgment declaring that the shield laws of three representative states—New York, Massachusetts, and California—violate the Full Faith and Credit Clause, U.S. Const. art. IV, § 1; the equal-sovereignty doctrine, *Shelby County*, 570 U.S. at 544; the federal common law of public

---

[4] Nina Martin, *She's Remaking the Abortion Landscape One Pill at a Time*, Mother Jones (July 31, 2026), perma.cc/E8AJ-N8P6 ("*One Pill at a Time*").

[5] Society of Family Planning, #WeCount Report April 2022 to December 2025 (June 10, 2026), perma.cc/YCM5-CH6X (select Louisiana, Arkansas, and Alabama).

nuisance; and the "dormant Commerce Clause," *Nat'l Pork Producers Council*, 598 U.S. at 368–71 (citing U.S. Const. art. I, § 8, cl. 3). Plaintiff States likewise request an injunction preventing Defendants' officials from enforcing those laws.

14. This lawsuit also seeks to restore the promise of *Dobbs*—and to vindicate this Court's authority to say what the law is. *Dobbs* is no more than a parchment promise if shield-law states can defy this Court by unilaterally decreeing that abortions must flourish in pro-life states.

15. Where *Dobbs* envisioned a world that "allow[s] each State to regulate abortion as its citizens wish," 597 U.S. at 230, Massachusetts, California, and New York have claimed the right to make abortion policy—their abortion policy—for the entire Nation by overriding democratically enacted laws in pro-life states like Louisiana, Arkansas, and Alabama.

16. This is not the promise of *Dobbs*—and it is a direct affront to this Court as an institution and an attack on our constitutional structure, *see supra* ¶ 13. The Court's exercise of its original jurisdiction is warranted.

## JURISDICTION

17. The Court has original jurisdiction over this suit under Article III, § 2, cl. 2 of the Constitution of the United States and 28 U.S.C. § 1251(a).

## STATEMENT

### I. Plaintiff States Prohibit Abortion Within Their Borders After *Dobbs*.

18. In 2022, this Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." *Dobbs*, 597 U.S. at 232. When it did so, the Court anticipated that "the people of the various States" may react "differently" to the Court's decision: Voters in some states may favor "more extensive" abortion protections, while voters in other states "may wish to impose tight restrictions based on their belief that abortion destroys an 'unborn human being.'" *Id.* at 256. The Court was right.

19. Following *Dobbs*, Plaintiff States, among other pro-life states, generally prohibited abortion with narrow exceptions. Those prohibitions lie at the core of this case.

20. Each Plaintiff State treats an unborn baby as fully human from the moment of conception. *See* La. R.S. §§ 14:2(A)(11), 22:1014(A)(4); Ark. Const. amend. 68, § 2; Ark. Code § 20-16-1503(6); Ala. Const. art. I, § 36.06(b); Ala. Code § 26-23H-3(7). Each Plaintiff State generally prohibits the abortion of an unborn baby except to save the life of the mother. *See* La. R.S. § 40:1061(C), (F); Ark. Code §§ 5-61-304(a), 5-61-404(a); Ala. Code § 26-23H-4(a), (b).

21. Each Plaintiff State extends its abortion prohibition to the use of abortion drugs to terminate a pregnancy. Each Plaintiff State proscribes the sale and prescription of abortion drugs. *See* La. R.S. §§ 14:87.9(A), 40:1061(C); Ark. Code §§ 5-61-303(1)(A), 5-61-403(1)(A); Ala. Code §§ 26-23H-3(1), 13A-13-7. In the narrow circumstances where abortion is

permissible, it is a crime to dispense abortion drugs without an in-person examination by a state-licensed physician. *See* La. R.S. §§ 1061.1.5(A), 1061.10; Ark. Code § 20-16-1504(c); Ala. Code § 26-23E-7. And any administration of such drugs must be carried out in-person with the prescribing physician. *See, e.g.*, La. R.S. § 40:1061.11(A); Ark. Code § 20-16-603(b)(1).

22. In parallel with these prohibitions, Louisiana and Arkansas expressly prohibit the mailing of abortion drugs within the state, including those arising out of internet sales. *See* La. R.S. § 962.2(A), (B); Ark. Code § 20-16-1504(b). Louisiana and Alabama also criminally prohibit abortion advertising, *i.e.*, "the placing and carrying of any advertisement of abortion services by the publicizing of the availability of abortion services." La. R.S. § 14:87.4(A); *see* Ala. Code § 13A-4-1(a)(1).

## II. Defendant States Adopt Shield Laws Aimed at Facilitating Abortion in Plaintiff States.

23. As the Court anticipated, other states—including Massachusetts, California, and New York—had different reactions to *Dobbs*. "I am pissed," said California Governor Gavin Newsom.[6] "This decision is a grave injustice," said New York Governor Kathy

[6] Io Dodds, *California enacts bill to shield abortion providers and patients from red state bans*, Independent (June 27, 2022), perma.cc/9NG5-QCQK.

Hochul.[7] Former Massachusetts Governor Charlie Baker added that he was "deeply disappointed."[8]

24. Such states, of course, are entitled to their opinions—and to their sovereign prerogatives to regulate abortion as they see fit within their borders.[9] But what they did over the next four years in response to *Dobbs* is blatantly unlawful.

25. Beginning during the COVID-19 pandemic—and then permanently in January 2023—the Biden Administration eliminated a longstanding in-person dispensing requirement for the abortion drug mifepristone as approved by the U.S. Food and Drug Administration (FDA). That agency action is the subject of pending litigation in *Louisiana v. FDA*, No. 26-30203 (5th Cir.), which this Court already has seen in a stay posture.[10] *See Danco Lab'ys, LLC*, 146 S. Ct. 1192.

---

[7] New York State, *Statement from Governor Hochul on Supreme Court's Ruling in Dobbs V. Jackson* (June 24, 2022), perma.cc/QG4A-HGEU.

[8] *Abortion access is protected in Massachusetts despite overturning of Roe v. Wade*, CBS News (June 24, 2022), perma.cc/RU2B-JNC7.

[9] This lawsuit thus does not address the issue of non-New York, Massachusetts, and California residents who travel to those states to receive an abortion. *See Dobbs*, 597 U.S. at 346 (Kavanaugh, J., concurring).

[10] Every major mail-order, abortion-drug provider in the United States today uses FDA-approved mifepristone because of the Biden Administration's removal of the in-person dispensing requirement. If and when Louisiana succeeds in its challenge to that agency action, however, Louisiana anticipates that mail-order providers may shift to either non-FDA-approved mifepristone or other tactics altogether (such as shipments containing only a related drug, misoprostol). *See* Martin, *One Pill at a Time*, *supra* n.4 (mail-order provider issuing such a threat).

26. The Biden Administration's action opened the door to a broad-scale, mail-order abortion scheme that would allow organizations, prescribers, and pharmacies in pro-abortion states to prescribe and mail abortion drugs into pro-life states. The problem with that scheme is that it would plainly subject the out-of-state actors to civil and criminal liability in pro-life states and expose them to professional repercussions in their own states. That is why shield laws exist.

27. In basic terms, a shield law attempts to protect (from liability in pro-life states and professional repercussions in shield-law states) a doctor in, say, Massachusetts who wishes to engage in "telemedicine" by prescribing and shipping abortion drugs into a pro-life state that bans abortion.

28. According to their proponents, "[s]hield laws are designed to thwart the near-total abortion bans and other restrictions that have proliferated in red states since the 2022 *Dobbs* decision."[11] Or, as a representative of the Center for Reproductive Rights (and the legal director of the Abortion Coalition for Telemedicine) put it: "Anti-abortion extremists thought 'we're going to overturn *Roe*, we're going to ban abortion' .... Because of shield laws and telehealth providers, that's not the case—and they're furious."[12]

29. Although shield laws take different forms across various pro-abortion states, the shield laws

---

That is why this suit is critical: to cut off another essential reason for the current flood of abortion drugs into Plaintiff States, the shield laws.

[11] Nina Martin, *How Blue States Got Around the GOP's Efforts to Ban Abortion in Red States*, Mother Jones (Mar. 17, 2026), perma.cc/PE5Y-YR33 ("*Blue States*").

[12] *Id.*

adopted by New York, Massachusetts, and California and challenged in this case are a representative cross-section.

30. In the paragraphs below, Plaintiff States explain individual pieces of these shield laws at length—not because any one piece is critical to this case but because the sheer number of statutory provisions scattered throughout Defendants' legal codes is what gives the shield laws force. By touching—and trying to eliminate—virtually every legal and professional problem that a provider would otherwise face for illegally prescribing and mailing abortion drugs into pro-life states, the shield laws have convinced residents of New York, Massachusetts, and California that they can violate Plaintiff States' laws without fear of legal or professional repercussions.

**A. New York's Shield Law.**

31. Start with New York. In response to *Dobbs*, Governor Kathy Hochul signed three waves of legislation regarding abortion, the latter two of which comprise New York's "telehealth shield law."[13] While her initial package was generally limited to abortions in New York,[14] her second and third waves of legislation had nothing to do with abortions in New York.

---

[13] New York State, *Protecting Reproductive Freedom: Governor Hochul Signs Legislation Affirming New York's Status as a Safe Haven for Reproductive Health Care* (Feb. 3, 2025), perma.cc/QN8R-4WEL ("*2025 Signing Ceremony*") (video embedded).

[14] New York State, *Governor Hochul Signs Nation-Leading Legislative Package to Protect Abortion and Reproductive Rights for All* (June 13, 2022), perma.cc/W5DC-RFP7.

32. In 2023, Governor Hochul issued a press release announcing that her second piece of *Dobbs*-related legislation "expands the current law to ensure doctors, medical providers, and facilitators in the state are able to provide telehealth services to patients outside of New York without fear of litigation in states where abortion services are outlawed or restricted."[15] She criticized "a shameful regression of women's rights in this country as abortion access is restricted in states across the nation."[16] And she stated that her shield-law package would "ensur[e] our health care providers can deliver telehealth services to out-of-state patients without fear of legal or professional repercussions."[17]

33. "New York is continuing to fight back against restrictive abortion laws," her press release concluded, and that meant ensuring that New Yorkers can "use telehealth services to prescribe medication abortion ... to people in states with restrictive abortion laws."[18]

34. At a signing ceremony, Governor Hochul stated that she was "really proud to be able to sign ... the new shield law, to protect New Yorkers who prescribe and send abortion pills to patients in states where abortion is outlawed."[19] She criticized "extremists, lawmakers in other states"—and she proclaimed that "they can't stop us, they can't stop our providers, they can't stop New York, and that's how we're fighting back."[20]

---

[15] *2023 Signing Ceremony*, *supra* n.1.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 14:03-20.
[20] *Id.* at 13:35-58.

35. The sponsors of the shield law echoed that sentiment: "We are taking the offense, we are going to bring the fight ... using these extraordinary women practitioners in New York who are courageous enough to engage in telemedicine and prescribe abortion mediation to women outside of New York."[21] "Today, we are rejecting the [*Dobbs*] decision, and the thinking behind that decision."[22]

36. Governor Hochul was flanked at that ceremony by two New York doctors named Margaret Carpenter and Linda Prine. According to Governor Hochul, Carpenter and Prine told her, "Governor, the second you sign this legislation, we're gonna start prescribing these pills."[23] Prine subsequently confirmed to the audience that "we're going to mail pills across state lines .... We can mail pills in two or three days once this legislation is signed, and will we do that."[24] So Governor Hochul signed it.

37. In 2025, New York and Governor Hochul amended New York's shield law through a third legislative package, in response to what they viewed as their failure to adequately shield Margaret Carpenter, who stood behind Governor Hochul at the 2023 signing ceremony.

38. Their problem arose in Louisiana. Louisiana discovered that Carpenter was responsible for prescribing and mailing abortion drugs into Louisiana for a pregnant teenage girl whose mother coerced her to take them. Paramedics found the young girl in a pool of blood on a bathroom floor holding her aborted baby

---

[21] *Id.* at 20:40-59.
[22] *Id.* at 23:20-26.
[23] *Id.* at 15:40-16:45.
[24] *Id.* at 29:15-30:20.

and crying hysterically. Her pain on a scale of 1-to-10, she reported, was 1,000.

39. A Louisiana grand jury thereafter indicted Carpenter for violating Louisiana's abortion laws—and Louisiana issued an extradition request to Governor Hochul. Pursuant to New York's shield law, Governor Hochul said "there's no way in hell" that she would extradite Carpenter,[25] and she issued "a law enforcement notice that certain out-of-state warrants are not enforceable in the State of New York."[26]

40. Governor Hochul also took the opportunity to amend New York's shield law to thwart pro-life states' ability to identify the prescribers responsible for illegally mailing abortion drugs into their states. "You know how they found [Carpenter]?" Governor Hochul asked at yet another signing ceremony.[27] Her name "was on the prescription bottle." "After today, that will no longer happen," she pledged in signing an amendment that now exempts those prescribing abortion drugs from the general New York law requiring providers' names to appear on the drug label.[28]

41. In summing up New York's shield-law efforts, Governor Hochul left no doubt about New York's singular purpose of facilitating abortions in pro-life states. She described New York's 2023 telehealth shield law as "designed to provide extensive protection for New York-based doctors serving patients in those

[25] *2025 Signing Ceremony*, *supra* n.13, at 6:55-7:06.

[26] New York State, *Video, Audio, Photos & Rush Transcript: Governor Hochul Makes a Reproductive Freedom Announcement* (Feb. 13, 2025), perma.cc/W5FT-AE9J.

[27] *2025 Signing Ceremony*, *supra* n.13, at 7:32-40.

[28] *Id.* at 7:43-8:15.

restrictive states through telehealth."[29] She then characterized New York's 2025 amended shield law as "offering additional protections for doctors prescribing medications used to perform abortions to patients in hostile states."[30] "Thanks to New York's shield law," she said, "providers in the State can provide medication used to treat abortion to patients in hostile states ...."[31]

42. The Center for Reproductive Rights, which "assist[ed]" in drafting New York's shield law, agreed that the law "makes it more difficult for hostile states to target New York doctors serving patients in states lacking access to abortion care."[32] And that is by design: "Legal protections like [these] ensure telehealth providers continue to reach pregnant [women] in the 16 states currently enforcing abortion bans ...."[33]

43. As it exists today, New York's telehealth shield law includes special provisions keyed to "legally protected health activity," which is defined to cover providers physically present in New York while dispensing abortion drugs out-of-state. *See* N.Y. Crim. Proc. Law § 570.17(1)(a), (c).[34] And those provisions are embedded all over New York law, including:

---

[29] *2025 Signing Ceremony*, *supra* n.13.

[30] *Id.*

[31] *Id.*

[32] *New York's Strengthened Shield Law Will Further Protect Doctors Prescribing Abortion Medication*, Ctr. for Reproductive Rights (Feb. 6, 2025), perma.cc/78PU-MAZP.

[33] *Id.*

[34] The term also is statutorily defined to include "gender-affirming care." *See* N.Y. Crim. Proc. Law § 570.17(1)(b), (c). For purposes of this suit, Plaintiff States focus only on the shield law insofar as it covers conduct surrounding the prescription and mailing of abortion drugs out-of-state.

- An exemption only for the prescribers of abortion drugs from New York's general rule that a drug label must bear the prescriber's name. *See* N.Y. Educ. Law §§ 6807(1)(b), (b-1), 6810(1), (1-a).

- A bar on the extradition of individuals who illegally prescribe and mail abortion drugs from New York into pro-life states. *See* N.Y. Crim. Proc. Law § 570.17(2).

- A bar on any state or local government employee or entity (or any of their agents) cooperating with any out-of-state law enforcement investigation into the prescription and mailing of abortion drugs—while exempting any intrastate investigation regarding the same conduct and any out-of-state investigation not involving abortion. *See* N.Y. Exec. Law § 837-x(2).

- A bar on any police officer arresting an individual for prescribing and mailing abortion drugs out-of-state. *See* N.Y. Crim. Proc. Law § 140.10(3-a).

- A bar on New York courts, clerks, and attorneys issuing any subpoena in connection with an out-of-state proceeding relating to abortion drugs prescribed and mailed out-of-state—while exempting subpoenas in connection with an out-of-state proceeding not relating to abortion. N.Y. Civ. Prac. Law & R. § 3119(g).

- A bar on New York courts compelling depositions in connection with an out-of-state proceeding relating to abortion drugs prescribed and mailed out-of-state—while exempting

depositions in connection with an out-of-state proceeding not relating to abortion. *Id.* § 3102(e).

- A bar on the admissibility of any evidence that a provider prescribed and mailed abortion drugs "to persons not physically present in this state" "as evidence that such party has engaged in any wrongdoing, whether civil, criminal, professional, or otherwise." *Id.* § 4550.
- A bar on any medical-malpractice insurer of a New York provider "taking any adverse action" against the provider solely because they prescribed and mailed abortion drugs "out-of-state." N.Y. Ins. Law § 3436-a(a).
- An exemption from professional-misconduct liability for health care practitioners where liability is based "solely" on their prescription and mailing of abortion drugs out-of-state. N.Y. Educ. Law § 6531-b(2).

### B. Massachusetts' Shield Law.

44. The story behind the Massachusetts shield law is materially similar.

45. Two days after *Dobbs*, former Massachusetts Governor Charlie Baker issued an executive order condemning *Dobbs*' "major consequences for women across the country who live in states with limited access to reproductive health care services"—and pledging to "protect reproductive health care providers who serve out of state residents."[35]

---

[35] Michael P. Norton, *Baker signs executive order to shield Mass. abortion providers from lawsuits*, GBH (June 24, 2022), perma.cc/DSV5-WGA4.

46. A month later, he codified that pledge in Massachusetts' shield law, which purports to protect "providers from legal interference from more restrictive laws in other states."[36] Media reports claimed that drafters worked "closely" with then-Massachusetts Attorney General Maura Healey to build a shield law that would "withstand a likely constitutional challenge from anti-abortion forces."[37] And Linda Prine—who would later speak at Governor Hochul's 2023 signing ceremony—remarked, "The Massachusetts shield law is a huge breakthrough for getting pills to women in restricted states."[38]

47. Unlike New York, which waited a year after *Dobbs* to target the prescription and mailing of abortion drugs out-of-state, Massachusetts immediately targeted such alleged "telemedicine" through its July 2022 shield law. In 2025, now-Governor Maura Healey signed into law amendments intended to make the shield law "even stronger."[39] And by all accounts, the Massachusetts shield law contains some of the most sweeping provisions in the country.

48. A supporting organization, Reproductive Equity Now, has emphasized that "Massachusetts' shield

---

[36] Alison Kuznitz, *Massachusetts abortion protections bill, shielding providers and patients, signed into law by Gov. Charlie Baker* (July 29, 2022), perma.cc/6MZ4-VX7G.

[37] Carrie N. Baker, *Groundbreaking Massachusetts Law Protects Telemedicine Abortion Providers Serving Patients Located in States Banning Abortion*, Ms. Magazine (Aug. 18, 2022), perma.cc/65K6-ZXPL.

[38] *Id.*

[39] Ryan Adamczeski, *Massachusetts lesbian Gov. Maura Healey signs abortion and gender-affirming care shield law*, Advocate (Aug. 8, 2025), perma.cc/TY28-F5XU.

law protections have safeguarded providers in the Commonwealth while ensuring that patients in banned or restricted states can continue to access essential healthcare."[40]

49. The current version of Massachusetts' shield law is like New York's in many ways. It is keyed to "legally-protected health care activity," defined to include prescribing and mailing drugs out-of-state. *See* Mass. Gen. Laws ch. 12, § 11*l* 1/2(a).[41] And it embeds numerous familiar provisions all throughout the Massachusetts General Laws, including:

- An exemption for providers of abortion drugs from Massachusetts' general rule that the name of a provider who prescribes controlled substances must appear on the drug label. *See* Mass. Gen. Laws ch. 94C, §§ 21, 22(d).
- A bar on the extradition of a Massachusetts provider who illegally prescribed and mailed abortion drugs into a pro-life state. *See* Mass. Gen. Laws ch. 276, § 13.
- A bar on Massachusetts public officials cooperating with any out-of-state investigation regarding abortion drugs prescribed and mailed out-of-state so long as such conduct would be lawful if it had "occurred entirely in the commonwealth." *See* Mass. Gen. Laws ch. 12, § 11*l* 1/2(g); *accord* Mass. Gen. Laws ch. 147, § 63(b); Mass. Gen. Laws ch. 31 § 75. The

[40] *Four Years Post-Dobbs: Because of Shield Law Protections, More Abortions Are Being Provided Than Ever Before*, Reproductive Equity Now (June 23, 2026), perma.cc/YA27-HYSX.

[41] Like New York, Massachusetts defines this term to also include "gender-affirming health care services." That portion of the shield law is outside the scope of this complaint.

Massachusetts Attorney General has the authority to civilly prosecute violations of this prohibition. *See* Mass. Gen. Laws ch. 147, § 63(c); Mass. Gen. Laws ch. 12, § 11*l* 1/2(i).

- A bar on the admissibility of evidence relating to an individual who "was not physically present" in Massachusetts when they received abortion drugs insofar as it is intended to show "that such individual has engaged in wrongdoing, whether civil, criminal, professional or otherwise." *See* Mass. Gen. Laws ch. 12, § 11*l* 1/2(h).

- An exemption from professional discipline for providers who prescribe and mail abortion drugs out-of-state so long as such conduct would be lawful if it had "occurred entirely in the commonwealth." *See* Mass. Gen. Laws ch. 112, § 5F 1/2; *accord* Mass. Gen. Laws ch. 112, §§ 61, 77, 128.

- A bar on Massachusetts courts enforcing out-of-state judgments involving abortion drugs prescribed and mailed out-of-state. *See* Mass. Gen. Laws ch. 218, § 4A(g).

- A bar on medical-malpractice insurers "discriminat[ing]" against a Massachusetts provider based on its abortion-related conduct that is "unlawful in another state." *See* Mass. Gen. Laws ch. 175, § 193U.

- A bar on Massachusetts courts issuing a summons or ordering testimony or document production for use in connection with any out-of-state proceeding concerning the out-of-state shipment of abortion drugs. *See* Mass. Gen.

Laws ch. 223A, § 11; Mass. Gen. Laws ch. 233, § 13A.

50. Beyond those provisions, the Massachusetts shield law adds a few others that warrant special mention.

51. For example, the shield law provides that the home address, telephone number, email address, and place of employment of prescribers engaged in the prescription and mailing of abortion drugs out-of-state "shall not be public records in the custody of a government agency which maintains records identifying such persons as falling within such categories and shall not be disclosed." *See* Mass. Gen. Laws ch. 66, § 10B; *accord* Mass. Gen. Laws ch. 112, §§ 12Q, 12Q 1/2.

52. The law likewise governs private business entities that "provide[] electronic communication services or remote computing service" to individuals or entities that engage in out-of-state shipments of abortion drugs. *See* Mass. Gen. Laws ch. 93, § 115(a). It provides that such an entity "shall not comply with a subpoena, warrant or other civil or criminal legal process for records, information or assistance that the business entity knows relates to" the abortion conduct—unless the requester swears "under penalty of perjury" that they do not seek documents, information, or testimony related to out-of-state liability for conduct "that is lawful in the commonwealth." *Id.* A single false attestation is punishable by a statutory penalty of up to $50,000 plus "damages." *Id.* § 115(c). And the Attorney General may sue to compel the entity's compliance. *Id.* § 115(d); *see* Mass. Gen. Laws ch. 111, § 70*l* (similar provisions for businesses involved in health record-keeping).

53. The shield law also bars the Massachusetts Department of Public Health from disclosing to out-of-state law enforcement data from its prescription-drug monitoring program that relates to the out-of-state shipment of abortion drugs—so long as "such services would be lawful as provided had they occurred entirely in the commonwealth." *See* Mass. Gen. Laws ch. 94C, § 24A(n).

54. Finally, the Massachusetts shield law creates a private cause of action—for "any aggrieved person"—against "any plaintiff, prosecutor, attorney or law firm" that sues to try to stop the illegal shipment of abortion drugs within another state's borders. *See* Mass. Gen. Laws ch. 12, § 11*l* 1/2(d). "[R]ecovery shall be in the amount of actual damages, which shall include damages for the amount of any judgment issued in connection with any [such] litigation, and any and all other expenses, costs or reasonable attorney's fees incurred in connection with [such] litigation." *Id.*

**C. California's Shield Law.**

55. California's shield law generally tracks the laws discussed above.

56. Like his counterparts, California Governor Gavin Newsom has justified California's shield law on the ground that "[a]n alarming number of states continue to outlaw abortion ..., and it's more important than ever to fight like hell for those who need these essential services."[42]

[42] Governor Gavin Newsom, *New Protections for People Who Need Abortion Care and Birth Control*, perma.cc/84CC-UZAM (last visited Sept. 27, 2026).

57. His version of the extradition bar came via an executive order rather than a legislative enactment—and he recently vetoed legislation that would codify the extradition bar.[43]

58. Louisiana is well familiar with his position on extradition because of a case involving a California doctor named Remy Coeytaux. Coeytaux is responsible for illegally mailing abortion drugs to a young Louisiana woman whose ex-boyfriend coerced her to take them and abort the baby she wanted to keep. After Louisiana issued an arrest warrant for Coeytaux and an extradition request, Governor Newsom refused to cooperate. He later published a follow-up message to the Louisiana Attorney General: "@AGLizMurrill: Go fuck yourself."[44]

59. Setting aside the extradition issue, California's shield law otherwise generally embeds familiar provisions throughout California law. They are all keyed to "legally protected health care activity," which is defined to include telehealth abortion "regardless of the patient's location," *see* Cal. Penal Code § 13778.3(a)(2); *id.* § 1549.15(b)(1)(C), (c).[45] Among many other labyrinthine provisions, the shield law:

- Permits the omission of a prescriber's name on an abortion drug label, and bars out-of-state individuals from accessing a private log kept by

---

[43] Nina Martin, *Newsom Vetoes Bill That Would Ban Extraditions for Abortion and Gender-Affirming Care*, Mother Jones (Sept. 23, 2026), perma.cc/KW4C-X6R6.

[44] Gavin Newsom (@GavinNewsom), X (Feb. 5, 2026), perma.cc/5532-P3BS.

[45] Like New York and Massachusetts, California defines this term to include "gender-affirming" conduct. As noted above, that aspect of the shield law is not the focus of this complaint.

pharmacies that tracks prescribers' information. *See* Cal. Bus. & Prof. Code § 4076(g).

- Bars California employees, contractors, and agents from cooperating with any bondsman, bounty hunter, or out-of-state law enforcement investigation regarding abortion drugs mailed out-of-state if the conduct "would be legal if it occurred in this state." *See* Cal. Penal Code § 13778.3(b); *accord id.* § 13778.2(b); *see also id.* § 847.5(b), (c) (related provisions for California magistrates, bondsmen, and bounty hunters).[46]

- Bars recognition of any out-of-state subpoena, warrant, wiretap order, and the like that does not include a sworn affidavit or declaration stating the request "is not in connection with an out-of-state proceeding relating to" abortion drugs mailed out-of-state. *See id.* § 13778.3(d). It also bars California courts, clerks, and court employees (and elsewhere, attorneys) from issuing a subpoena without such an affidavit or declaration. *Id.* § 13778.3(e); *accord id.* § 13778.2(c)(1), (2); Cal. Code of Civ. Proc. §§ 2029.300(e)(1), 2029.350(b)(1).

- Bars California corporations that "provide[] electronic communication services or remote computing services to the general public" from complying with any out-of-state subpoena or

[46] Notably, California law says that nothing "prohibit[s] the investigation of any criminal activity in this state that may involve the performance of a legally protected health care activity"—except that "information relating to any medical procedure performed on a specific individual [cannot be] shared with an agency or individual from another state for the purpose of enforcing another state's law involving a legally protected health care activity." Cal. Penal Code § 13778.2(d).

warrant that lacks such an affidavit or declaration. *See* Cal. Penal Code § 13778.3(f); *accord id.* §§ 1546.5(a), (c), 629.51(a)(5)(A). Here, and above, the California Attorney General is authorized to civilly prosecute the submission of a false affidavit, with the threat of up to $15,000 in civil penalties "in addition to any other penalties or remedies provided by law." *Id.* § 13778.3(g)(1), (2).

- Bars judges from directing witnesses to appear for testimony "if the criminal prosecution is based on the laws of another state that authorize a criminal penalty to an individual performing, receiving, supporting, or aiding ... abortion ... if [it] is lawful under the laws of this state." *See id.* § 1334.2(f).

- Bars courts from recognizing or enforcing an out-of-state judgment based on the illegal facilitation of an abortion. *See* Cal. Health & Safety Code § 123467.5(a), (b).

- Allows any aggrieved person or entity to sue a person who engages in litigation intended to deter, prevent, sanction, or punish abortion-related conduct "that was legal in the state in which it occurred." *See* Cal. Civ. Code §§ 1798.300(a), (b), 1798.303.

- Bars the disclosure of abortion-drug data from California's drug monitoring program in connection with an out-of-state investigation regarding abortion drugs. *See* Cal. Health & Safety Code § 11165(c)(2).

- Bars the termination of professional-liability insurance or the denial of coverage related to

abortion conduct that is "lawful in this state" but "may be unlawful in another state." *See* Cal. Ins. Code § 11589.1(a)(1), (c), (d).

## III. The Shield Laws Are Irreparably Harming Plaintiff States.

60. Galvanized by FDA's deregulation of mifepristone—and by organizations and individuals "eager for a chance to help thwart draconian anti-abortion laws"[47]—the shield laws have had their intended effect.

61. That is principally a result of a series of corporations and organizations strategically placed throughout the United States to take advantage of the shield laws. To take a few examples, the Massachusetts Medication Abortion Access Project (themap.wspr.health) and Abuzz (abuzzhealth.com) operate out of Massachusetts. A Safe Choice Network (asafechoicenetwork.com), OPTIO Women's Health (optiowomenshealth.com), We Take Care Of Us (wetakecareof.us), and Choices Rising (choicesrising.com) operate out of California.

62. Each of these entities runs materially identical online operations: (1) they advertise the sale and shipment of abortion drugs in Plaintiff States; (2) they ask only for shipping information, money (usually around $150), and the completion of a short questionnaire; and then (3) they promise delivery of abortion drugs in 1-5 business days.

63. Through public-protection investigations, Plaintiff States have confirmed that these entities will sell and mail abortion drugs based on entirely

---

[47] Martin, *One Pill at a Time*, *supra* n.4.

fabricated pregnancy and patient information, even when that information is supplied by a man.

64. Each of the entities above has benefited from their home state shield laws to Plaintiff States' detriment.

65. Consistent with the California shield law, every shipment that comes out of California lacks a prescriber's name on the drug labels, making it virtually impossible for Plaintiff States to find the source. Under the California shield law, California pharmacies purportedly have confidential logs of the prescribers' activity—but out-of-state actors are barred from seeing them. *See* Cal. Bus. & Prof. Code § 4076(g). And the same thing is happening under the Massachusetts shield law: Shipments from the Massachusetts Medication Abortion Access Project and the like say nothing about the prescribers behind the drugs.

66. The shield laws' prohibitions on private businesses providing electronic communications services have likewise stymied Plaintiff States' investigations. An investigator could not obtain Google, AT&T, and Spruce records via subpoena because those companies asked for the California and Massachusetts-required certifications that the records were for a non-abortion purpose. Similarly, the investigator could not obtain payment records from Stripe (a payment platform) via subpoena for the Massachusetts Medication Abortion Access Project because they asked for the same certification under the Massachusetts shield law.

67. Finally, as previewed above, Governor Hochul relied on the New York shield law's bar on extradition in refusing to send Margaret Carpenter to Louisiana. She also relied on the shield law's bar on state officials' cooperation with Louisiana in warning all such officials not to honor Louisiana's arrest warrant.

68. These concrete instances of shield-law problems are powerful enough. But the real force of the shield laws comes from their combined effect—because it is the sheer breadth of these shield laws that have emboldened individuals in states like New York, Massachusetts, and California to violate Plaintiff States' laws, thinking themselves immune from legal and professional repercussions. And that is borne out in the human, economic, and sovereign costs of this unlawful enterprise.

69. In total, Plaintiff States are experiencing approximately 2,000 abortions a month. Plaintiff States have learned that a single Massachusetts prescriber—Manisha Kumar—is responsible for (at least) some 5,000 abortions in Plaintiff States since 2024. They have also learned that a single California prescriber—Remy Coeytaux—is responsible for (at least) some 1,000 abortions in Plaintiff States since 2025. And one California mail-order pharmacy (JBN Operations LLC), on information and belief, is responsible for quite literally thousands of abortions in Plaintiff States in the same timeframe.

70. The principal human costs behind these numbers are, of course, the babies whose lives were terminated. Like the laws of other pro-life states, Plaintiff States' laws reflect "a respect for and preservation of prenatal life at all stages of development"—and specifically from the moment of conception. *Dobbs*, 597 U.S. at 300–01; *see supra* Section I. Some may disagree with Plaintiff States' policy choices, but they are "legitimate." *Dobbs*, 597 U.S. at 300–01. And the reality is that Plaintiff States are suffering the losses of thousands of unborn babies every month.

71. The human costs also extend to women and girls in Plaintiff States. As detailed above, New York's shield law prompted Margaret Carpenter to send abortion drugs into Louisiana where they were forced on a teenage girl who ended up in the hospital. California's shield law prompted Remy Coeytaux to send abortion drugs into Louisiana where an ex-boyfriend coerced a young woman to take them and abort a baby that she wanted to keep—and she ended up on a garage floor bleeding and in excruciating pain.

72. On top of these unspeakable situations are the examples of women suffering complications from the abortion drugs. Louisiana has documented reports of women who took Aid Access drugs (on information and belief, shipped by JBN from California) and ended up in emergency rooms. Louisiana has a sworn report of a woman who took Abuzz drugs and nearly died in the operating room because she started hemorrhaging and needed a suction D&C to complete the abortion. Criminal charges also have been filed against a Louisiana man who mixed mifepristone and misoprostol in smoothies to drug his teenage daughter and end her pregnancy at 23 weeks gestation—her baby survived and has been in neonatal intensive care for months. Further, Louisiana has multiple reports from physicians and other providers on the ground stating that they are treating women suffering complications from abortion drugs on a daily basis.

73. As women require care from complications, Louisiana has discovered that a significant number of those women are on Medicaid—thereby requiring the State to pay for a portion of those Medicaid costs. And at least one health care provider in Louisiana has reported that approximately half of their team's patients treated for abortion drug complications are on Medicaid.

74. Finally, Plaintiff States are suffering direct sovereign harms from this avowed effort to effectuate abortion within their borders. The advertising of abortion drugs in Plaintiff States violates their laws. *See supra* Section I. The remote dispensing of abortion drugs within Plaintiff States violates their laws. *Id.* And of course, the thousands of abortions every month in Plaintiff States are independent violations of their laws. *Id.*

75. Plaintiff States invested in the promise of *Dobbs*—that the citizens of Plaintiff States, through their elected representatives, could regulate abortion *in their states* as they believe is morally, ethically, and legally warranted. Defendants Massachusetts, California, and New York, however, have shuttered that promise with shield laws intended to make abortion policy—their abortion policy—for the whole country.

76. Everyone agrees that the shield laws are essential to the gutting of pro-life states' laws.

77. One media report, for example, states that, when "Massachusetts enacted its shield law in July 2022," the co-founder of the Massachusetts Medication Abortion Access Project "saw a perfect opportunity to operationalize her middle-finger rage" after *Dobbs*.[48] Another report—entitled "How Blue States Got Around the GOP's Efforts to Ban Abortion in Red States"—explains that post-*Dobbs* "telemedicine" abortion rates are rising "thanks largely to 'shield' laws—blue-state statutes that protect abortion providers and helpers from being investigated, prosecuted,

[48] Martin, *One Pill at a Time*, *supra* n.4.

sued, and harassed for providing care to patients living in places where abortion is illegal."[49]

78. The two American manufacturers of the abortion drug mifepristone just argued the same point to this Court. Appl. 27, *GenBioPro, Inc. v. Louisiana*, No. 25A1208 (U.S. May 2, 2026) ("Louisiana's asserted injuries derive from the 'unfettered choices made by independent' actors—*i.e.*, medical providers in other states who ship mifepristone in reliance on shield laws that Louisiana's co-equal sovereign states have enacted."); Appl. 23, *Danco Lab'ys, L.L.C. v. Louisiana*, No. 25A1207 (U.S. May 2, 2026) ("[T]he alleged frustration of Louisiana's laws occurs because other 'states have enacted shield laws to protect medical practitioners in their states from extradition for prescribing' mifepristone." (quotation marks omitted)). And Governor Hochul confirmed as much: "[T]hey can't stop us, they can't stop our providers, they can't stop New York, and that's how we're fighting back."[50]

## COUNT I
## Full Faith and Credit, U.S. Const. art. IV, § 1

79. The Full Faith and Credit Clause provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, or Judicial Proceedings of every other State." U.S. Const. art. IV, § 1.

80. "A statute"—such as the laws adopted by Louisiana, Arkansas, and Alabama, *see supra* Section I—"is a 'public Act' within the meaning of the Full Faith and Credit Clause." *Franchise Tax Bd. of Cal. v. Hyatt*, 578 U.S. 171, 176 (2016).

---

[49] Martin, *Blue States*, *supra* n.11.

[50] *2023 Signing Ceremony*, *supra* n.1, at 13:46-58.

81. The Clause deems "constitutionally impermissible" a state's "policy of hostility to the public Acts of a sister State." *Id.* at 179 (quotation marks omitted). A state "need not substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Id.* (quotation marks omitted). But neither can a state "devis[e] a special—and hostile—rule" for a sister state, for that directly violates each state's obligation to "sensitively appl[y] principles of comity with a healthy regard for [each other's] sovereign status." *Id.* at 180 (citation omitted).

82. For these reasons, our Constitution tolerates no policy that would render "a State where [an] injury occur[s] ... powerless to provide any remedies or safeguards" "for acts occurring within her boundaries." *Carroll v. Lanza*, 349 U.S. 408, 414 (1955). The Court has confirmed that it does "not think the Full Faith and Credit Clause demands that subserviency from the State of the injury." *Id.*; *see Pac. Employers Ins. v. Indus. Accident Comm'n*, 306 U.S. 493, 503 (1939) ("Few matters could be deemed more appropriately the concern of the state in which [an] injury occurs or more completely within its power."). For "[t]he State of the forum also has interests to serve and to protect." *Carroll*, 349 U.S. at 412.

83. The shield laws of Massachusetts, California, and New York violate the Full Faith and Credit Clause. They have virtually nothing to do with abortions conducted within the borders of those states. Instead, their sole purpose is to facilitate illegal abortions in Plaintiff States and other pro-life states, while simultaneously protecting the resident perpetrators from liability in those states or professional repercussions in their home states. *Cf. Nat'l Pork Producers*

*Council*, 598 U.S. at 409 (Kavanaugh, J., concurring in part and dissenting in part) ("A State's effort to regulate farming, manufacturing, and production practices in another State (in a manner different from how that other State's laws regulate those practices) could in some circumstances raise questions under [the Full Faith and Credit] Clause.").

84. Indeed, it is difficult to imagine a clearer violation of the Full Faith and Credit Clause. By design, these shield laws are intended to render states like Louisiana, Arkansas, and Alabama "powerless to provide any remedies or safeguards" for illegal abortions "occurring within [their] boundaries" and caused by organizations, prescribers, and pharmacies in Defendant States. *Carroll*, 349 U.S. at 414. As Governor Hochul has repeatedly said, she and others have acted "to protect [those] who prescribe and send abortion pills to patients in states where abortion is outlawed"[51]—so that they may do so "without fear of legal or professional repercussions."[52]

85. That is the very definition of a "constitutionally impermissible" "policy of hostility to the public Acts of a sister State." *Franchise Tax Bd. of Cal.*, 578 U.S. at 179 (quotation marks omitted). And it comes nowhere close to "sensitively appl[ying] principles of comity with a healthy regard for [Plaintiff States'] sovereign status." *Id.* at 180 (citation omitted).

**COUNT II**
**Equal-Sovereignty Doctrine**

86. The shield laws of Massachusetts, California, and New York also squarely violate the "'fundamental

[51] *2023 Signing Ceremony*, *supra* n.1 at 14:00-20.
[52] *2023 Signing Ceremony*, *supra* n.1.

principle of *equal* sovereignty' among the States." *Shelby County*, 570 U.S. at 544 (citation omitted). "[O]ur Nation 'was and is a union of States, equal in power, dignity[,] and authority.'" *Id.* (citation omitted). As this Court has emphasized, "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* (citation omitted).

87. Just as Congress has no authority to "sharply depart[] from these basic principles," *id.*, so, too, a state has no authority to unilaterally upset the equal sovereignty of the several states. "[U]nder the Constitution's horizontal separation of powers," states generally may not impose regulations beyond "the territorial limits of state authority." *Nat'l Pork Producers Council*, 598 U.S. at 376 n.1.

88. Yet that is precisely what Massachusetts, California, and New York have done. They complain that "hostile" and "restrictive"[53] Plaintiff States have chosen life within their borders—and they claim the right to unilaterally override Plaintiff States' sovereign prerogatives by forcing abortion into Plaintiff States nonetheless and destroying their co-equal status in the Union.

89. If there were any doubt that this is unconstitutional, *Dobbs* would eliminate it. The Court returned the abortion issue to the people's elected representatives so that each state—pro-abortion and pro-life alike—could choose its own abortion regulations for itself. Massachusetts, California, and New York, however, have rejected *Dobbs* in favor of their choosing *for all states* that abortion must persist.

---

[53] *2025 Signing Ceremony*, *supra* n.13.

90. The sponsors behind these shield laws have not minced words: "Today, we are rejecting the [*Dobbs*] decision." [54] And those they have enabled have not minced words, either: "It made me so happy ... when [Justice Alito] wrote, 'They're undermining *Dobbs*.' I was like, *yeah*, *exactly*."[55]

91. That is *unequal* sovereignty, not *equal* sovereignty—and it is plainly unconstitutional.

**COUNT III**
**Federal Common Law of Public Nuisance**

92. Defendant States' shield laws also present a classic violation of the federal common law of public nuisance.

93. Federal common law governs "areas of national concern," including "where the basic scheme of the Constitution so demands" and where a suing state's harm "emanat[es] from another State." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) (citation omitted). And the federal common law of public nuisance protects a sovereign state's "interest in the abatement of public nuisances, instances in which the injury to the public health and comfort [is] graphic and direct." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 604 (1982).

94. A state thus may, for example, sue to enjoin another state's (or out-of-state entity's) discharge of "noxious" items across state lines and into the suing state. *See id.* at 603–04 (citing *Missouri v. Illinois*, 180 U.S. 208 (1901); *Ga. v. Tenn. Copper Co.*, 206 U.S. 230 (1907)). And more broadly, it may sue to enjoin the

[54] *2023 Signing Ceremony*, *supra* n.1, at 23:20-26.
[55] Martin, *One Pill at a Time*, *supra* n.4.

facilitation of conduct "not warranted by law, ... which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all." *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 691 (5th Cir. 2021) (quoting Restatement (Second) of Torts § 821B cmt. a (Am. L. Inst. 1979)). Indeed, the facilitation of "conduct … proscribed by a statute" presents a quintessential public nuisance, especially where it involves "a significant interference with the public health" and the perpetrator "knows" of that "continuing" harm. Restatement (Second) of Torts § 821B(2) & cmt. d; *accord City of Huntington v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 566–69 (4th Cir. 2025); *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 220 (3d Cir. 2020).

95. That is Defendant States' shield laws in spades. As discussed above, the singular purpose animating those laws is to thwart pro-life states' prohibitions of abortion—and the predictable and intended consequence of those laws is the monthly termination of thousands of unborn babies' lives in Plaintiff States, with the health and safety of women and girls as collateral damage. That is the most profound interference with the public health imaginable in Plaintiff States.

96. If Defendant States had enacted laws goading their residents into sending anthrax, fentanyl, or mail bombs into Plaintiff States, or launching cyber-attacks against Plaintiff States' infrastructure, there would be no question that Plaintiff States could sue to abate those public nuisances. The same is true here.

97. That is especially so because this suit implicates virtually every sovereign and quasi-interest that this Court has recognized. *First*, a state has a sovereign interest in preserving its "power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc.*, 458

U.S. at 601. *Second*, a state has a sovereign interest in demanding the "recognition of [its] borders" "from other sovereigns." *Id. Third*, a state has "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* at 607. And *fourth*, a state has "a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* Each of those interests is directly abridged by Defendant States' adoption of laws intended to assure their residents that they can violate Plaintiff States' laws "without fear of legal or professional repercussions."[56]

98. When Plaintiff States surrendered their ability to carry out "the forcible abatement of outside nuisances," they "expected" that the federal government would bear "the duty of providing a remedy" for the sorts of brazen misconduct addressed in this suit. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604 (citations omitted). The federal common law of public nuisance provides that remedy.

**COUNT IV**
**Dormant Commerce Clause,**
**U.S. Const. art. I, § 8, cl. 3**

99. Finally, Defendant States' shield laws present a dormant Commerce Clause problem. "The Constitution vests Congress with the power to 'regulate Commerce ... among the several States.'" *Nat'l Pork Producers Council*, 598 U.S. at 368 (quoting U.S. Const. art. I, § 8, cl. 3). Implicit in that grant of power is "'a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic

[56] *2023 Signing Ceremony*, *supra* n.1.

regulations] even when Congress has failed to legislate on the subject.'" *Id.*

100. A core feature of this negative command is that "no State may use its laws to discriminate purposefully against out-of-state economic interests." *Id.* at 364. And, so long as a state complies with that non-discrimination principle, it "'may exclude from its territory ... any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." *Id.* at 369.

101. Through their democratically elected representatives, Louisiana, Arkansas, and Alabama have "exclude[d] from [their] territory" items—specifically, remotely dispensed abortion drugs— "which, in [their] judgment, fairly exercised, are prejudicial to the health or which would endanger the lives or property of [their] people." *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1879). Put otherwise, on pain of criminal penalties, Plaintiff States have closed their markets to the sale and remote dispensing of abortion drugs.

102. That decision is unquestionably non-discriminatory: It applies to such drugs regardless of their origin. Plaintiff States thus rest squarely within "the exercise of [their] police powers" as preserved by the dormant Commerce Clause, *id.*, and by this Court's own decision in *Dobbs*, 597 U.S. at 300–01 ("[T]he States may regulate abortion for legitimate reasons," including "respect for and preservation of prenatal life at all stages of development" and "the protection of maternal health and safety.").

103. The shield laws of Massachusetts, California, and New York, however, are designed specifically—indeed, solely—to generate that prohibited economic activity across state lines and within Plaintiff States.

That is a form of "economic protectionism," *Nat'l Pork Producers Council*, 598 U.S. at 369 (citation omitted), because it attempts to shield Massachusetts, California, and New York residents from any legal or professional repercussions of their illegal commercial conduct. It is also "purposeful discrimination against out-of-state interests," *id.* at 371, because it drives into Plaintiff States the very economic activity that they have lawfully "exclude[d] from [their] territory," *Guy*, 100 U.S. at 443.

104. This happens every day an individual operating under Defendant States' shield laws advertises abortion drugs for sale online in Plaintiff States; accepts around $150 for such drugs through a cross-border commercial transaction; and then ships those drugs into Plaintiff States. Carpenter did so from New York; Coeytaux did so from California; and various faceless Massachusetts prescribers do so every day through organizations like the Massachusetts Medication Abortion Access Project.

105. The dormant Commerce Clause—especially in light of "the Constitution's structure and the principles of 'sovereignty and comity' it embraces"—forbids this frontal assault on Plaintiff States. *Nat'l Pork Producers Council*, 598 U.S. at 376.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs State of Louisiana, State of Arkansas, and State of Alabama respectfully request that the Court:

- Declare that the shield laws of New York, Massachusetts, and California violate the Full Faith and Credit Clause.

- Declare that the shield laws of New York, Massachusetts, and California violate the equal-sovereignty doctrine.
- Declare that the shield laws of New York, Massachusetts, and California violate the federal common law of public nuisance.
- Declare that the shield laws of New York, Massachusetts, and California violate the Dormant Commerce Clause.
- Enjoin officials in New York, Massachusetts, and California from enforcing their shield laws.
- Grant any and all other relief as the Court deems proper.

Respectfully submitted,

TIM GRIFFIN
Attorney General
AUTUMN HAMIT PATTERSON
Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
101 W. Capitol Ave.
Little Rock, AR 72201

STEVE MARSHALL
Attorney General
A. BARRETT BOWDRE
Solicitor General
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130

LIZ MURRILL
Attorney General
J. BENJAMIN AGUIÑAGA
Solicitor General
*Counsel of Record*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

No. ____, Original

IN THE

# Supreme Court of the United States

STATE OF LOUISIANA; STATE OF ARKANSAS; AND STATE OF ALABAMA,
*Plaintiffs*,

v.

STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSETTS; AND STATE OF CALIFORNIA,
*Defendants*.

## BRIEF IN SUPPORT OF MOTION FOR LEAVE TO FILE BILL OF COMPLAINT


LIZ MURRILL
Attorney General
J. BENJAMIN AGUIÑAGA
Solicitor General
*Counsel of Record*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

TIM GRIFFIN
Attorney General
AUTUMN HAMIT PATTERSON
Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
101 W. Capitol Ave.
Little Rock, AR 72201

STEVE MARSHALL
Attorney General
A. BARRETT BOWDRE
Solicitor General
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ ii

INTRODUCTION ........................................................ 1

ARGUMENT ................................................................ 4

I. THE SERIOUSNESS AND DIGNITY OF PLAINTIFF STATES' CLAIMS WARRANT THE EXERCISE OF THIS COURT'S ORIGINAL JURISDICTION. ........................................................ 4

A. The Shield Laws Attack Quintessential Sovereign Interests........................................ 5

B. The Shield Laws Harm Quintessential Quasi-Sovereign Interests............................. 7

II. THIS IS THE APPROPRIATE FORUM......................... 10

A. The Issue Presented Is Deeply Important Nationwide................................. 10

B. The Attack on This Court's Authority Warrants This Court's Review.................... 12

C. There Is No Other Suitable Forum............. 14

III. PLAINTIFF STATES' CLAIMS ARE PLAINLY MERITORIOUS. ...................................................... 17

CONCLUSION ......................................................... 19

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Alabama v. California*,
145 S. Ct. 757 (2025) .............................................. 3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982) ................................ 5, 6, 7, 8, 9

*Carroll v. Lanza*,
349 U.S. 408 (1955) ........................................ 17, 18

*Danco Lab'ys, LLC v. Louisiana*,
146 S. Ct. 1192 (2026) ............................................. 3

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) ...... 1, 3, 5, 7, 11, 12, 13, 18, 19

*Franchise Tax Bd. of Cal. v. Hyatt*,
578 U.S. 171 (2016) .............................................. 17

*Louisiana v. Nouhavandi*,
No. 2:26-cv-3836 (W.D. La.) ................................. 16

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) ......................................... 3, 4, 15

*Missouri v. Illinois*,
180 U.S. 208 (1901) .......................................... 7, 14

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .............................................. 19

*Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493 (1971) .......... 14

*Shelby County v. Holder*, 570 U.S. 529 (2013) .......... 18

*South Carolina v. North Carolina*, 558 U.S. 256 (2010) .......... 14

*South Carolina v. Regan*, 465 U.S. 367 (1984) .......... 10, 11

**Statutes**

28 U.S.C. § 1251(a) .......... 15

**Other Authorities**

*After* Roe *Fell: U.S. Abortion Laws by State*, Ctr. for Reproductive Rights, perma.cc/79LM-7HS6 .......... 11

Nina Martin, *She's Remaking the Abortion Landscape One Pill at a Time*, Mother Jones (July 31, 2026), perma.cc/E8AJ-N8P6 .......... 3, 11, 13

*Shield Laws Related to Sexual and Reproductive Health Care*, The Guttmacher Inst., perma.cc/79LM-7HS6 .......... 10, 11

U.S. Const. art. III, § 2, cl. 2 .......... 15

## INTRODUCTION

The Bill of Complaint details one of the starkest examples of interstate aggressions warranting the exercise of this Court's original jurisdiction. In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), this Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." *Id.* at 232. Pro-life states like Plaintiffs Louisiana, Arkansas, and Alabama thus restricted and banned abortion within their borders. In response, pro-abortion states—including Defendants New York, Massachusetts, and California—enacted so-called telehealth "shield laws." Those laws are challenged here.

Although pro-abortion states have adopted telehealth shield laws, such laws have nothing to do with abortion within the borders of those states. Instead, the sole purpose of a telehealth shield law is to facilitate abortion by mail in pro-life states. For that reason, shield laws are not shields at all—they are swords disguised as shields and driven into pro-life states.

A telehealth shield law achieves its aim via dozens of special provisions embedded throughout criminal, civil-procedure, public-health, insurance, education, and other codes. One common provision, for example, allows prescribers to leave their names off abortion-drug labels (but not other drug labels) so that pro-life states cannot identify the senders to hold them accountable. Compl. ¶¶ 40, 43, 49, 59, 65. Another common provision forbids public and private individuals from cooperating with out-of-state investigations concerning the illegal mailing of abortion drugs into pro-life states. *Id.* ¶¶ 43, 49, 59, 66. Other provisions bar extradition and the recognition of out-of-state

judgments in pro-life states. *Id.* ¶¶ 43, 49, 59. Still more provisions exempt shield-law state residents from professional discipline and the termination or denial of insurance based on violations of pro-life states' laws. *Id.* ¶¶ 49, 59. And Massachusetts and California have created private causes of action for ruinous liability against any individual or entity who brings a lawsuit seeking to sanction or deter the illegal mailing of abortion drugs into pro-life states. *Id.* ¶¶ 54, 59.

The combined effect of these provisions is an attempt to eliminate every potential legal or professional repercussion for shield-law state residents who illegally prescribe and mail abortion drugs into a pro-life state—thereby assuring residents that they may violate that pro-life state's laws with impunity.

The results are predictable and sobering. Louisiana, Arkansas, and Alabama alone are suffering approximately 2,000 abortions per month due to abortion drugs prescribed and mailed into their jurisdictions predominantly by residents of New York, Massachusetts, and California. *Id.* ¶¶ 11, 69. Each such abortion involves not only the loss of an unborn baby's life, but also the concomitant pain and suffering of women and girls within these states. That is demonstrated by mounting reports of abusers wielding mail-order drugs to compel unwanted abortions; increased demands for emergency medical care, including, for example, a woman who nearly died in a Louisiana operating room after she began hemorrhaging and needed a suction D&C to complete an abortion; and in some cases, continued neonatal intensive care for babies who miraculously survive abortion drugs. *Id.* ¶¶ 38, 58, 70–73.

This is all by design—and all part of a nationwide "scheme to undermine [this Court's] decision in

*Dobbs*." *Danco Lab'ys, LLC v. Louisiana*, 146 S. Ct. 1192, 1193 (2026) (Alito, J., dissenting). New York Governor Kathy Hochul has emphasized that these telehealth shield laws are intended to "protect [those] who prescribe and send abortion pills to patients in states where abortion is outlawed." *Id.* ¶ 8. In adopting such laws, New York, Massachusetts, and California "are rejecting the [*Dobbs*] decision, and the thinking behind that decision." *Id.* ¶ 35. And in operating under those laws to send abortion drugs into pro-life states, shield-law state residents are just as open about their mission: "It made me so happy ... when [Justice Alito] wrote, 'They're undermining *Dobbs*.' I was like *yeah, exactly*.'" Nina Martin, *She's Remaking the Abortion Landscape One Pill at a Time*, Mother Jones (July 31, 2026), perma.cc/E8AJ-N8P6 ("*One Pill at a Time*").

Defendants' candor begins and ends this case. "[T]hey can't stop us, they can't stop our providers, they can't stop New York, and that's how we're fighting back," says Governor Hochul. Compl. ¶ 8. "Thanks to New York's shield law ... providers in the State can provide medication used to treat abortion to patients in hostile states ...." *Id.* ¶ 41.

This is a textbook case warranting an exercise of this Court's original jurisdiction.[1] *First*, the "seriousness and dignity" of Plaintiff States' challenge to these shield laws are unquestionable. *Mississippi v.*

[1] This Court's original jurisdiction is mandatory, not discretionary, for all the reasons previously expressed by Justices Thomas and Alito. *See, e.g.*, *Alabama v. California*, 145 S. Ct. 757, 757–59 (2025) (Thomas, J., dissenting from the denial of motion for leave to file complaint). Understanding that other members of the Court may not agree, however, Plaintiff States here also argue the discretionary factors, which—because they are plainly satisfied—moot any question about the mandatory nature of the Court's original jurisdiction.

*Louisiana*, 506 U.S. 73, 77 (1992) (citation omitted). Through their shield laws, New York, Massachusetts, and California have sought to violate virtually every sovereign and quasi-sovereign interest held by Louisiana, Arkansas, Alabama, and other pro-life states. This would be an all-out "*casus belli* if the States were fully sovereign." *Id.* (citation omitted). *Second*, this is the appropriate forum to end this conflict. All 50 states are involved and have chosen sides—and only this Court properly may address the open rebellion against its precedent. *Third*, the telehealth shield laws are unlawful. They constitute an overt policy of hostility that violates full faith and credit and the equal-sovereignty doctrine, among other settled principles. The only question is which path the Court will select to invalidate these laws and when it will do so. The time is now.

## ARGUMENT

### I. THE SERIOUSNESS AND DIGNITY OF PLAINTIFF STATES' CLAIMS WARRANT THE EXERCISE OF THIS COURT'S ORIGINAL JURISDICTION.

In determining "whether a case is 'appropriate' for [this Court's] original jurisdiction," this Court often first "look[s] to 'the nature of the interest of the complaining State,' focusing on the 'seriousness and dignity of the claim.'" *Mississippi*, 506 U.S. at 77 (citations omitted). "The model case for invocation of this Court's original jurisdiction," the Court has said, "is a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign." *Id.* (citation omitted).

That is this case. Plaintiff States challenge telehealth shield laws that violate both (A) sovereign interests and (B) quasi-sovereign interests long

recognized by this Court as striking at the very heart of state sovereignty.

### A. The Shield Laws Attack Quintessential Sovereign Interests.

Start with Plaintiff States' sovereign injuries. This Court has "easily identified" "[t]wo sovereign interests" warranting suits such as this. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). The first is "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Id.* The second is "the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders." *Id.* The shield laws violate both.

1. In the wake of *Dobbs*, Plaintiff States adopted materially identical legal codes for the express purpose of protecting their unborn babies, women, and girls. They each treat an unborn baby as fully human from the moment of conception. Compl. ¶ 20. They each generally prohibit abortion except to save the life of the mother. *Id.* They each proscribe the sale and prescription of abortion drugs. *Id.* ¶ 21. And they each require an in-person examination and in-person administration of abortion drugs even if an abortion were otherwise permissible. *Id.*

The shield laws of New York, Massachusetts, and California, however, are designed to gut those laws and Plaintiff States' ability to enforce them. They exist so that residents of New York, Massachusetts, and California can "prescribe and send abortion pills to patients in states where abortion is outlawed"—*i.e.*, Plaintiff States. *Id.* ¶ 8. Facilitating the remote dispensing of abortion drugs alone violates Plaintiff

States' laws because abortion drugs may be dispensed (if at all) only in-person and after an in-person examination. And facilitating the abortions of unborn babies in Plaintiff States independently violates Plaintiff States' laws. By facilitating each category of violations, Defendants' shield laws directly attack Plaintiff States' sovereign authority to create a legal code and their sovereign power to regulate persons and items within their borders.

Defendants go further, moreover, by also attacking Plaintiff States' ability to enforce their legal codes. Among other provisions, the shield laws affirmatively allow the concealment of prescribers' names on abortion-drug labels, forbid cooperation with out-of-state investigations and enforcement of out-of-state judgments, and even create causes of action to scare anyone who might challenge this illegal conduct—all in an attempt to immunize Defendants' residents from any legal liability for their open violations of Plaintiff States' laws. *Id.* ¶¶ 43, 49–54, 59. To be clear, these aspects of the shield laws serve no purpose *other than* to thwart Plaintiff States' ability to enforce their legal codes. This attack thus goes to the very essence of the sovereign interest recognized by this Court. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601.

2. For the same reasons, it is difficult to imagine a clearer attack on Plaintiff States' interest in respect for their borders. *Id.* The basic premise of shield laws is open disrespect for sovereign borders—reaching outside of New York, Massachusetts, and California and into "hostile states." Compl. ¶¶ 8, 41, 42. A doctor at one of Governor Hochul's shield-law signing ceremonies cheerfully announced: "[W]e're going to mail pills across state lines ... once this legislation is signed." *Id.* ¶ 36. Rather than respect Plaintiff States' borders,

therefore, Defendants' shield laws exist solely to breach those borders by convincing shield-law state residents that they cannot suffer any legal or professional repercussions for their illegal conduct.

### B. The Shield Laws Harm Quintessential Quasi-Sovereign Interests.

This attack on Plaintiff States is starker still because it also constitutes a violation of their quasi-sovereign interests. The Court has identified "two general categories" of cognizable quasi-sovereign injuries. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607. The first is a state's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* The second is a state's "quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* Both are violated here.

1. This Court has recognized that states like Louisiana, Arkansas, and Alabama have "legitimate interests" in regulating abortion based on "respect for and preservation of prenatal life" and "the protection of maternal health and safety." *Dobbs*, 597 U.S. at 301. Those interests align with Plaintiff States' "quasi-sovereign interest in the health and well-being" of their residents. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607; *accord Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("[I]t must surely be conceded that, if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them.").

Those interests are being directly violated because Defendants' residents are sending drugs into Plaintiff States under the shield laws. Thousands of unborn babies' lives are terminated even though Plaintiff States'

laws protect them. Compl. ¶¶ 11, 69–70. And women and girls in Plaintiff States are finding themselves in unspeakable situations, such as coercion at the hands of abusers and life-threatening harms requiring emergency care. That includes, for example, a Louisiana teenager coerced by a parent to have an abortion she did not want, found on a bathroom floor holding her aborted baby and crying hysterically; a young Louisiana woman coerced by an ex-boyfriend to have an abortion she did not want, ending up on a garage floor bleeding and in excruciating pain; a Louisiana woman who nearly died in the operating room after she needed a suction D&C and began hemorrhaging; and a Louisiana teenager drugged with smoothies at 23 weeks gestation, requiring an emergency operation to save the baby. *Id.* ¶¶ 38, 58, 71–73.

If New York, Massachusetts, and California had erected laws encouraging their residents to ship fentanyl or anthrax to addresses in Plaintiff States, there is no question that Plaintiff States would have textbook quasi-sovereign interests in challenging those laws—for the very lives and health of their citizens would be at stake. That is exactly the case here: Plaintiff States protect unborn babies from the moment of conception. Thus, every unborn baby whose life is terminated—like every woman or girl who faces pain and suffering—is valued and protected in Plaintiff States. *Cf. Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607 ("One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.").

By goading their residents into sending life-ending and life-threatening drugs into Plaintiff States, Defendants actively are abridging the quasi-sovereign interests of Louisiana, Arkansas, and Alabama.

2. "Distinct from but related to" the harm to "the general well-being of [Plaintiff States'] residents," Louisiana, Arkansas, and Alabama have "an interest in securing observance of the terms under which [they] participate[] in the federal system." *Id.* at 607–08. Or, put otherwise, "a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

For the same reasons the shield laws plainly violate full faith and credit and the equal-sovereignty doctrine, *see infra* Section III, they also deny Plaintiff States their rightful status in our constitutional system. If co-equal sovereignty means anything, it means that the several states properly may regulate abortion within their borders—but they may not force abortion into a sister state that has elected to prohibit abortion. Defendants' telehealth shield laws exist only to spur that unlawful conduct "in hostile states." Compl. ¶ 41; *see id.* ¶ 8 ("[T]hey can't stop us, they can't stop our providers, they can't stop New York, and that's how we're fighting back.").

*        *        *

New York, Massachusetts, and California have made an overt decision to attack quite literally every sovereign and quasi-sovereign state interest recognized by this Court. Having surrendered their rights to traditional sovereign methods of settling serious disputes, Louisiana, Arkansas, and Alabama invoke this Court's "duty" to provide a remedy, *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604 (citation omitted)—

one that is easily supplied under the Court's existing precedents, *see infra* Section III.

## II. THIS IS THE APPROPRIATE FORUM.

This is the necessary and proper forum, moreover, for resolving this interstate conflict. That is so for at least three independent reasons: (A) this case is deeply important to all 50 states; (B) the interstate aggression at issue in this case bears directly on this Court as an institution; and (C) there is no other suitable forum for an issue of this magnitude.

### A. The Issue Presented Is Deeply Important Nationwide.

Most fundamentally, this case presents "a question that is of vital importance to all fifty States," thus rendering it "appropriate for [this Court] to exercise its discretion in favor of hearing this case." *South Carolina v. Regan*, 465 U.S. 367, 382 (1984) (plurality op.); *accord id.* at 384 (Blackmun, J., concurring in the judgment) ("The issue presented is a substantial one, and is of concern to a number of States."). That is because this case arises from a nationwide conflict between two dozen states that wish to deregulate abortion across the country and two dozen states that have fully or partially banned abortion within their borders.

This suit challenges the telehealth shield laws of New York, Massachusetts, and California because they are representative of virtually the same shield laws adopted in other states like Colorado, Maine, Rhode Island, Vermont, Virginia, and Washington. *See Shield Laws Related to Sexual and Reproductive Health Care*, The Guttmacher Inst., perma.cc/79LM-7HS6. Portions of those laws, moreover, are embedded

throughout the legal codes of some 23 states and the District of Columbia. *See id.*

For their part, Louisiana, Arkansas, and Alabama—plus other states like Indiana, Kentucky, Mississippi, Oklahoma, Texas, and West Virginia—have banned abortion within their borders (with very narrow exceptions). *After* Roe *Fell: U.S. Abortion Laws by State*, Ctr. for Reproductive Rights, perma.cc/79LM-7HS6. A dozen others have adopted more-limited abortion bans that vary from state to state. *See id.* And each of those states is experiencing the same incursion that Louisiana, Arkansas, and Alabama challenge in this case: the unalloyed and shield-law-driven dispensing of abortion drugs into their states in violation of their democratically enacted laws.

Just one entity operating under the Massachusetts shield law—the Massachusetts Medication Abortion Access Project—claims to send "more than 6,000" abortion-drug packages a month, "95 percent [of which go to] states where abortion is subject to harsh restrictions and near-total bans." Martin, *One Pill at a Time*, *supra*. The Project's "favorite example" of a success story "is Mississippi, where the *Dobbs* case originated." *Id.* Although Mississippi's pro-life law prevailed in *Dobbs*, post-*Dobbs* abortions in Mississippi "have risen a mind-boggling 85 percent—all thanks to shield laws and telemedicine." *Id.*

This pitched battle across the Nation over the legal issue presented in this case is unmistakable. And it confirms that the issue—which is "of vital importance to all fifty States"—is "appropriate[ly]" resolved through an exercise of this Court's original jurisdiction. *Regan*, 465 U.S. at 382 (plurality op.).

### B. The Attack on This Court's Authority Warrants This Court's Review.

This forum is likewise appropriate because this controversy strikes at the very authority of this Court. States like New York, Massachusetts, and California have enacted telehealth shield laws for the avowed purpose of effectuating abortion in pro-life states. While pro-life states are the principal targets of the shield laws, this Court is no less a target.

Only a few years ago, this Court "overrule[d] [its abortion precedents] and once again allow[ed] each State to regulate abortion as its citizens wish." *Dobbs*, 597 U.S. at 230. "[T]he authority to regulate abortion," the Court held, "must be returned to the people and their elected representatives." *Id.* at 292; *see id.* at 302 ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion.").

In returning the abortion issue to the states, the Court recognized that "the people of the various States may evaluate [the issue] differently"—some may prefer to deregulate abortion, while others "may wish to impose tight restrictions based on their belief that abortion destroys an 'unborn human being.'" *Id.* at 256. But that was a feature, not a bug, of the promise of *Dobbs*: The citizens of each state may decide for themselves how to regulate abortion.

Telehealth shield laws are a direct response to *Dobbs*. They have virtually nothing to do with ensuring a shield-law state's ability to regulate abortion *within* its borders. Instead, the whole point of a telehealth shield law is to facilitate abortions *outside* its borders—to promise shield-law state residents that they will not suffer legal or professional repercussions

for prescribing and mailing abortion drugs to a state where abortion is illegal.

That endeavor is a direct attack on *Dobbs*. For it brazenly seeks to subordinate pro-life states' laws—which are based on "legitimate interests," including "respect for and preservation of prenatal life" and "the protection of maternal health and safety," *id.* at 301—to the policy preferences of pro-abortion states.

This is not hyperbole; these are the public representations of Defendants, proponents of telehealth shield laws, and those acting under the shield laws. New York Governor Kathy Hochul has emphasized that these laws are intended to "protect [those] who prescribe and send abortion pills to patients in states where abortion is outlawed." Compl. ¶ 8. In adopting such laws, New York, Massachusetts, and California "are rejecting the [*Dobbs*] decision, and the thinking behind that decision." *Id.* ¶ 35. And in operating under those laws, shield-law state residents are just as celebratory: "It made me so happy ... when [Justice Alito] wrote, 'They're undermining *Dobbs*.' I was like *yeah*, *exactly*.'" Martin, *One Pill at a Time*, *supra*.

The Court need only take Governor Hochul and others at their word: "[T]hey can't stop us, they can't stop our providers, they can't stop New York, and that's how we're fighting back." Compl. ¶ 8. This is an unabashed attack on *Dobbs* and on this Court's authority to say what the law is. It is thus difficult to imagine a stronger reason for exercising this Court's original jurisdiction in the first instance.

### C. There Is No Other Suitable Forum.

Finally, although the Court sometimes has considered the availability of another forum, no such alternative is warranted or exists here.

1. This is not a case where the Court must "assume the role of a trial judge." *South Carolina v. North Carolina*, 558 U.S. 256, 278 (2010) (Roberts, C.J., concurring in the judgment in part and dissenting in part) (citing *Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 498 (1971)). That is because of the purely legal nature of the issue presented: May a state construct a legal system for the avowed purpose of facilitating illegal abortions in a sister state? The answer to that question is governed by settled law in this Court's precedents, *see infra* Section III, and it arises from the very face of the shield laws adopted by New York, Massachusetts, and California.

This is thus not a case where the "complexities" of "factual questions that are essentially ones of first impression" would impose an "unrealistic" burden on this Court. *Wyandotte Chems. Corp.*, 401 U.S. at 504. To the contrary, there is every reason to think that the Court will be able to resolve this case efficiently on cross-dispositive motions without the need for a special master.

2. There also is no other forum that could adequately consider, or provide a remedy for, the challenge in this case. *See, e.g.*, *Missouri*, 180 U.S. at 241 ("An inspection of the bill discloses that the nature of the injury complained of is such that an adequate remedy can only be found in this court at the suit of the state of Missouri."). That is so in four related respects.

*First*, as just noted, the core question is whether one sovereign state may structure its entire legal system to facilitate violations of a separate sovereign state's laws. The sovereign-versus-sovereign nature of this controversy thus uniquely implicates this Court's original and exclusive jurisdiction. U.S. Const. art. III, § 2, cl. 2; 28 U.S.C. § 1251(a). Indeed, because this Court's jurisdiction is exclusive, all other federal courts are "necessarily denie[d] jurisdiction" over this case. *Mississippi*, 506 U.S. at 77–78.

*Second*, even if another court had jurisdiction, no other court could actually "resolve[]" "the issue tendered." *Id.* at 77. As the Bill of Complaint details, each Defendant's shield law comprises dozens of provisions scattered throughout the state's legal codes—spanning criminal codes, codes of civil procedure, health and safety codes, insurance codes, and so on. Compl. ¶¶ 43, 49–54, 59. The sheer breadth of these provisions is what gives shield laws effect, for they are intended to eliminate all conceivable negative repercussions a shield-law state resident might face for illegally sending abortion drugs into a pro-life state.

But the same sheer breadth is what would prevent Plaintiff States from bringing a single lawsuit in a federal district court raising this challenge. It would be remarkably difficult, if not impossible, to identify suitable and suable defendants for each of a shield law's provisions, much less group them together in a coherent Article III case or controversy. This suit avoids that problem by challenging New York, Massachusetts, and California's ability to enact these policies of hostility in the first place.

*Third*, the very point of the shield laws is to *prevent* Plaintiff States and others from even filing a lawsuit

challenging the flood of abortion drugs within their borders. As discussed above, they do so, for example, through provisions rendering prescribers anonymous, and provisions preventing public and private individuals from disclosing any information that could illuminate this interstate scheme. They also do so by purportedly creating private rights of action that threaten ruinous liability against anyone that would dare file suit.

In this upside-down world, a sovereign state likely is the only entity with the available resources and risk protection that can bring a suit of this nature. Having created this world—and having attempted to close courthouse doors all over the country—Defendant States cannot avoid this Court's original jurisdiction by insisting that another adequate forum exists.

*Fourth*, and finally, this suit is a critical component of Plaintiff States' broader attempts to defend against these attacks on their sovereignty.

As the Court is aware, Louisiana has challenged the Biden Administration's removal of the in-person dispensing requirement for FDA-approved mifepristone, which is flooding into Plaintiff States. *See* Compl. ¶ 25 & n.10. If Louisiana prevails in that challenge, Louisiana may obtain only partial relief because shield-law state residents have threatened to resort to using other drugs. *See id.*

Through a lawsuit filed today, *see Louisiana v. Nouhavandi*, No. 2:26-cv-3836 (W.D. La.), Plaintiff States also have sued nearly every shield-law state resident they have been able to identify as responsible for illegally dispensing abortion drugs within their borders. If Plaintiff States prevail in that challenge, however, they may obtain only partial relief because

other bad (and likely unidentifiable because of the shield laws) actors exist and may multiply as they seek to maintain abortion shipments into Louisiana, Arkansas, and Alabama.

That is what makes this final piece of the puzzle so important: Only in this Court may Louisiana, Arkansas, and Alabama directly target New York, Massachusetts, and California's creation of a legal system designed to overrun Plaintiff States' own sovereign, prolife laws. Indeed, if Plaintiff States cannot press this suit here, then it appears unlikely that they could ever fully repel that invasion. That is the clearest of reasons to exercise this Court's original jurisdiction.

## III. PLAINTIFF STATES' CLAIMS ARE PLAINLY MERITORIOUS.

If there were any doubt that this case is well suited for this Court's original jurisdiction, the indisputably unlawful nature of Defendants' shield laws would eliminate it. The Bill of Complaint preserves four independent routes to that conclusion—two of which, in tandem, present the most straightforward bases for invalidation: full faith and credit and the equal-sovereignty doctrine.

This Court's longstanding full faith and credit precedents prohibit a sovereign state from adopting a "policy of hostility to the public Acts of a sister State." *Franchise Tax Bd. of Cal. v. Hyatt*, 578 U.S. 171, 179 (2016) (quotation marks omitted). Indeed, not only can a state not adopt "a special—and hostile—rule" for her sister state, *id.* at 180 (citation omitted), but the state especially cannot adopt such a rule that would render "a State where [an] injury occur[s] ... powerless to provide any remedies or safeguards" "for acts occurring within her boundaries," *Carroll v. Lanza*, 349 U.S.

408, 414 (1955). Full faith and credit neither permits nor "demands that subserviency from the State of the injury." *Id.*

But how else to describe the telehealth shield laws of New York, Massachusetts, and California? By definition, they embody policies of hostility toward the laws of Louisiana, Arkansas, Alabama, and other prolife states that have chosen life within their borders. By definition, they are intended to facilitate illegal abortions *in Plaintiff States*. And by definition, they are intended to render Plaintiff States powerless to enforce their laws against the violators of those laws. Indeed, the telehealth shield laws may present the most egregious full faith and credit violations that this Court has ever seen: For the shield laws have nothing to do with ensuring the availability of abortion *within* the borders of New York, Massachusetts, and California—they exist only to perpetuate abortions *outside* of those borders in Plaintiff States. That is classic "subserviency" barred by full faith and credit. *Id.*

It also points to the unambiguous violation of the "fundamental principle of equal sovereignty" among the states. *Shelby County v. Holder*, 570 U.S. 529, 544 (2013). Our Union is built upon states that are "equal in power, dignity[,] and authority." *Id.* (citation omitted). That "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* (citation omitted).

The shield laws, however, exist solely to upset that constitutional balance. Where *Dobbs* assured each state that it could regulate abortion for itself, states like New York, Massachusetts, and California have unilaterally decreed abortion policy—their abortion

policy—for the Nation. As Governor Hochul has proclaimed, abortion must persist not only in shield-law states but also "in states where abortion is outlawed." Compl. ¶ 8. That is not constitutional *equality*—it is constitutional *inequality*. This gambit thus squarely violates our constitutional structure. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) ("[U]nder the Constitution's horizontal separation of powers," states generally may not impose regulations beyond "the territorial limits of state authority.").

* * *

This case asks the Court to resolve one of the most dramatic and sweeping interstate conflicts in modern history. There can be no question about the seriousness of the interests at stake. Nor can there be any question that this is the appropriate forum to resolve the conflict, and that the shield laws at issue are plainly unlawful. If *Dobbs* is more than a parchment promise, then the Court's exercise of original jurisdiction is urgently needed in this case to restore the equal sovereignty of the several states and the promise of *Dobbs*.

## CONCLUSION

The Court should grant the Motion for Leave to File the Bill of Complaint.

Respectfully submitted,

TIM GRIFFIN
Attorney General
AUTUMN HAMIT PATTERSON
Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 W. Capitol Ave.
Little Rock, AR 72201

STEVE MARSHALL
Attorney General
A. BARRETT BOWDRE
Solicitor General
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130

LIZ MURRILL
Attorney General
J. BENJAMIN AGUIÑAGA
Solicitor General
*Counsel of Record*
LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov